**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**(Owensboro Division)**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hartshorne Holdings, LLC, *et al.*, | ) | Case No. 20-40133 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**DEBTORS' APPLICATION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING THE DEBTORS TO (A) RETAIN FTI CONSULTING, INC. TO**
**PROVIDE THE DEBTORS A CHIEF RESTRUCTURING OFFICER AND CERTAIN**
**ADDITIONAL PERSONNEL AND (B) DESIGNATE BERTRAND TROIANO AS**
**CHIEF RESTRUCTURING OFFICER  FOR THE DEBTORS, *NUNC PRO***
***TUNC* TO THE PETITION DATE, AND (II) GRANTING RELATED RELIEF**

Hartshorne Holdings, LLC and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this application (the "Application")[2] seeking entry of an order, substantially in the form tendered contemporaneously with this Application (the "Proposed Order"), (a) authorizing the Debtors to (i) retain FTI Consulting, Inc. ("FTI") to provide the Debtors with a Chief Restructuring Officer ("CRO") and certain additional FTI personnel (collectively, the "Engagement Personnel") to assist the CRO and (ii) designate Bertrand Troiano as the Debtors' CRO, effective *nunc pro tunc* to February 20, 2020 (the "Petition Date") on the terms set forth in that certain engagement letter, effective as of February 20, 2020 (as amended, restated, or otherwise supplemented from time to time, the "Engagement Letter"),[3] a copy of which is attached hereto as **Exhibit A**, and (b) granting

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Hartshorne Holdings, LLC (3948); Hartshorne Mining Group, LLC (0063); Hartshorne Mining, LLC (1941); and Hartshorne Land, LLC (5582).  The Debtors' headquarters are located at 373 Whobry Road, Rumsey, Kentucky 42371.

[2] Capitalized terms used in this Application, which are not otherwise defined herein, have the meanings ascribed to them in the Engagement Letter, the First Day Declaration (defined below), or the Troiano Declaration (defined below), as applicable.

[3] Any references to, or summaries of, the Engagement Letter in this Application are qualified by the express terms of the Engagement Letter, and the Engagement Letter's terms shall control in the event there is a conflict between the Engagement Letter and such references or summaries.

related relief.  In support of the Application, the Debtors rely upon and incorporate by reference the *Declaration of Bertrand Troiano in Support of the Debtors' Application for Entry of an Order (I) Authorizing the Debtors to (A) Retain FTI Consulting, Inc. to Provide the Debtors with a Chief Restructuring Officer and Certain Additional Personnel and (B) Designate Bertrand Troiano as Chief Restructuring Officer for the Debtors, Nunc Pro Tunc to the Petition Date, and (II) Granting Related Relief* (the "Troiano Declaration") attached hereto as **Exhibit B**.  In further support of this Application, the Debtors respectfully state as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.       The Debtors confirm their consent to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Relief Requested

5.      By this Application, the Debtors seek entry of the Proposed Order:  (a) authorizing the Debtors to (i) retain FTI to provide the Debtors with the Engagement Personnel, including a CRO and (ii) designate Bertrand Troiano as the Debtors' CRO, effective *nunc pro tunc* to the Petition Date, on the terms set forth in the Engagement Letter and in this Application, and (b) granting related relief.

**Background**

6.    On February 20, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.

7.    A description of the Debtors' business and the reasons for filing these chapter 11 cases is set forth in the *Declaration of David Gay in Support of Chapter 11 Filings and First Day Motions* (the "First Day Declaration") [Docket No. 14].

8.    The Debtors' core business is the production and sale of high quality thermal coal through the operation of the Poplar Grove Mine, which is part of the Buck Creek Complex located in the Illinois Coal Basin in Western Kentucky.  The Buck Creek Complex includes two mines – (i) the operating Poplar Grove Mine, and (ii) the permitted, but not constructed, Cypress Mine. The projected production capacities of the Poplar Grove Mine and the Cypress Mine are 2.8 Mtpa and 3.8 Mtpa, respectively.

**RETENTION OF FTI**

9.    In consideration of the size and complexity of their business, the Debtors have determined that the services of experienced restructuring managers will substantially enhance their efforts to maximize the value of their estates.  The Engagement Personnel and the CRO are well qualified to act on the Debtors' behalf given their extensive knowledge and expertise with the Debtors' industry and business.

10.    The Engagement Personnel specialize in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.  FTI's debtor advisory services have included a wide range of activities targeted at

stabilizing and improving a company's financial position, including: (a) developing or validating forecasts and business plans and related assessments of a business's strategic position; (b) monitoring and managing cash, cash flow, and vendor relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring plans.

11.    FTI's professionals have assisted, advised and provided strategic advice to, debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases similar in size and complexity to the Debtors' chapter 11 cases. FTI has provided restructuring or crisis management services in numerous large cases, including most recently, *In re Blackjewel LLC*, No. 19-30289 (FWV) (Bankr. S.D. W. Va. Aug. 13, 2019); *In re Cambrian Holding Company, Inc.*, No. 19-51200 (GRS) (Bankr. E.D. Ky. July 5, 2019); *In re Goodman Networks Inc.*, No. 17-31575 (MI) (Bankr. S.D. Tex. Apr. 20, 2017); *In re Armstrong Energy, Inc.*, No. 17-47541 (KSS) (Bankr. E.D. Missouri Dec. 1, 2017); *In re AFA Investment Inc.*, No 12-11127 (MFW) (Bankr. D. Del. Apr. 24, 2012); *In re CS Mining LLC*, No. 16-24818 (WTT) (Bankr. D. Utah Aug. 24, 2016); *In re Magnetation LLC*, No. 15-50307 (GFK) (Bankr. D. Minn. June 10, 2015); *In re Altegrity, Inc.*, No. 15-10226 (LSS) (Bankr. D. Del. March 16, 2015).

12.    The Debtors propose to designate Bertrand Troiano as their CRO, *nunc pro tunc* to the Petition Date. Mr. Troiano is a Managing Director at FTI based in New York, New York, and is a senior member of FTI's Global Mining Advisory Practice. He has worked in the mining and metals industry for over twenty years, and has served as Finance Director and Chief Financial Officer in the coal and other sectors of the mining industry. Mr. Troiano has substantial knowledge and experience in senior management positions with, or as restructuring advisor to, distressed companies. Specifically, Mr. Troiano has experience assisting distressed companies with

stabilizing their financial condition, analyzing their operations, and developing appropriate business plans to either accomplish the necessary restructuring of their operations and finances or to prepare the company for an expedited sale process.

13.    FTI has provided financial or restructuring advice to a number of companies or their creditors in the energy and mining sectors, including Peabody Energy Corporation, Cloud Peak Energy, Arch Coal, Inc.—three of the largest U.S. coal companies— Armstrong Energy, Blackjewel, LLC (where FTI provided interim CEO and the CRO), Cambrian Holding Company Inc. (where Mr. Troiano served as Chief Restructuring Advisor), Patriot Coal Corporation, American Gilsonite Company, CS Mining, LLC (where FTI provided the CRO), Midway Gold Corporation (where FTI provided the CRO), Magnetation, Inc. (where FTI provided the CRO), Mineral Park, Inc. (where FTI provided the CRO), and Thompson Creek Metals Company, Inc.

14.    On December 30, 2019 and on January 15, 2020, FTI and Debtor Hartshorne Mining Group LLC executed engagement letters (together, the "Prior Engagement Letters"), which set forth the services that FTI would provide to the Debtors prior to the Petition Date, including consultation to determine whether to seek relief under the Bankruptcy Code.

15.    On February 27, 2020, FTI and Debtor Hartshorne Mining Group LLC entered into the Engagement Letter attached hereto as **Exhibit A**.  The Engagement Letter sets forth the services that the CRO and the Engagement Personnel will provide to the Debtors during these chapter 11 cases.  In addition, the Engagement Letter provides for the compensation of FTI (i) on a monthly fixed fee basis for the CRO and (ii) on an hourly basis for the Engagement Personnel, all as more fully set forth in the Engagement Letter.

16.    FTI is intimately familiar with the Debtors' businesses, financial affairs, and capital structure.  Since FTI's engagement, Mr. Troiano and the Engagement Personnel have devoted

- 5 -

substantial amounts of time and effort working with members of the Debtors' senior management and legal advisors to, among other things, assist in the development of near-term projections and short-term cash management activities, review strategic alternatives, and coordinate the Debtors' efforts to prepare for and operate in these chapter 11 cases. For these reasons, FTI is both well qualified and uniquely suited to deal effectively and efficiently with matters that may arise in the context of these chapter 11 cases. Accordingly, the Debtors submit that the retention of FTI and the designation of Mr. Troiano as CRO on the terms and conditions set forth in the Engagement Letter and in this Application are necessary and appropriate, are in the best interest of the Debtors' estates, creditors, and all other parties in interest, and should be granted in all respects.

## <u>SERVICES TO BE PROVIDED</u>

17.    Subject to approval by the Court, the Debtors propose to retain FTI to provide the Debtors with a CRO and the additional Engagement Personnel as necessary on the terms and conditions set forth in the Engagement Letter and this Application, except as otherwise explicitly set forth herein or in any order granting the relief requested herein. The Engagement Personnel will provide assistance to the Debtors in completing their restructuring through these chapter 11 cases, including cash forecasting, liquidity management, assistance in addressing business issues that arise during the pendency of these chapter 11 cases, the development of information for the Debtors and parties-in-interest, bankruptcy administration, preparation of monthly operating reports and motions, and testimony, as may be required, and other assistance intended to support the Debtors and their other retained professionals. The Debtors will monitor the work of the Engagement Personnel and ensure that they do not provide duplicating services relative to other retained professionals.

18.     Subject to further order of the Court, the Engagement Personnel may provide the services described in the Engagement Letter, as the CRO and the Debtors shall deem appropriate and feasible in order to manage the Debtors during these chapter 11 cases (collectively, the "Restructuring Advisory Services"), including but not limited to:

(a)     assisting with the preparation of the statement of affairs, schedules and other regular reports required by the Court;

(b)     assisting with monthly operating reports and other court and U.S. Trustee requested or required information;

(c)     assisting with the additional cataloging of executory contracts and unexpired leases and advising the Debtors regarding decisions on assumptions and rejections and cure amounts;

(d)     advising senior management in the negotiation and implementation of restructuring initiatives and evaluation of strategic alternatives;

(e)     assisting in communication and/or negotiation with outside constituents including stakeholders, vendors and suppliers and other lenders and their advisors;

(f)     managing the claims and claims reconciliation processes;

(g)     providing required cash budgeting and reporting under the agreements and the terms of the debtor-in-possession financing and cash collateral motion;

(h)     providing assistance to management in connection with the Debtors' development of its rolling 13-week cash receipts and disbursements forecasting tool designed to provide on-time information related to the Debtors' liquidity;

(i)     assisting in obtaining and presenting information required by parties-in-interest in the Debtors' bankruptcy process including to the official committees appointed by the Court and the Court itself;

(j)     assisting the Debtors and outside counsel on the development of an approach to meet the requirements of Bankruptcy Rule 2015.3 for reporting on the value, operations and profitability of those entities in which the Debtors' estate holds a substantial or controlling interest;

(k)     assisting the Debtors in other business and financial aspects of a chapter 11 proceeding, including, but not limited to, development of a disclosure statement and chapter 11 plan;

(l)     assisting as requested in managing any litigation that may be brought against the Debtors in the Court;

(m)     providing assistance in such areas as testimony before the Court on matters that are within the scope of FTI's engagement and within FTI's area of testimonial competencies; and

(n)     assisting with such other matters as may be requested that fall within FTI's expertise and that are mutually agreeable.

19.     Such Restructuring Advisory Services are necessary to the Debtors' restructuring efforts and in the ongoing operation and management of the Debtors' businesses while subject to chapter 11 of the Bankruptcy Code.  The Restructuring Advisory Services provided by FTI will complement, and not duplicate, the services to be rendered by other professionals retained in these chapter 11 cases.  The Engagement Personnel has and will continue to work closely with the other professionals retained by the Debtors to minimize and avoid duplication of services.  In addition, on February 20, 2020, the Board of Managers for each of the Debtors (collectively, the "Board") approved the retention of Mr. Troiano as CRO.  As CRO, Mr. Troiano will act under the direction, control, and supervision of the Board.  Moreover, to the extent any additional FTI personnel other than those provided in the Engagement Letter are to assist the Debtors, such appointments, if any, will occur only if reasonably satisfactory to the Board after the Debtors are consulted about any modifications to the staffing plan.

## FTI'S DISINTERESTEDNESS

20.     To the best of the Debtors' knowledge, information and belief, and except to the extent disclosed herein and in the Troiano Declaration, attached hereto as **Exhibit B**, FTI (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, (b) has no connection with the Debtors, their creditors, or other parties in interest, or the attorneys or accountants of the foregoing, or the Office of the United States Trustee for the Western District of

Kentucky (the "U.S. Trustee") or any person employed in the Office of the U.S. Trustee, and (c) does not hold any interest adverse to the Debtors' estates.

21.    Although the Debtors respectfully submit that the retention of FTI is not governed by section 327 of the Bankruptcy Code, the Troiano Declaration discloses, among other things, any relationship that FTI or Mr. Troiano have with the Debtors, their significant creditors, or other significant parties in interest known to FTI.  Based upon the disclosures set forth in the Troiano Declaration, the Debtors submit that FTI is a "disinterested person" as that term is defined by section 101(14) of the Bankruptcy Code.

22.    As set forth in the Troiano Declaration, to the extent that any new relevant facts or relationships bearing on the matters described herein during the period of FTI's retention are discovered or arise, FTI will provide the Court with a supplemental declaration disclosing, among other things, new material facts and relationships between the Debtors, the Engagement Personnel, or other significant parties in interest.

## <u>TERMS OF RETENTION</u>

23.    As set forth in the Engagement Letter and this Application, the Debtors have agreed to, among other things:  (a) compensate and reimburse FTI for expenses incurred and services provided by the Engagement Personnel; and (b) indemnify those persons serving as directors or officers on the same terms as provided to the Debtors' other officers and directors under the Debtors' corporate bylaws and provide such persons insurance coverage under the Debtors' director and officer liability insurance policy as further described below.

### *Professional Compensation and Expense Reimbursement*

24.    In summary, the Engagement Letter provides for the following compensation:

- **<u>Chief Restructuring Officer</u>**:  For services rendered in connection with this assignment, the Debtors agreed to pay FTI a monthly, non-refundable

advisory fee of $140,000, paid at the beginning of each month of service, for the services of Bertrand Troiano. The monthly fee provided for Bertrand Troiano is a discounted fee that is less than the fees that the Debtors would incur if FTI were to bill for Mr. Troiano's work on an hourly basis. All such payments are considered to be earned upon payment.

- **Standard Hourly Rates**:  For services rendered by the Engagement Personnel, fees will be billed at their current hourly rate. Fees may be billed as frequently as weekly and will be billed not less frequently than monthly. The normal hourly billing rates for the professionals with the skills and expertise needed for engagements of this kind, which are subject to periodic revision, are as follows:

|  | Per Hour (USD) |
| --- | --- |
| Senior Managing Directors | $985 - 1295 |
| Directors / Senior Directors / Managing Directors | $735 - 905 |
| Consultants/Senior Consultants | $415 - 660 |
| Administrative / Paraprofessionals | $150 - 280 |

- **Completion Fee:**  If the Debtors succeed in obtaining: (a) a consensual restructuring, compromise and/or extinguishment of existing indebtedness or (b) a final judicial order approving a plan of reorganization under chapter 11 or (c) a sale, transfer or other disposition of substantially all of the Debtors' assets in one or more transactions under section 363 of the Bankruptcy Code, then, upon the consummation of such restructuring or sale, the Debtors will pay FTI a Completion Fee in the amount $300,000.

- **Reimbursement of Expenses**:   In addition to compensation for professional services rendered by the Engagement Personnel, FTI will seek reimbursement for reasonable and customary expenses incurred in connection with these chapter 11 cases, including, but not limited to internet access, telephone, overnight mail, messenger, travel, meals, and accommodations. In addition, FTI shall be reimbursed for the reasonable fees and expenses incurred in connection with the preparation and approval of this Application. All fees and expenses due to FTI will be billed on a monthly basis, or more frequently as agreed to between FTI and the Debtors, as further set forth in the Engagement Letter, but in all events subject to the order approving the Application.

*Indemnification Provisions*

25.    As a material part of the consideration for which FTI has agreed to provide the services described herein, and pursuant to the Engagement Letter, including the indemnification provisions attached thereto and incorporated by reference herein (the "Indemnification

Provisions"), the Debtors have agreed to: (a) indemnify the Engagement Personnel serving as directors or officers of the Debtors to the same extent as the most favorable indemnification and advancement provisions provided by the Debtors to their directors, officers, and any equivalently placed employees, whether under the Debtors' by-laws, by contract or otherwise; and (b) indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contractors and employees (collectively, the "Indemnified Persons") under certain circumstances.[4]  The rights to indemnification shall survive the termination of these chapter 11 cases or any cases into which they may be converted.

26.    Accepting the Indemnification Provisions was a condition to FTI's engagement, the terms and provisions of which were, along with all other terms of the Engagement Letter, negotiated by the Debtors and FTI at arm's-length and in good faith.  FTI and the Debtors believe that the Indemnification Provisions are comparable to those indemnification provisions generally obtained by crisis management firms of similar stature to FTI and for comparable engagements, both in- and out-of-court.  The Debtors respectfully submit that the Indemnification Provisions, viewed in conjunction with the other terms of FTI's proposed retention, are reasonable and in the best interests of the Debtors' estates and creditors, in light of the fact that the Debtors require FTI's services to successfully manage the Debtors' business during the pendency of the chapter 11 cases.

**FEES AND REPORTING**

---

[4] The Indemnification Provisions generally provide that the Debtors will indemnify and hold harmless the Indemnified Parties from and against any claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation), arising out of or relating to the Debtors' retention of FTI, the execution and delivery of the Engagement Letter, and the provision of services or other matters relating to or arising from the Engagement Letter.  Notwithstanding the terms of the Indemnification Provisions, the Debtors and FTI have agreed, subject to the Court's approval of this Application, that in no event shall an Indemnified Party be indemnified or receive contribution or other payment under the Indemnification Provisions if the Debtors, their estates, or the statutory committee of unsecured creditors appointed in these chapter 11 cases, if any, assert a claim against an Indemnified Party and the Court determines by final order that such claim arose out of the gross negligence or willful misconduct on the part of that or any other Indemnified Persons.

27.    If the Court approves the relief requested herein, FTI will be retained to provide the Debtors with the Engagement Personnel and Mr. Troiano will be designated as the CRO pursuant to section 363 of the Bankruptcy Code.  Because FTI is not being employed as a professional under section 327 of the Bankruptcy Code, FTI will not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  Instead, FTI will file with the Court, and provide notice to the U.S. Trustee, the Official Committee of Unsecured Creditors, if one is appointed in these chapter 11 cases, and counsel to Tribeca Global Resources Credit Pty Ltd, Wyatt, Tarrant & Combs LLP (collectively, the "Notice Parties"), reports of compensation earned and expenses incurred on at least a quarterly basis.  Such compensation and expenses shall be subject to Court review in the event that an objection is filed.  In addition, FTI will file with the Court and provide the Notice Parties a report on staffing (the "Staffing Report") by the 20th day of each month for the previous month, and the report will include the names and tasks performed by all Engagement Personnel involved in this matter.  The Staffing Report (and FTI's staffing for this matter) will be subject to review by the Court in the event so requested by any of the Notice Parties.

28.    As set forth in the Prior Engagement Letters, FTI received $150,000 as a retainer from the Debtors (the "Retainer") prepetition.  FTI has applied the Retainer to amounts due for services rendered and expenses incurred prior to the Petition Date, which exhausted the Retainer.  To the extent that FTI was owed any outstanding fees and expenses in excess of the balance of the Retainer as of the Petition Date, FTI has written-off such amounts.  For the avoidance of doubt, the Retainer was exhausted as of the Petition Date and the Debtors have not and will not replenish the Retainer during these chapter 11 cases.  Moreover, the Debtors are not aware of any asserted or threatened disputes against FTI or the Engagement Personnel on account of their services provided before the Petition Date.

29.     Given the numerous issues which the Engagement Personnel may be required to address in the performance of their services, FTI's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for such services in an in-court and out-of-court context, the Debtors submit that the fee arrangements set forth in this Application and in the Engagement Letter are reasonable.

### BASIS FOR RELIEF

30.     The Debtors seek approval of the employment of FTI as described herein pursuant to section 363 of the Bankruptcy Code, *nunc pro tunc* to the Petition Date.  Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

31.     Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved.  *See, e.g.*, *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (concluding that a bankruptcy court can "authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Manalapan Mining Co.*, No. 13-61501, 2015 Bankr. LEXIS 2024, *7 (Bankr. E.D. Ky. June 19, 2015) (authorizing the transfer of a lease because the trustee's "business judgment will be respected until a party comes forward with evidence to the contrary"); *In re Jillian's Entm't Holdings*, 327 B.R. 616, 617 (Bankr. W.D. Ky. 2005) (recognizing that the proper standard for considering a proposed motion to sell is the business judgment standard"); *In*

*re Daily Gazette Co.*, 548 B.R. 540 (Bankr. S.D. W. Va. 2018) (approving the disbursement of certain sale proceeds where the court finds "there is abundant business justifications for the section 363(b) sale."); *In re MCSGlobal Inc.*, 562 B.R. 648 (Bankr. E.D. Va. 2017) ("Courts generally look to the trustee's business judgment in analyzing asset sales under Section 363(b)."); *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1)."); *In re Patriot Coal Corp.*, 492 B.R. 518, 530–31 (Bankr. E.D. Mo. 2013) ("Any transfer made outside the ordinary course of business [. . .] must be justified by the facts and circumstances of the case, which ordinarily means that the business judgment standard of Section 363(b) applies."); *In re N. Port Assocs., Inc.*, 182 B.R. 810, 813 (Bankr. E.D. Mo. 1995) ("Section 363(b)(1) simply requires notice and a hearing before the trustee may use, sell or lease property of the estate other than in the ordinary course of business."); *see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

32.     The retention of FTI and its professionals is a sound exercise of the Debtors' business judgment.  Mr. Troiano has extensive experience as a senior officer and as an advisor to many troubled companies, and the Debtors believe that the Engagement Personnel will provide services that benefit the Debtors' estates and creditors.  In addition, FTI has extensive experience in providing restructuring consulting services in reorganization proceedings and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States.  Furthermore, Mr. Troiano and the Engagement Personnel, working in conjunction with the Debtors' senior management, have already proven to be of invaluable

assistance in the Debtors' efforts in developing near-term projections, assisting in short-term cash
management activities, evaluating strategic alternatives, and coordinating the Debtors' efforts to
prepare for and operate in chapter 11.

33.    In view of the foregoing, the Debtors believe that the retention of FTI and the
employment of Mr. Troiano and the Engagement Personnel is a sound exercise of the Debtors'
business judgment and is in the best interests of all parties in interest in these chapter 11 cases.
The Debtors additionally believe that the Engagement Personnel are well qualified and able to
represent the Debtors in a cost effective, efficient, and timely manner.  FTI has indicated a
willingness to cause the Engagement Personnel to act on behalf of the Debtors and to subject itself
to the jurisdiction and supervision of the Court.  For the reasons set forth above, the Debtors
respectfully request that the Court authorize the Debtors to retain FTI to provide the Debtors with
a CRO and the Engagement Personnel, and to designate Mr. Troiano as the CRO *nunc pro tunc* to
the Petition Date, all pursuant to section 363 of the Bankruptcy Code.

34.    The retention of corporate officers and other temporary employees is proper under
section 363 of the Bankruptcy Code.  Numerous courts have approved relief similar to the relief
requested in this Application.  *See, e.g.*, *In re FirstEnergy Solutions Corp., et al.*, No. 18-50757
(AMK) (Bankr. N.D. Ohio April 26, 2018) (authorizing debtor to retain advisory firm and
designating a chief restructuring officer *nunc pro tunc* to petition date); *In re Blackjewel, LLC*, No.
19-30289 (FWV) (Bankr. S.D. W.Va. Aug. 13, 2019) (authorizing debtors to retain FTI and
designate a chief restructuring officer *nunc pro tunc* to petition date and interim chief executive
officer); *In re The Gymboree Corp.*, No. 17-32986) (KLP) (Bankr. E.D. Va. July 26, 2017)
(authorizing debtors to retain advisory firm and designating a chief restructuring officer *nunc pro
tunc* to petition date); *In re 21st Century Oncology Holdings, Inc.*, No. 17-22770 (RDD) (Bankr.

- 15 -

S.D.N.Y. July 19, 2017) (authorizing debtors to retain advisory firm and designate a chief executive officer and chief financial officer *nunc pro tunc* to petition date); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 16, 2017) (authorizing debtors to retain advisory firm and designating a chief restructuring officer *nunc pro tunc* to petition date); *In re Goodman Networks Inc.*, No. 17-31575 (MI) (Bankr. S.D. Tex. Apr. 20, 2017) (authorizing debtors to retain FTI and designate a chief restructuring officer *nunc pro tunc* to petition date); *In re BCBG Max Azria Global Holdings*, LLC, No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 29, 2017) (authorizing debtors to retain advisory firm and designate a chief restructuring officer and chief financial officer *nunc pro tunc* to petition date).[5]

35.    Based upon the foregoing, the Debtors submit that the retention of FTI, and the designation of Mr. Troiano as CRO on the terms set forth herein and in the Engagement Letter, is essential, appropriate, and in the best interest of the Debtors' estates, creditors, and other parties in interest and should be granted in these chapter 11 cases.

## **NOTICE**

36.    The Debtors, with the assistance of their proposed claims and noticing agent, will provide notice of this Application by email and/or first class mail to:  (a) the United States Trustee for Region 8; (b) the creditors holding the 30 largest unsecured claims in these cases; (c) the Office of the United States Attorney for the Western District of Kentucky; (d) the Environmental Protection Agency; (e) the Kentucky Energy and Environment Cabinet; (f) the office of the Kentucky Attorney General; (g) the Internal Revenue Service; (h) the Debtors' prepetition secured parties; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

---

[5] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Application. Copies of these orders are available upon request of the Debtors' proposed counsel.

## NO PRIOR REQUEST

37.     No prior request for the relief sought in this Application has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

DATED: March 2, 2020          **FROST BROWN TODD LLC**

By: */s/ Edward M. King*
Edward M. King
Bryan J. Sisto
400 West Market Street, Suite 3200
Louisville, Kentucky 40202
Telephone: 502.589.5400
Facsimile: 502.581.1087
tking@fbtlaw.com
bsisto@fbtlaw.com

– and –

**SQUIRE PATTON BOGGS (US) LLP**

Stephen D. Lerner (admitted *pro hac vice*)
Norman Kinel (admitted *pro hac vice*)
Nava Hazan (admitted *pro hac vice*)
Travis A. McRoberts (admitted *pro hac vice*)
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
Norman.kinel@squirepb.com
nava.hazan@squirepb.com
travis.mcroberts@squirepb.com

*Proposed Co-Counsel to the Debtors and Debtors-in-Possession*

**EXHIBIT A**

<u>Engagement Letter</u>

(Attached)



CONFIDENTIAL

February 28, 2020

Mr. Egan Antill
Hartshorne Mining Group LLC
373 Whobry Road
Rumsey, KY 42371

**Re: Hartshorne - Chief Restructuring Officer Retention**

Mr. Antill:

The purpose of this letter is to confirm the understanding and agreement (the "Agreement") between
Hartshorne Mining Group LLC and its U.S. affiliates (together, the "Company", "Client" or
"Hartshorne") and FTI Consulting, Inc. ("FTI") concerning the Client's engagement of FTI to provide
certain temporary employees to the Client for chief restructuring officer and financial advisory services
(the "Services"). This Agreement is effective on February 20, 2020 (the "Effective Date"). The FTI
Standard Terms and Conditions attached hereto as Exhibit "A" are also incorporated herein and form part
of this Agreement.

## 1.    **Temporary Officers, Hourly Temporary Employees and Services**

FTI will provide Bertrand Troiano to serve as the Client's Chief Restructuring Officer (the "CRO"and the
"Temporary Officer") reporting to the Board of Directors (the "Board") in connection with the
Engagement. The Temporary Officer, as well as any additional Hourly Temporary Staff (as defined
below), shall have such duties as the Board may from time to time determine, and shall at all times report
to and be subject to supervision by the Board. Without limiting the foregoing, the Temporary Officer, as
well as any Hourly Temporary Staff, shall work with other senior management of the Client, and other
professionals, to provide the Services.

In addition to providing the Temporary Officer, FTI may also provide the Client with additional staff (the
"Hourly Temporary Staff" and, together with the Temporary Officer, the "FTI Professionals"), subject to
the terms and conditions of this Agreement. The Hourly Temporary Staff may be assisted by or replaced
by other FTI professionals reasonably satisfactory to the Client, as required, who shall also become
Hourly Temporary Staff for purposes hereof. The initial schedule of Hourly Temporary Staff is set out on
Exhibit "B". FTI will keep the Client reasonably informed as to FTI's staffing and will not add additional
Hourly Temporary Staff to the assignment without first consulting with the Client.

Once cases under the Bankruptcy Code are commenced and our retention is approved, our role will
include serving as principal bankruptcy financial advisors to the debtors and debtors in possession in
those cases, subject to court approval. Our role also will encompass all out-of-court planning and
negotiations attendant to these tasks.

The services we will provide in connection with the Engagement will encompass all services normally
and reasonably associated with this type of engagement that we are requested and are able to provide and
that are consistent with our ethical obligations. With respect to all matters of our Engagement, we will
coordinate closely with the Company as to the nature of the services that we will render and the scope of

1

▥ F T I'

our engagement.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that, in the course of that Engagement, we expect to provide information or advice to directors, officers or employees in their corporate capacities.

FTI does not make any representations or guarantees that, inter alia, (i) any restructuring proposal or strategic alternative presented to the Company's management or the Board will be more successful than all other possible restructuring proposals or strategic alternatives, (ii) a restructuring proposal or strategic alternative can be formulated for the Company that is appropriate, (iii) restructuring is the best course of action for the Company, or (iv) if expressed, that any proposed restructuring plan or strategic alternative will be accepted by any of the Company's creditors, shareholders and other stakeholders. Additionally, FTI does not assume any responsibility for the Company's decision to pursue or not pursue any business strategy or to effect, or not to effect, any transaction. FTI shall be responsible for assisting in the implementation of the restructuring proposal or strategic alternative approved by the Board and only to the extent, and in the manner, authorized and directed by the Board.

Once cases under the Bankruptcy Code are commenced, the engagement of FTI to perform the Services shall be subject to the approval of the Bankruptcy Court and shall be substantially as provided in this Agreement as modified by the retention order approved by the Bankruptcy Court. Client agrees, at Client's expense, to file an application (the "Application") to employ FTI as crisis and turnaround manager *nunc pro tunc* to the Effective Date pursuant to § 363 of the Bankruptcy Code. The Client agrees to file all required applications, including the Application, for the employment or retention of FTI at the earliest practical time.

The Services do not include (i) audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services which are typically outsourced and which shall be obtained directly where required by the Client at Client's expense; or (ii) investment banking, including valuation or securities analysis, including advising any party or representation of the Client on the purchase, sale or exchange of securities or representation of the Client in securities transactions. FTI is not a registered broker-dealer in any jurisdiction and will not offer advice or its opinion or any testimony on valuation or exchanges of securities or on any matter for which FTI is not appropriately licensed or accredited. An affiliate of FTI is a broker-dealer but is not being engaged by the Client to provide any investment banking or broker-dealer services. The Client agrees to supply office space, and office and support services to FTI as reasonably requested by FTI in connection with the performance of its duties hereunder.

## 2.     **Compensation to FTI**

Chief Restructuring Officer

For services rendered in connection with this assignment, the Client agrees to pay FTI a monthly, non-refundable advisory fee of $140,000, paid at the beginning of each month of service, for the services of Bertrand Troiano. The monthly fee provided for Bertrand Troiano is a discounted fee that is less than the fees that the Client would incur if FTI were to bill for Mr. Troiano on an hourly basis. All such payments are considered to be earned upon payment.

Hourly Temporary Staff

For services rendered by the Hourly Temporary Staff, fees will be billed at their current hourly rate. Fees may be billed as frequently as weekly and will be billed not less frequently than monthly.

2



Hourly Rates

The normal hourly billing rates for the professionals with the skills and experience needed for engagements of this kind, which are subject to periodic revision, are as follows:

**United States**

| | Per Hour (USD) |
|---|---|
| Senior Managing Directors | $985 - 1295 |
| Directors / Senior Directors / Managing Directors | 735 - 905 |
| Consultants/Senior Consultants | 415 - 660 |
| Administrative / Paraprofessionals | 150 - 280 |

Completion Fee

If the Company succeeds in obtaining: (a) a consensual restructuring, compromise and/or extinguishment of a substantial amount of its existing indebtedness or (b) a final judicial order approving a plan of reorganization under Chapter 11 or (c) a sale, transfer or other disposition of substantially all of the Company's assets in one or more transactions under U.S. Bankruptcy Code Section 363, then, upon the consummation of such restructuring or sale, the Company will pay FTI a Completion Fee of $300,000.

The Completion Fee shall be subject to any required approval of the Bankruptcy Court having jurisdiction over the Chapter 11 Cases. The Client agrees to file any required Bankruptcy Court application for approval of the Completion Fee.

In addition to the fees outlined above, FTI will bill for reasonable allocated and direct expenses which are likely to be incurred on your behalf during this Engagement. Allocated expenses include the cost of items which are not billed directly to the engagement but are incurred centrally, including out-of-pocket costs for data services and research materials which FTI subscribes to that we expect to use on your engagement, copying, phone charges, and other overhead expenses that are not billed through as direct reimbursable expenses and are calculated at 6.0% of FTI's fees as described above. Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the Engagement such as internet access, telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to this engagement. Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by you at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

The Company agrees to promptly notify FTI if the Company or any of its subsidiaries or affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of FTI involved in this Engagement and agrees that FTI has earned and is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to FTI's former principal or employee that the Company or any of its subsidiaries or affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by FTI with respect to this Engagement.

Once a case under the Bankruptcy Code is commenced, fees and expenses may not be paid without the express prior approval of the bankruptcy court. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a

3



procedure for the payment of interim fees during the case that would permit payment of interim fees. If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless remain liable for payment of court approved post-petition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503(b)(l). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan cannot be confirmed unless these priority claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment).

Additional Provisions Regarding Fees:

a) FTI may stop work or terminate the Agreement immediately upon the giving of written notice to the Client as set forth in this Agreement: (i) if payments are not made in accordance with this Agreement, (ii) if the Application is not approved by the Bankruptcy Court, (iii) if the Chapter 11 case is dismissed or converted to a Chapter 7 proceeding, or (iv) if a Chapter 11 Trustee or other responsible person is appointed.

b) If local Bankruptcy rules or the order approving the Application so require, FTI shall file with and serve on creditors entitled to notice thereof, a statement of staffing, professional services, compensation or expenses, on a quarterly basis, or as the Bankruptcy Court or rules may direct, and creditors and other parties in interest shall have an opportunity to object thereto and request a hearing thereon. In the event that FTI is employed post-petition as a "professional person" pursuant to § 327 of the Bankruptcy Code, Bankruptcy Court approval will generally be required to pay FTI's fees and expenses for Post-petition Services. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Client agrees that in this situation it will, at the Client's expense, request the Bankruptcy Court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the Bankruptcy Court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our Engagement.

c) Any unpaid post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Client understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Client shall nevertheless remain liable for payment of court approved post-petition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503(b)(l). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan cannot be confirmed unless administrative claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment).

4



d) Client agrees that FTI is not an employee of the Client and the FTI employees and independent FTI contractors who perform the Services are not employees of the Client, and they shall <u>not</u> receive a W-2 from the Client for any fees earned under this Engagement, and such fees are not subject to any form of withholding by the Client. The Client shall provide FTI a standard form 1099 on request for fees earned under this Engagement.

e) Copies of Invoices shall be sent by facsimile or email as follows:

To the Client at:
Hartshorne Mining Group LLC
373 Whobry Road
Rumsey, KY 42371

Attention: Mr. David Gay

### 3.    Availability of Information

In connection with FTI's activities on the Client's behalf, the Client agrees (i) to furnish FTI with all information and data concerning the business and operations of the Client which FTI reasonably requests, and (ii) to provide FTI with reasonable access to the Client's officers, directors, partners, employees, retained consultants, independent accountants, and legal counsel. FTI shall not be responsible for the truth or accuracy of materials and information received by FTI under this Agreement.

### 4.    Notices

Notices under this Agreement to the Client shall be provided as set forth in paragraph 2(e).

Notices to FTI shall be to:
FTI Consulting
999 17th Street, Suite 700
Denver, CO 80202
Attn: David Beckman
Phone: (303) 689-8878
Fax: (303) 689-8803
Email: dave.beckman@fticonsulting.com

Notices shall be provided by (a) fax and email, (b) hand delivery, or (c) overnight delivery. If provided by fax and email or hand delivery, they shall be deemed effective the date given. If provided by overnight delivery, they shall be deemed effective on the date of actual receipt.

### 5.    Miscellaneous

This Agreement represents the entire understanding of the parties hereto and supersedes any and all other prior agreements among the parties regarding the subject matter hereof; shall be binding upon and inure to the benefit of the parties and their respective heirs, representatives, successors and assigns; may be executed by facsimile (followed by originals sent via regular mail), and in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; and may not be waived, modified or amended unless in writing and signed by a representative of the Client and FTI. The provisions of this Agreement shall be severable. No failure to delay in exercising any right, power or privilege related hereto, or any single or partial exercise thereof, shall operate as a waiver thereof.

5



Based on our understanding of the parties involved in this matter, we have compiled a list of interested parties (the "Potentially Interested Parties") and have undertaken a limited review of our records to determine FTI's professional relationships with the Company and such Potentially Interested Parties. From the results of such review, we are not aware of any conflicts of interest or relationships that we believe would preclude us from performing the Services.

As you know, however, we are a large consulting firm with numerous offices throughout the world.  We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties. The FTI professionals providing services hereunder will not accept an engagement that directly conflicts with this Engagement without your prior written consent.

6



If this letter correctly sets forth our understanding, please so acknowledge by signing below and returning a signed copy of this letter to us.

Very truly yours,

FTI CONSULTING, INC.

By:

Name: David Beckman
Title: Senior Managing Director

ACCEPTED AND AGREED this 28th day of February, 2020.

On behalf of Hartshorne Mining Group LLC and its U.S. affiliates

By: _____
    Name:    EGAN J. ANTILL
    Title:   C.E.O.

By: _____
    Name:
    Title:

Date: _____ 2/28/2020 _____

7



# EXHIBIT A

## FTI CONSULTING, INC.

### STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with Hartshorne Mining Group LLC and its U.S. affiliates dated as of February 28, 2020 (the "Engagement Letter"). The Engagement Letter and these Standard Terms and Conditions annexed thereto (collectively, the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

**1. Reports and Advice**

1.1    **Use and purpose of advice and reports**— Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party, or refer to us or the Services, without our prior written consent, which shall be conditioned on the execution of a third party release letter in the form provided by FTI. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

**2. Information and Assistance**

2.1    **Provision of information and assistance** – Our performance of the Services is dependent upon you and the Company providing us with such information and assistance as we may reasonably require from time to time.

2.2    **Punctual and accurate information** – You and Company personnel shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. You and the Company shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3    **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4    **Prospective financial information** - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

8



**3.    Additional Services**

3.1    **Responsibility for other parties**— You and the Company shall be solely responsible for the work and fees of any other party engaged by you or the Company to provide services in connection with the Engagement regardless of whether such party was introduced to you by us.  Except as provided in this Engagement Contract (including section 1 of the Engagement Letter with respect to the retention of certain agents and independent contractors), we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.  Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you or the Company, other than our agents or independent contractors engaged to provide Services, without your or the Company's written authorization.

**4.    Confidentiality**

4.1    **Restrictions on confidential information**— All parties to this Engagement Contract agree that any confidential information received from the other parties shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, no party will disclose other contracting party's confidential information to any third party without such party's consent. Confidential information shall not include information that:

4.1.1    is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

4.1.2    is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

4.1.3    is or has been independently developed by the recipient (without the use of confidential information).

4.2    **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, all parties will be entitled to disclose confidential information to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other parties.

4.3    **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4    **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews; *provided*, that we shall cause such persons to keep such information confidential in accordance with the terms of this Engagement Contract.

4.5    **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies; *provided*, that we shall keep such materials confidential in accordance with the terms of this Engagement Contract.

**5.    Termination**

5.1    **Termination of Engagement with notice**— Termination of Engagement with notice –This Agreement is terminable by the Client or by FTI at any time upon the giving of thirty (30) days written notice. Upon such termination by the Client (the "Termination Date"), FTI shall cease work and the Client shall have no further obligation for fees and expenses of FTI arising or incurred after the Termination Date, provided, however, that, notwithstanding any termination by the Client or by FTI in the circumstances described in

9

FTI

paragraph (a) under "Additional Provisions Regarding Fees" in the Engagement Letter,

a) The Client shall reimburse FTI for its out-of-pocket expenses (the "Termination Expenses") incurred in connection with commitments made by FTI prior to the Termination Date with respect to advance travel arrangements reasonably incurred, to the extent FTI is unable to obtain refunds of such expenses. FTI shall provide the Client with reasonable documentation to substantiate all Termination Expenses for which payment is requested; and

b) Unless FTI is in material default of this Agreement, termination shall not affect FTI's entitlement to the Completion Fee.

5.2     **Continuation of terms**— The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

**6.      Indemnification, Insurance and Liability Limitation**

6.1     **Indemnification** – The Company agrees to indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contractors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted (an "Adverse Determination"). The Company shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance. FTI agrees that it will reimburse any amounts paid in advance to the extent they relate directly to an Adverse Determination.

Subject to any limitation post-petition required by the Bankruptcy Court, the Client agrees to indemnify and hold harmless FTI and its shareholders, directors, officers, managers, employees, contractors, agents and controlling persons (each, an "Indemnified Party") from and against any losses, claims, damages or expenses, or if same was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, or any hearing, inquiry or investigation, in each case by reason of (or arising in part out of) any event or occurrence related to this agreement or any predecessor agreement for services or the fact that any Indemnified Party is or was an agent, officer director, employee or fiduciary of the Client, or by reason of any action or inaction on the part of any Indemnified Party while serving in such capacity (an "Indemnifiable Event") against expenses (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any Indemnifiable Event. The Application shall include the assumption by the Client of FTI's right to indemnification in respect of its actions under this Agreement prior to the Petition Date. The Indemnified Party shall promptly forward to the Client all written notifications and other matter communications regarding any claim that could trigger the Client's indemnification obligations under this Section 6. If the Client so elects or is requested by an Indemnified Party, the Client will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the reasonable fees and disbursements of such counsel. In the event, however, such Indemnified Party is advised by counsel that having common counsel would present such counsel with a conflict of interest or if the defendants in, or targets of, any such action or proceeding include both an Indemnified Party and the Client, and such Indemnified Party is advised by counsel that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available to the Client, or if the Client fails to assume the defense of the action or proceeding or to employ counsel reasonably satisfactory to such Indemnified Party, in either case in a timely manner, then such Indemnified Party may employ separate

10

F T I

counsel to represent or defend it in any such action or proceeding and the Client will pay the reasonable fees and disbursements of such counsel; provided, however, that the Client will not be required to pay the fees and disbursements of more than one separate counsel (in addition to local counsel) for an Indemnified Party in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which the Client assumes, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense. The Client further agrees that the Client will not, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the Indemnified Party or any other Indemnified Party is an actual or potential party to such claim, action, suit or proceeding) unless (i) to the extent that such settlement, compromise or consent purports directly or indirectly to cover the Indemnified Party or any other Indemnified Party, such settlement, compromise or consent includes an unconditional release of the Indemnified Party and each other Indemnified Party from all liability arising out of such claim, action, suit or proceeding, or (ii) to the extent that such settlement, compromise or consent does not purport directly or indirectly to cover the Indemnified Party or any other Indemnified Party, the Client has given the Indemnified Party reasonable prior written notice thereof and used all reasonable efforts, after consultation with the Indemnified Party, to obtain an unconditional release of the other Indemnified Parties hereunder from all liability arising out of such claim, action, suit or proceeding. The Indemnified Party shall not enter into any closing agreement or final settlement that could trigger the Client's indemnification obligations under this Section 6 without the written consent of the Client, which shall not unreasonably be withheld or delayed or conditioned. The Client will not be liable for any settlement of any action, claim, suit or proceeding affected without the Client's prior written consent, which consent shall not be unreasonably withheld or delayed or conditioned, but if settled with the consent of the Client or if there be a final judgment for the plaintiff, the Client agrees to indemnify and hold harmless the Indemnified Party from and against any loss or liability by reason of such settlement or judgment, as the case may be.

6.2     **Insurance** –In addition to the above indemnification and provision regarding advancement of fees/expenses, FTI employees serving as directors or officers of the Company or its affiliates will receive the benefit of the most favorable indemnification and advancement provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.  The Company shall specifically include and cover employees and agents serving as directors and officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees. Prior to FTI accepting any director or officer position, the Company shall, at the request of FTI, provide FTI a copy of its current D&O policy, a certificate of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other document that FTI may reasonably request evidencing the appointment and coverage of the indemnitees. The Company shall maintain such D&O insurance for the period through which claims can be made against such persons. In the event the Company is unable to include FTI employees and agents under the Company's policy or does not have first dollar coverage acceptable to FTI in effect for at least $10 million, FTI may, subject to the prior written consent of the Company, attempt to purchase a separate D&O insurance  policy that will cover the FTI employees and agents only.  The cost of the policy shall be invoiced to the Company as an out-of-pocket expense.  Notwithstanding anything to the contrary, the Company's indemnification obligations in this Section 6 shall be primary to (and without allocation against) any similar indemnification and advancement obligations of FTI, its affiliates and insurers to the indemnitees (which shall be secondary), and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by FTI or otherwise).

This indemnity shall not apply to any portion of any such losses, claims, damages, liabilities and expenses to the extent it is found in a final judgment by a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence, willful misconduct or violation of law of any such Indemnified Party. The Client agrees to use commercially reasonable best efforts to (i) include Bertrand Troiano and any other FTI personnel who assume officer or director positions with the Client or who perform Services hereunder, FTI and its agents, employees, officers, subcontractors, directors, joint venture partners and members, as

11

 F T I

insureds under the Client's directors and officers insurance; and (ii) unless it is unable to do so at a commercially reasonable cost, purchase a three-year directors and officers insurance "tail" or runoff policy (or such a policy for such shorter period as Client has the right to or is otherwise able to purchase) covering the period of FTI's service. In connection with this engagement Client represents to FTI that Client hereby represents that (i) it has timely remitted and will continue to timely remit to the appropriate beneficiaries all employee source deductions, payroll and other taxes, benefits deductions, and contribution to employee benefit programs, and has timely collected and remitted sales and use and other similar taxes to appropriate collecting authorities and will continue timely to do so; (ii) there is no litigation or other proceeding pending, or to knowledge of Client, threatened (nor is Client aware of facts that could give rise to such), in each case that seeks or could give rise to personal liability of officers and directors of Client; and (iii) Client has been in continuing compliance with all applicable laws and regulations concerning the discharge, treatment, storage, transportation or use of hazardous materials and is aware of no facts or circumstances that could give rise to Client responsibility or liability under such laws and regulations.

6.3     **Limitation of liability** -- You agree that no Indemnified Person shall be liable to you, or your successors, affiliates or assigns for damages in excess of the total amount of the fees paid to FTI under this Engagement Contract. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

You and the Company agree that no Indemnified Person shall have any liability as a result of your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of an Indemnified Person or Persons. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

7.      **Governing Law, Jurisdiction and WAIVER OF JURY TRIAL** — The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof. The Bankruptcy Court having jurisdiction over the Client's Bankruptcy case shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.  TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, YOU, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO DEMAND A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR ANY SUCH OTHER MATTER.

12



**Confirmation of Standard Terms and Conditions**

Subject to the terms and conditions of the Engagement Letter, we agree that FTI Consulting, Inc. is engaged upon the terms set forth in these Standard Terms and Conditions as outlined above.

**On behalf of Hartshorne Mining Group LLC and its U.S. affiliates**

By: _____

    Name:    EGAN J. ANTILL

    Title:    C.E.O.

Date: _____2/28/20_____

13



## EXHIBIT B

### INITIAL SCHEDULE OF HOURLY TEMPORARY STAFF

| Staff | Level | Hourly Rate |
|---|---|---|
| David Beckman | Senior Managing Director | $1,125 |
| Michael Talarico | Managing Director | $865 |
| John Hinman | Senior Consultant | $560 |
| Matthew Nardini | Consultant | $405 |

14

**EXHIBIT B**

<u>Declaration of Bertrand Troiano</u>

(Attached)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
(Owensboro Division)**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hartshorne Holdings, LLC, *et al.*, | ) | Case No. 20-40133 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**DECLARATION OF BERTRAND TROIANO
IN SUPPORT OF THE DEBTORS' APPLICATION FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE DEBTORS TO (A) RETAIN FTI CONSULTING, INC. TO
PROVIDE THE DEBTORS A CHIEF RESTRUCTURING OFFICER AND CERTAIN
ADDITIONAL PERSONNEL AND (B) DESIGNATE BERTRAND TROIANO AS
CHIEF RESTRUCTURING OFFICER  FOR THE DEBTORS, *NUNC PRO
TUNC* TO THE PETITION DATE, AND (II) GRANTING RELATED RELIEF**

I, Bertrand Troiano, make this Declaration pursuant to 28 U.S.C. § 1746, and state:

1.      I am a Managing Director of FTI Consulting, Inc. ("FTI"), an internationally

recognized consulting firm that has a wealth of experience in providing financial advisory services

both in and out-of-court, and enjoys an excellent reputation for services it has rendered in large

and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

2.      I submit this declaration (the "Declaration") on behalf of FTI in support of the

*Debtors' Application for Entry of an Order (I) Authorizing the Debtors to (A) Retain FTI Consulting,*

*Inc. to Provide the Debtors A Chief Restructuring Officer and Certain Additional Personnel, and*

*(B) Designate Bertrand Troiano as Chief Restructuring Officer for the Debtors, Nunc Pro Tunc to*

*the Petition Date, and (II) Granting Related Relief* (the "Application"),[2] pursuant to which the

Debtors are seeking authority to retain FTI on the terms and conditions set forth in the Application

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  Hartshorne Holdings, LLC (3948); Hartshorne Mining Group, LLC (0063); Hartshorne Mining, LLC (1941); and Hartshorne Land, LLC (5582).  The Debtors' headquarters are located at 373 Whobry Road, Rumsey, Kentucky 42371.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application.

and the engagement letter between the Debtors and FTI, annexed to the Application as **Exhibit A** (the "Engagement Letter").  Except as otherwise noted,[3] I have personal knowledge of the matters set forth herein.  If called and sworn as a witness, I could, and would, testify competently to the matters set forth herein.

### Retention of FTI

3.      In consideration of the size and complexity of their business, the Debtors have determined that the services of experienced restructuring managers will substantially enhance their efforts to maximize the value of their estates.  The Engagement Personnel, including myself, are well qualified to act on the Debtors' behalf given our extensive knowledge and expertise with the Debtors' industry and business.

4.      The Engagement Personnel specialize in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.  FTI's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including:  (a) developing or validating forecasts and business plans and related assessments of a business's strategic position; (b) monitoring and managing cash, cash flow, and vendor relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring plans.

5.      FTI's professionals have assisted, advised and provided strategic advice to, debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases similar in size and complexity to the Debtors' chapter 11 cases.  FTI has provided restructuring or crisis management services in numerous large cases, including most recently, *In re Blackjewel LLC*, No.

---

[3] Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at FTI and are based on information provided by them.

19-30289 (FWV) (Bankr. S.D. W. Va. Aug. 13, 2019); *In re Cambrian Holding Company, Inc.*, No. 19-51200 (GRS) (Bankr. E.D. Ky. July 5, 2019); *In re Goodman Networks Inc.*, No. 17-31575 (MI) (Bankr. S.D. Tex. Apr. 20, 2017); *In re Armstrong Energy, Inc.*, No. 17-47541 (KSS) (Bankr. E.D. Missouri Dec. 1, 2017); *In re AFA Investment Inc.*, No 12-11127 (MFW) (Bankr. D. Del. Apr. 24, 2012); *In re CS Mining LLC*, No. 16-24818 (WTT) (Bankr. D. Utah Aug. 24, 2016); *In re Magnetation LLC*, No. 15-50307 (GFK) (Bankr. D. Minn. June 10, 2015); *In re Altegrity, Inc.*, No. 15-10226 (LSS) (Bankr. D. Del. March 16, 2015).

6.      The Debtors propose to designate me as their CRO, *nunc pro tunc* to the Petition Date.  I am a Managing Director with FTI based in New York, New York and a senior member of FTI's Global Mining Advisory Practice.  I have worked in the mining and metals industry for over twenty years, and served as Finance Director and Chief Financial Officer in the coal and other sectors of the mining industry.  I have substantial knowledge and experience in senior management positions with, or as restructuring advisor to, distressed companies.  Specifically, I have assisted distressed companies with stabilizing their financial condition, analyzing their operations, and developing appropriate business plans to either accomplish the necessary restructuring of their operations and finances or to prepare the company for an expedited sales process.  FTI has provided financial or restructuring advice to a number of companies or their creditors in the energy and mining sectors, including Peabody Energy Corporation, Cloud Peak Energy, and Arch Coal, Inc.—three of the largest U.S. coal companies—Armstrong Energy, Blackjewel, LLC (where FTI provided the CRO and interim CEO), Cambrian Holding Company Inc. (where I served as Chief Restructuring Advisor), Patriot Coal Corporation, American Gilsonite Company, CS Mining, LLC (where FTI provided the CRO), Midway Gold Corporation (where FTI provided the CRO),

3

Magnetation, Inc. (where FTI provided the CRO), Mineral Park, Inc. (where FTI provided the CRO), and Thompson Creek Metals Company, Inc.

7.    On December 30, 2019 and on January 15, 2020, FTI and Debtor Hartshorne Mining Group LLC executed engagement letters (together, the "Prior Engagement Letters"), which set forth the services that FTI would provide to the Debtors prior to the Petition Date, including consultation in advance to determine whether to seek relief under the Bankruptcy Code.

8.    On February 27, 2020, FTI and Debtor Hartshorne Mining Group LLC entered into the Engagement Letter attached as **Exhibit A** to the Application.  The Engagement Letter sets forth the services that the CRO and the Engagement Personnel will provide to the Debtors.  In addition, the Engagement Letter provides for compensation of FTI on a monthly fixed fee basis for the CRO and on an hourly basis for the Engagement Personnel, all as more fully set forth in the Engagement Letter.  As CRO, I will report to the Board of Managers of each of the Debtors (collectively, the "Board").

9.    FTI is intimately familiar with the Debtors' businesses, financial affairs, and capital structure.  Since FTI's engagement, the Engagement Personnel and I have devoted substantial amounts of time and effort working with members of the Debtors' senior management and legal advisors to, among other things, assist in the development of near-term projections and short-term cash management activities, review strategic alternatives, and coordinate the Debtors' efforts to prepare for and operate in these chapter 11 cases.  For these reasons, FTI is both well qualified and uniquely suited to deal effectively and efficiently with matters that may arise in the context of these chapter 11 cases.  As a result of their history with the Debtors, FTI is intimately familiar with the Debtors' business, financial affairs, and capital structure.

## Services to be Provided

10.     Subject to approval by the Court, the Debtors propose to retain FTI to provide the Debtors with a CRO and the additional Engagement Personnel as necessary on the terms and conditions set forth in the Engagement Letter and this Application, except as otherwise explicitly set forth herein or in any order granting the relief requested herein.  The Engagement Personnel will provide assistance to the Debtors in completing their restructuring through these chapter 11 cases, including cash forecasting, liquidity management, assistance in addressing business issues that arise during the pendency of these chapter 11 cases, the development of information for the Debtors and parties-in-interest, bankruptcy administration, preparation of monthly operating reports and motions, and testimony, as may be required, and other assistance intended to support the Debtors and their other retained professionals.  The Debtors will monitor the work of the Engagement Personnel and ensure that they do not provide duplicating services relative to other retained professionals.

11.     Subject to further order of the Court, the Engagement Personnel may provide the services described in the Engagement Letter, as the Debtors and I shall deem appropriate and feasible in order to manage the Debtors during these chapter 11 cases (collectively, the "Restructuring Advisory Services"), including but not limited to:

(o)     assisting with the preparation of the statement of affairs, schedules and other regular reports required by the Court;

(p)     assisting with monthly operating reports and other court and U.S. Trustee requested or required information;

(q)     assisting with the additional cataloging of executory contracts and unexpired leases and advising the Debtors regarding decisions on assumptions and rejections and cure amounts;

(r)     advising senior management in the negotiation and implementation of restructuring initiatives and evaluation of strategic alternatives;

5

(s)     assisting in communication and/or negotiation with outside constituents including stakeholders, vendors and suppliers and other lenders and their advisors;

(t)     managing the claims and claims reconciliation processes;

(u)     providing required cash budgeting and reporting under the agreements and the terms of the debtor-in-possession and cash collateral motion;

(v)     providing assistance to management in connection with the Debtors' development of its rolling 13-week cash receipts and disbursements forecasting tool designed to provide on-time information related to the Debtors' liquidity;

(w)     assisting in obtaining and presenting information required by parties-in-interest in the Debtors' bankruptcy process including to the official committees appointed by the Court and the Court itself;

(x)     assisting the Debtors and outside counsel on the development of an approach to meet the requirements of Bankruptcy Rule 2015.3 for reporting on the value, operations and profitability of those entities in which the Debtors' estate holds a substantial or controlling interest;

(y)     assisting the Debtors in other business and financial aspects of a chapter 11 proceeding, including, but not limited to, development of a disclosure statement and chapter 11 plan;

(z)     assisting as requested in managing any litigation that may be brought against the Debtors in the Court;

(aa)    providing assistance in such areas as testimony before the Court on matters that are within the scope of this engagement and within FTI's area of testimonial competencies; and

(bb)    assisting with such other matters as may be requested that fall within FTI's expertise and that are mutually agreeable.

12.    Such Restructuring Advisory Services are necessary to the Debtors' restructuring efforts and in the ongoing operation and management of the Debtors' business while subject to chapter 11 of the Bankruptcy Code.  The Restructuring Advisory Services provided by FTI will complement, and not duplicate, the services to be rendered by other professionals retained in these chapter 11 cases.  The Engagement Personnel has and will continue to work closely with the other professionals retained by the Debtors to minimize and avoid duplication of services.  As CRO, I

will act under the direction, control, and supervision of the Board. Moreover, to the extent any additional FTI personnel other than those provided in the Engagement Letter are to assist the Debtors, such appointments, if any, will occur only if reasonably satisfactory to the Board after the Debtors are consulted about any modifications to the staffing plan.

### FTI's Disinterestedness

13.    In connection with its proposed retention by the Debtors in these chapter 11 cases, FTI undertook a lengthy review to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtors. Specifically, FTI obtained from the Debtors and/or their representatives the names of individuals and entities that may be parties in interest in these chapter 11 cases (the "Potential Parties in Interest"). Such parties are listed on **Schedule 1** annexed hereto. A search was performed for connections to the Potential Parties in Interest within the past five years, and results were disclosed as to FTI Holdings, LLP ("FTI Holdings"), FTI's parent company, and each of FTI Holdings' U.S. and non-U.S. subsidiary affiliates.

14.    The relationships with the Potential Parties in Interest that were identified through the investigations described above are set forth on **Schedule 2** attached hereto. The conflicts check revealed that certain of the Potential Parties in Interest or their subsidiaries or affiliates are currently or were previously clients of FTI within the last two years in matters unrelated to the Debtors or these cases.

15.    FTI and its affiliates are advisors and crisis managers providing services and advice in many areas, including restructuring and distressed debt. As part of its diverse practice, FTI appears in numerous cases, proceedings, and transactions involving many different attorneys, accountants, investment bankers, and financial consultants, some of whom may represent claimants and parties in interest in these chapter 11 cases. Further, FTI has in the past, and may

in the future, be represented by various attorneys and law firms, some of whom may be involved in these chapter 11 cases.  In addition, FTI has been in the past, and likely will be in the future, engaged in matters unrelated to the Debtors or these chapter 11 cases in which it works with or in opposition to other professionals involved in these chapter 11 cases.  Moreover, FTI might have referred work to other professionals who are retained in these chapter 11 cases.  Likewise, certain professionals who are retained in these chapter 11 cases might have referred work to FTI.

16.     From time to time, FTI has provided services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties adverse to the Debtors in matters wholly unrelated to these chapter 11 cases.  As described herein, however, FTI has undertaken a detailed search to determine, and to disclose, whether it is providing or has provided services to any significant creditor, equity security holder, insider or other party-in-interest in such unrelated matters.

17.     Based on that review, FTI represents that, to the best of its knowledge, FTI knows of no fact or situation that would represent a conflict of interest for FTI with regard to the Debtors.  Unless otherwise noted, references to FTI in the disclosures below collectively refer to FTI Consulting, Inc. and each of its subsidiary affiliates.

18.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, none of these business relationships constitute interests adverse to the Debtors.

19.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, none of the FTI personnel (a) have any connection with the U.S. Trustee, or any employee in the Office of the U.S. Trustee; or (b) are related or connected to any

8

United States Bankruptcy Judge for the Western District of Kentucky, except as otherwise set forth herein.

20.      To the best of my knowledge, none of the members of the engagement team, or FTI is a direct holder of any of the Debtors' securities.  It is possible that members of the engagement team or certain of FTI employees, senior managing directors, board members, equity holders, or an affiliate of any of the foregoing, may own interests in mutual funds or other investment vehicles (including various types of private funds) that own the Debtors' or other parties in interest's debt or equity securities or other financial instruments, including bank loans and other obligations. Typically, the holders of such interests have no control over investment decisions related to such investment funds or financial instruments.  FTI's policy prohibits its employees from personally trading in the Debtors' securities.

21.      To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, FTI has not been retained to assist any entity or person other than the Debtors on matters relating to, or in direct connection with, these chapter 11 cases.  FTI will continue to provide professional services to entities that may be creditors or equity security holders of the Debtors or other parties in interest in these chapter 11 cases, provided that such services do not relate to, or have any direct connection with, these chapter 11 cases or the Debtors.

22.      Certain of FTI's employees, senior managing directors, board members, equity holders, or an affiliate of any of the foregoing may have financial accounts or insurance relationships with a Potential Party in Interest.

23.      Despite the efforts described above to identify and disclose the connections that FTI and its affiliates have with parties in interest in these chapter 11 cases, because the Debtors

form an enterprise with numerous creditors and other relationships, FTI is unable to state with certainty that every client relationship or other connection has been identified and disclosed.

24.     In accordance with section 504 of the Bankruptcy Code and Bankruptcy Rule 2016, neither I nor FTI has entered into any agreements, express or implied, with any other party in interest, including the Debtors, any creditor, or any attorney for such party in interest in these chapter 11 cases, (a) for the purpose of sharing or fixing fees or other compensation to be paid to any such party in interest or its attorneys for services rendered in connection therewith, (b) for payment of such compensation from the assets of the estates in excess of the compensation allowed by this Court pursuant to the applicable provisions of the Bankruptcy Code, or (c) for payment of compensation in connection with these chapter 11 cases other than in accordance with the applicable provisions of the Bankruptcy Code.

25.     Accordingly, except as otherwise set forth herein, insofar as I have been able to determine, none of FTI, I, nor any FTI personnel holds or represents any interest adverse to the Debtors or their estates, and FTI is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that FTI and its professionals and employees who will work on the engagement:

      (a)      are not creditors, equity security holders, or insiders of the Debtors;

      (b)      were not (except for in connection with this retention) a director, officer or employee of the Debtors within two years before the Petition Date; and

      (c)      do not have an interest materially adverse to the interest of the Debtors' estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

26.     If FTI discovers additional information that requires disclosure, FTI will promptly file a supplemental disclosure with this Court disclosing, among other things, new material facts

10

and relationships between the Debtors, the Engagement Personnel, or other significant parties in interest. FTI reserves the right to supplement this Declaration in the event that FTI discovers any facts bearing on matters described in this Declaration regarding FTI's employment by the Debtors.

## **Terms of Retention**

27.    As set forth in the Engagement Letter and the Application, the Debtors have agreed to, among other things: (a) compensate and reimburse FTI for expenses incurred and services provided by the Engagement Personnel; and (b) indemnify those persons serving as executive officers on the same terms as provided to the Debtors' other officers and directors under the Debtors' corporate bylaws and provide such persons insurance coverage under the Debtors' director and officer liability insurance policy.

### *Professional Compensation and Expense Reimbursement*

28.    In summary, the Engagement Letter provides for the following compensation:

- **Chief Restructuring Officer**: For services rendered in connection with this assignment, the Debtors agreed to pay FTI a monthly, non-refundable advisory fee of $140,000, paid at the beginning of each month of service, for the services of Bertrand Troiano. The monthly fee provided for Bertrand Troiano is a discounted fee that is less than the fees that the Debtors would incur if FTI were to bill for Mr. Troiano's work on an hourly basis. All such payments are considered to be earned upon payment.

- **Standard Hourly Rates**: For services rendered by the Engagement Personnel, fees will be billed at their current hourly rate. Fees may be billed as frequently as weekly and will be billed not less frequently than monthly. The normal hourly billing rates for the professionals with the skills and expertise needed for engagements of this kind, which are subject to periodic revision, are as follows:

|  | Per Hour (USD) |
| --- | --- |
| Senior Managing Directors | $985 - 1295 |
| Directors / Senior Directors / Managing Directors | $735 - 905 |
| Consultants/Senior Consultants | $415 - 660 |
| Administrative / Paraprofessionals | $150 - 280 |

- **Completion Fee:**  If the Debtors succeed in obtaining: (a) a consensual restructuring, compromise and/or extinguishment of existing indebtedness or (b) a final judicial order approving a plan of reorganization under chapter 11 or (c) a sale, transfer or other disposition of substantially all of the Debtors' assets in one or more transactions under section 363 of the Bankruptcy Code, then, upon the consummation of such restructuring or sale, the Debtors will pay FTI a Completion Fee in the amount $300,000.

- **Reimbursement of Expenses**:  In addition to compensation for professional services rendered by the Engagement Personnel, FTI will seek reimbursement for reasonable and customary expenses incurred in connection with these chapter 11 cases, including, but not limited to internet access, telephone, overnight mail, messenger, travel, meals, and accommodations.  In addition, FTI shall be reimbursed for the reasonable fees and expenses incurred in connection with the preparation and approval of this Application.  All fees and expenses due to FTI will be billed on a monthly basis, or more frequently as agreed to between FTI and the Debtors, as further set forth in the Engagement Letter, but in all events subject to the order approving the Application.

### *Indemnification Provisions*

29.    As a material part of the consideration for which FTI has agreed to provide the services described herein, and pursuant to the Engagement Letter, including the indemnification provisions attached thereto and incorporated by reference herein (the "Indemnification Provisions"), the Debtors have agreed to: (a) indemnify the Engagement Personnel serving as directors or officers of the Debtors to the same extent as the most favorable indemnification and advancement provisions provided by the Debtors to their directors, officers and any equivalently placed employees, whether under the Debtors' by-laws, by contract or otherwise; and (b) indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contractors and employees (collectively, the

"Indemnified Persons") under certain circumstances.[4]  The rights to indemnification shall survive the termination of these chapter 11 cases or any cases into which they may be converted.

30.      Accepting the Indemnification Provisions was a condition to FTI's engagement, the terms and provisions of which were, along with all other terms of the Engagement Letter, negotiated by the Debtors and FTI at arm's-length and in good faith.  FTI and the Debtors believe that the Indemnification Provisions are comparable to those indemnification provisions generally obtained by crisis management firms of similar stature to FTI and for comparable engagements, both in- and out-of-court.

## Fees and Reporting

31.      If the Court approves the relief requested herein, FTI will be retained to provide the Debtors with the Engagement Personnel and I will be designated as the CRO pursuant to section 363 of the Bankruptcy Code.  Because FTI is not being employed as a professional under section 327 of the Code, FTI will not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  Instead, FTI will file with the Court, and provide notice to the U.S. Trustee, the Official Committee of Unsecured Creditors, if one is appointed in these chapter 11 cases, and counsel to Tribeca Global Resources Credit Pty Ltd, Wyatt, Tarrant & Combs LLP (collectively, the "Notice Parties"), reports of compensation earned and expenses incurred on at least a quarterly basis.  Such compensation and expenses shall be subject to Court review in the

---

[4] The Indemnification Provisions generally provide that the Debtors will indemnify and hold harmless the Indemnified Parties from and against any claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation), arising out of or relating to the Debtors' retention of FTI, the execution and delivery of the Engagement Letter, and the provision of services or other matters relating to or arising from the Engagement Letter.  Notwithstanding the terms of the Indemnification Provisions, the Debtors and FTI have agreed, subject to the Court's approval of this Application, that in no event shall an Indemnified Party be indemnified or receive contribution or other payment under the Indemnification Provisions if the Debtors, their estates, or the statutory committee of unsecured creditors appointed in these chapter 11 cases assert a claim against an Indemnified Party and the Court determines by final order that such claim arose out of the gross negligence or willful misconduct on the part of that or any other Indemnified Persons.

event that an objection is filed.  In addition, FTI will file with the Court and provide the Notice Parties a report on staffing (the "Staffing Report") by the 20th day of each month for the previous month, and the report will include the names and tasks performed by all Engagement Personnel involved in this matter.  The Staffing Report (and FTI's staffing for this matter) will be subject to review by the Court in the event so requested by any of the Notice Parties.

32.     As set forth in the Prior Engagement Letters, FTI received $150,000 as a retainer from the Debtors (the "Retainer") prepetition.  FTI has applied the Retainer to amounts due for services rendered and expenses incurred prior to the Petition Date, which exhausted the Retainer. To the extent that FTI was owed any outstanding fees and expenses in excess of the balance of the Retainer as of the Petition Date, FTI has written-off such amounts.  For the avoidance of doubt, the Retainer was exhausted as of the Petition Date and the Debtors have not and will not replenish the Retainer during these chapter 11 cases.  Moreover, I am not aware of any asserted or threatened disputes against FTI or the Engagement Personnel on account of their services provided before the Petition Date.

33.     Given the numerous issues which the Engagement Personnel may be required to address in the performance of their services, I believe that FTI's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for such services in an in-court and out-of-court context, the fee arrangements set forth in the Application and in the Engagement Letter are reasonable.

010-8981-6022/6/AMERICAS

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  March 2, 2020

/s/

Bertrand Troiano
Managing Director, FTI Consulting, Inc.

**SCHEDULE I**

<u>List of Parties in Interest</u>

**Debtors**
Hartshorne Holdings, LLC
Hartshorne Mining Group, LLC
Hartshorne Mining, LLC
Hartshorne Land, LLC

**Non-Debtor Affiliates**
Paringa Resources Limited
Hartshorne Coal Mining Pty Ltd
HCM Resources Pty Ltd.
Hartshorne Operations, LLC

**Current and Former Directors and Officers**
Ian Middlemas
Todd Hannigan
Egan Antill
David Gay
Jonathan Hjelte
Richard McCormick
Thomas Todd
Richard Kim
Dominic Allen
Bruce Czachor
Gregory Swan
Adam Anderson
Greg Saragas
Gary Phillips
Jeff Garrison
Brent Hawley
Jim Middleton
Chris Blalock
Ronnie Drake
Troy Johnson
Chris Brooks
Zac Clayton
Mike Putman
Casey Larkins
Grant Quasha
Mark Pearce
Anastasio Arima

**Financers and Security Trustee**
Tribeca Global Resources Credit Pty Ltd

Global Loan Agency Services Australia Nominees Pty Ltd
Macquarie Bank Limited
Komatsu Financial Limited Partnership
Texas Capital Bank

**Current and Former Customers**
Big Rivers Electric Corporation
Indiana-Kentucky Electric Corporation
American Electric Power
Kentucky Utilities Company
Louisville Gas & Electric

**Debtors' Professional**
DLA Piper
Frost Brown Todd LLC
FTI Consulting, Inc.
Perella Weinberg Partners
Old National Bank
Argonaut Capital Limited
Marshall Miller & Associates, Inc.
Deloitte & Touche LLP
Energy Ventures Analysis
H.C. Wainwright & Co.
Roth Capital Partners
Cardno, Inc.
Precision Testing Laboratory, Inc.

**Grantors/Lessors**
Stambush, Earl
Hunt, Richard & Donna
Dame, Charles & Thelma
West, William
St. Mary's Episcopal Church
Farris, James M. James E., & Shannon
Wilson, John & Margaret, & JoAnn Mathis
Mercer, Carlus & Stacy
Quinn, Marilyn
Corim Farms, Inc.
Capps Family Trust
Kim, Chong Soo & Jin Sook
Combes, Clyde & Linda
Hust, Lawrence & Ann
Faulkner, Judith Keckley
Mercer, Carl & Bette Jo

3

Mercer, Jason
Woodruff, Larry & Marion
John Armstrong
Armstrong, Cheryl
Woodruff, Jimmie & Joy
Grant, Babara
Dame, Charles Kevin & JoAnn
Dame, Shawn
Tooth Acres, LLC
Stanley, Emmitt & Anita
Brazzell, William & Joyce Ann
William Thomas & Joyce Ann Brazzel Trust
West, John & Bonnie
C & T Famrs, LLC
Miles Farms, LLC
J.F. Wilbur, Inc.
Stanley, Lisa
Corum Family Trust
Parish, Omar Jr., & Barbara
Fox, Patricia
Ashby, Paul & Ginger
Tucker, Thomas
Tapp & Melton Farms, LLC
Bragg, Robert & Geraldine
Renfro, William & Karen
Fox, Harold & Judy
Nance, Barry
Story, Jane
Vaught, Kay
Ashby, Gerald & Barara
Rames, Charles & Lola Belle
Bradley Carroll Ashby Revocable Trust
Smith, Sharon Mac
Welte, Paulette & Virgil
Heilman, Eva
Cox, Lovinea
Adams, Julie & William Thomas
Coombs, Shirley & Charles
Heriges, Danielle & David
Pottgiesser, Nichole & David
Sanderfur, Robert & Marela
Patrick J. & Glenda A. Cortney Trust
Major, Linda
Major, Helen

4

Bickett, James & Margaret
Bickett, Alvin & Betty
Rudd, Allen & Pam
Weltner, Douglas & Ann
Harberson, Donald & Rita
Harberson, Jeremy & Rebecca
Zachary, Kerry & Janice
Wilson, Tommy & Debbie
Baggett, Gayle & Brenda
Daugherty, Roger & Sherry
Gardner, Robert
Corum, Frank & Janet
Cummins, Ann Corum
Linville, Darren & Larlee
Bickett, Edmund & Lula Margaret
Morning Star Properties, Inc.
Holzhauser, Albert & Ruby
Cobb, Jimmy & Gladys Mae
Miller, Larry & Nina
Ponderosa Realty Inc.
Bobby Wayne & Barbara Lee Thomas
Gregory Wayne & Stephanie Thomas
John R. , V & Heather Vickers
Cory & Candace Walker
Robert & Sara Englehardt
Allen & Michelle D. France
Derek L. & Susan Alexander
Cary, Glover Jr.
Austin, Oswald & Ina
Carter, Dorothy
Sutton, Larry
Sutton, John
VanCleve, James & Leigh, B.T. & Doris
Miles, William
E.T. Woosley Farms, LLC
Miller, David & Sharon
Miller, Gregory & Angela
Ayer, Jonathan & Traci
John H. and Betsy Woosley Trust
Woosley, Marnitta
Morehead, Craig & Janet
Dudley & Francis Dame
Dame, Larry & Vickey
Austin, Earlene

5

Charles Green Farms, LLC
Abrams, David & Betty
Bozarth, Glenna Belle
Johnson, Ben
Austin, Janet & Roger
Ayer, Bobby & Judith
Kirkland, Larry & Linda
Kirkland, Louise
Graham, Paul & Wanda
Alexander, Joyce M.
Raymond J. Walker Revocable Trust
Rickard, David & Patty
Johnson, Linda & Darrel
Bozarth, Rodney
Austin, Walter & Josephine
Hull, Mary
Austin, Jaclyn Belle
Miller, Danny & Kathy
Agent, Geraldine Miller
Hollis, Renee Miller
Miller, Linda
Cissna, Connie
Miller, Ricky
Woosley, Darrel & Shirley
Woosley, Kenneth
Ray, Juanita
Mackie, Carey
John & Donna Thomas Trust (Donna Thomas Trustee)
Kittinger, Loretta
Kittinger, McLean Farm
McElwain, Debra
McElwain Family Trust
Mitchell, Dan & Julie
Ellis, Lomer T. Jr., & Nancy Jo
Gaham, Freeman & Linda
Abrams, Edwin
Abrams, Benjamin & Barbara
Logsdon Family Farms, LLC
Logsdon, Philip & Mary
Hines, James & Janice
Hines, Jane
Hines, William & Renita
Igleheart, Christopher & Jennifer
Miller, Douglas & Marquetta

6

Miller, Wendell & Elizabeth
Miller, Allen Sr., & Wilma
Stratton, Byron Miles
Vickers, John R., IV, & Evelyn
McElwain, Lonnie & Danielle
Bowman, Benita
Miller, David & Sharon & Miller, Gregory & Angela
Rickard, Barbara
McElwain, John & Stacy
Romans, Judith Ann Moore
Graham, Jeremy & Graham, Jessica
Edna Willis Trust (Robert L. Willis, Trustee)
Fulkerson, Ronnie & Keila
Roberts, David & Judith
Carter, Jason & Michelle
Crowe, Jerry & Shirley
Smith, Richard & Rebecca
Bagget, Jerry & Jannett
Peyton, Joseph & Charlotte
Bell, Leora
Ricky Bell
Deanna McCoy
Wayne and Martha Bell
Jack and Trudy Bell
David and Brenda Bell
Kaleb and Ashley Bell
Ellis, Glenn & Ann
Keanan and Caroline Bell
Riggs, Stephen & Bebra
Howell, Stanley & Janet Rose
Revlett Grain Farms
Carter, Herschel & Martha
Austin, Wayne & Martha
Everly, Tina & Nathan
Bobo, Terry Sr. & Claudia
Mincy, Keith
Mincy, Luther Jr., & Kimberly
The Green Family Partnership
Green, David & Stacy
Green, Timothy
C.E. Martin Heirs, LLC
Gunterman, Jeff & Judith
Son, Geneva
Rickard, James & Helen

7

Campbell, James & Youlanda
Bunch, Alva
Rickard, William Morgan & Sondra
Cissna, Henry & Yvonne
Bowling, Doris
Rickard, Patrick & Beverly
Rickard, Tony & Carol
Williams, Eric & Tara
ICU Chickens, LLC
Rickard Farms LLC
Galloway, Jarrod & Brittney
Arnold, Terry
Schadler, George & Shirley
Seymour, Steve & Debra
Logsdon, Paull, III & Machera
Poplar Grove Poultry, Inc.
Logsdon Farm Service, Inc.
Rickard, David & Patty, Austin, Janet & Roger, & Young, Susan.
Willis, Glenda Sue
Daugherty, Barbara Ann
Howard, Jerrow W. Revocable Tr.
Hudson, Samuel Gaw & Teresa West
Thomas, Bobby Wayne & Barbara Lee
Thomas, Gregory Wayne & Stephanie
Riley, Joe E. & Betty C.
West, Harold T. & Starlene
Anderson, Sharon & Kenneth
Batsel, Jennie Lee
Marlatt, Joyce Deane & Loverne N.
Batsel, Thomas Ashby & Barbara
Niswonger, Elizabeth
Dossett, Susie Dee
Smith, Rogers H. & Tammy W.
Smith, Sidney Terrel & Linda Dayhoff
Rickard, Walter Wayne & Anna Faye
Ellis, John R., Sr.
West, Charles & Kelia
Ellis, John & Donna
Ellis, Christopher Jacob & Roxann
Baggett, Daniel L.
Baggett, Derek M.
Dant, Michael & Margaret
Frailley, Charles Morton & Paula F.
Frailley, Lucas & Susan

8

Frailley, Heath & Niki
Frailley, Chad N.
Rickard, Ellis W. & Nina G
Patterson, Guy W. & Sandra K
Patterson, Clint & Michelle
Gish, Charles R.
Walker, Cory & Candace
Rickard, James & Joyce
Mize, Sandra M. & Jerry
Pyles, Dana & David
Miller, Fletcher Eric & Grace
Rickard, Douglas & Barbara
Tooley, Elbert Dwight & Brenda
Davis TE Minerals, LLC
Eric Timrud and Dorothy Leszko
Robert L. and Patricia Rogers
Thomas A. and Emily W. Rogers
Judy and Joseph Christian
June Young
Kathy Lawrence
Gregory A. and Angela K. Miller
Allen J. and Wilma D. Miller
Douglas P. and Marquetta Miller
Wendell H. Miller
Charles F. and Edna Bates
William S. Bates
Lavinia C. and William Filiatreau
Bernie and Lois Crumbaker
Ronald E. and Jane B. Crumbaker
Terry L. & Rebecca D. Riley, Leslie W. & Lisa A. Riley
Dennis W. Dement
Elva Lee McKenny
Terry L. and Rebecca D. Riley
Douglas and Marquetta Miller
David H. Jernigan, Trustee
Richard B. Miller Revocable Living Trust
Rice Contracting, LLC
Randall L. Shanks
Edward & Crystal West
Latricia G. Fisher
Audra J. Fetcher
Joseph C. & Tracy L. Logsdon
Scott & Sherry Logsdon
Judy C. Logsdon

William C. Logsdon Irrecocable Trust
Philip and Mary L. Logsdon
Jeff & Judy Gunterman
Charles H. Gossett
Lyndel Arnold
David Conrad
Pamela & Robert Jennings
Karen & Gary Bickett Farms, LLC
Allen Leonard and Susan I. Baggett
Lavada Roberts
Walter K. Roberts
Madelaine Roberts
Jody E. Roberts and Peggy Roberts
Delores Roberts
Jennifer Dobbins and Paul Dobbins
Michelle Roberts and Gary Zirpoli
Bruce Roberts and Martha Roberts
Beverly Allen
Norville & Peggy Arnold
PK Ellis Estate
Ronald A. Logsdon
Janice Wicks
Bobby Wicks and Joyce Wicks
Janet Austin and Roger Austin
Susan Young
David Rickard and Patty Rickard
Billie John Thomas and Rebecca Thomas
Tommy Lynn Thomas and Tara Thomas
Jonnie Renea Thomas Jesperson and Rene K. Jesperson
Kris Ann Thomas Arnold and Tracy Arnold
Billie Jane Thomas Sumra and Atul Sumra
James Wesley Moore and Trudy Moore
Bryan Miles Stratton
Larry E. Kirkland, Linda C. Kirkland
Janet R. Austin, Roger W. Austin, Susan R. Young, David T. Rickard, Patty D. Rickard
Jaclyn Belle Austin
Glenna B. Bozarth
Guy and Sandra Patterson
Melvin R. and Katherine Cabbage
Carolyn Jackson
Gregory Wayne Thomas
Bobby and Barbara Thomas
Leslie W. and Lisa A. Riley
Lorna Sue and Donald Pierce

Charles M. and Paula F. Frailley
Randall Shanks, Edward & Crystal West
Oswald D. & Ina Austin
Jerrol W. Howard, Jr. Revocable Trust
Barbara Lee Thomas Estate
Linford Lee and Wanda Lee
Kimberly Marks
Kelly Baggett Foster and Kevin Foster
Lisa Baggett Hicks and Dwayne Hicks
C. Bruce Vanderver
Kimberly McGehee
Cheryl Bushong
Shelia Fulkerson
William S. Miles Estate
Sterett Miles
Paul Miles
Suzanne Miles
Michael Stratton
Jennifer McCrystal
Andy Seymour
Alison Miles
Bobby Miles
Abby Miles
Westyn Miles
Rebecca Bozarth
Buna Miller
John Doyle Wilson – Trustee for Sean C. Wilson
Jean Littlefield
Wendell M. Littlefield
David Quinn
Tony Ann Gipe
Elizabeth Dru West
Donah Lee McDonald
Corum Farms, Inc.
F & S Farms, LLC
Marjorie Ann Kittinger
James Hugh Kittinger
Diana Kittinger
Gilda E. Mitchell
James L. Beck and Bettye J. Beck
Roy Joe Head
Elizabeth Galloway
Christopher Armstrong
CBoone LLC

11

Woodruff Energy LLC
Nell Ann Arnold
Charles Ranes and Lola Bell Ranes
Patrick J. Courtney & Glenda A. Courtney Revocable Trust
Warren L. and Lori J. Givens
Boots Pennyrile, LLC

**VENDORS**
Aflac
Airgas
All Source Industry Supply, Inc
American Printing Company (APC)
Associated Engineers, Inc
AT&T
Buchanan Pump Service & Supply Co. Inc.
C.H. Kyle Co.
Carroll Engineering Co
CDW LLC
Champion Industries, Smith & Butterfield
Cintas
CRS One Source
Cuda Bits LLC
Envision Contractors, LLC
Eric Wells Training
First-Line Fire Extinguisher Company
Forestry Suppliers, Inc.
Fortner LP Gas Company Inc.
Fricke Management & Contracting, Inc.
Frontier-Kemper Constructors, Inc
Frost Brown Todd LLC
GBS Enterprises, Inc.
H&G Limestone Products. LLC
Hagan's Outdoor Equipment
Happy's of Madisonville
Harding Shymanski & Company, PSC
Health Resources, Inc.
Home Oil & Gas Company, Inc.
Hughes Network Systems, LLC
J.H. Fletcher & Co.
Jennmar
JMS Russel Metals Corp
John Plunkett
Kenergy Corporation
Kentucky State Treasurer

12

Kerco, Inc
Kimberly Sandberg
Komatsu Financial
Lang Co.
Lieberman Technologies
MACO Reprographics LLC
Madisonville Auto Parts, Inc.
Meuth Construction Supply, Inc
Mine and Mill Supply Company, LLC
MineSafe Electronics, Inc.
Modern Welding Company of Kentucky, Inc.
MSDS Online Inc. "Velocity EHS"
Natural Resource Management Solutions (NRMS)
NPN Environmental Engineers, Inc.
Office Depot
Pioneer Supply
Pollard & Sons Excavating LLC
Power Technologies
Preiser Scientific, Inc
PSG Safety Products
Rexel USA, Inc
Richland Volunteer Fire Department
Richwood Industries, Inc.
Road Builders, LLC
Royal Brass & Hose
Sacramento Waterworks
Shred-it USA
Special Mine Services, Inc.
Spectrotel
Star Industrial Supply, Inc.
Stonebridge Press LTD
Strata Safety Products LLC
Superior Office Systems
SWAT Pest Management
Time Warner Cable
United Central
US Bank Equipment Finance
WC Hydraulics LLC
West KY Pipe & Valve Inc.
Advanced Fabricators &  Rebuilders
William E. Groves Construction, Inc.
Woodruff Supply Co. Inc.
Catering and Creations
Advanced Coal Technology

13

Equisolve
Humana Insurance Company
Availent Systems
DJRP Enterprises LLC
Prophet One Solutions LLC
Redchip Companies, Inc.
Glenwood Management Corp.
Lakeshore Country Club

**Ordinary Course Professional**
Computershare investor Services
Gibson, Dunn & Crutcher
Quisenberry and Quisenberry
Wyatt Tarrant & Combs, LLP
Jackson Kelly PLLC
Stantec Consulting Services, Inc.
John Hancock
City Centre
Automatic Data Processing (ADP)

**Producers and Insurers**
Accord Corporation
Imperium Insurance Company
Great Midwest Insurance Company
Rockwood Casualty Insurance Company
Lloyds of London
Van Meter Insurance Group
Houchens Insurance Group
Price Forbes & Partners Limited
Aon UK Limited
FIRST Insurance Funding
Humana Insurance Company

**Bankruptcy Judges and Staff**
Judge Alan C. Stout
Karen Lynch
Jim Higdon
Sherry Graham
Judge Thomas H. Fulton
Mina Khalil
Benedict Wiesner
Angela Gudgel
Judge Joan A. Lloyd
Elaine Fountain

14

Barbara Wetzel
Kristin Goss

**Clerk of Court and Staff**
Elizabeth H. Parks
Jeanne Lucas
Michelle Pierce
Tina Preston
Ashley hardy
Jillian Harris
Candace Byrd
Penny Haas
Jeff Henry
Danielle Hite

**Office of the U.S. Trustee**
Charles Merrill
Robert Allison
Laura Cundiff
Linda Duncan
Gary Grimes
Timothy Ruppel
John Stonitsch
Sue Ziegler

**Regulatory and Government Authorities**
Kentucky, Commonwealth of, Department of Environmental Protection
Kentucky, Commonwealth of, Department of Higways
Kentucky, Commonwealth of, Department of Natural Resources
Kentucky, Commonwealth of, Energy and Environment Cabinet
United States, Government of the, Department of Agriculture Forestry Service
United States, Government of the, Army Corpos of Engineers
United States, Government of the, Department of Labor, Mine Safety & Health Administration
United States, Government of the, Department of the Interior
United States, Government of the, Environmental Protection Agency
United States, Government of the, Department of Labor
Bourbon, County of (KY), Sheriff's Office
Elliott, County of (KY), Sheriff's Office
Fayette, County of (KY), Office of the Sheriff
Kentucky, Commonwealth of, Treasurer
Lee, County of (KY), Sheriff's Office
Millersburg, City of (KY)
Morgan, County of (KY), Sheriff's Office
Morgan, Township of (KY), Tax Collector

15

Muhlenberg, County of (KY), Sheriff's Office
Ohio, County of (KY), Sheriff's Office
Union, County of (KY), Sheriff's Office
United States, Government of the, Office of Surface Mining Reclamation & Enforcement
Webster, County of (KY), Sheriff's Office
Kentucky, State of, Tax Department
United States, Government of the, Internal Revenue Service

**Parties to Existing Litigation**
Gordon T. Bryant
Kenneth L. Bryant
McLean County Fiscal Court
McLean County Joint Planning Commission

**Utilities**
Ring Central
River City Industrial Services, Inc.

**Top 30 Unsecured Creditors (Not Already Listed)**
Minova USA, Inc
Joy Global Underground Mining LLC
Trey K Mining & Electric, Inc.
Dapco, Inc.
Wallace Electrical Systems, LLC
Custom Staffing Services
Nalco Company LLC
Southern Pride Drilling, LLC
Kentucky Rivers Wood Products, LLC
Nasdaq Stock Market LLC
Purvis Industries (The Mine Supply)

010-8981-6022/6/AMERICAS

**SCHEDULE 2**

**Relationships in Matters Related to these Chapter 11 Cases:**
**None**

**Relationships in Unrelated Matters:**

**Financers and Security Trustee**
Macquarie Bank Limited
Texas Capital Bank

**Current and Former Customers**
American Electric Power

**Debtors' Professionals**
Cardno, Inc.
Deloitte & Touche LLP
DLA Piper
Frost Brown Todd LLC

**Grantors/Lessors**
Miller, David
Roberts, David
Smith, Richard
Williams, Eric

**Vendors**
Aflac
Airgas
AT&T
Cintas
Hughes Network Systems, LLC
Nasdaq Stock Market LLC
Office Depot
US Bank Equipment Finance
Time Warner Cable

**Ordinary Course Professional**
Automatic Data Processing (ADP)
Gibson, Dunn & Crutcher

**Producers and Insurers**
FIRST Insurance Funding
Lloyds of London
Price Forbes & Partners Limited

**Regulatory and Government Authorities**
United States, Government of the, Department of Labor
United States, Government of the, Environmental Protection Agency