**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**(Owensboro Division)**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hartshorne Holdings, LLC, *et al.*, | ) | Case No. 20-40133 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR**
**HARTSHORNE HOLDINGS, LLC AND ITS AFFILIATED DEBTORS**

| | |
|---|---|
| **SQUIRE PATTON BOGGS (US) LLP**<br>Stephen D. Lerner (admitted *pro hac vice*)<br>Nava Hazan (admitted *pro hac vice*)<br>Travis A. McRoberts (admitted *pro hac vice*)<br>Kyle F. Arendsen (admitted *pro hac vice*)<br>201 E. Fourth Street, Suite 1900<br>Cincinnati, Ohio 45202<br>Telephone: 513.361.1200<br>Facsimile: 513.361.1201<br><br><br>Co-Counsel for the Debtors and<br>Debtors-in-Possession | **FROST BROWN TODD LLC**<br>Edward M. King<br>Bryan J. Sisto<br>400 West Market Street, Suite 3200<br>Louisville, Kentucky 40202<br>Telephone:  502.589.5400<br>Facsimile:  502.581.1087<br><br><br><br><br>Co-Counsel for the Debtors and<br>Debtors-in-Possession |

Dated:        October 5, 2020

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Hartshorne Holdings, LLC (3948); Hartshorne Mining Group, LLC (0063); Hartshorne Mining, LLC (1941); and Hartshorne Land, LLC (5582). The Debtors' headquarters are located at 373 Whobry Road, Rumsey, Kentucky 42371.

<u>IMPORTANT NOTICE</u>

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE *JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR HARTSHORNE HOLDINGS, LLC AND ITS AFFILIATED DEBTORS* (THE "<u>PLAN</u>").  NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS AND THESE CHAPTER 11 CASES, THE DEBTORS' BUSINESSES, AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1**.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.  THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.   THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW.   DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT EACH CREDITOR WHO IS ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH WILL BE FILED NO LATER THAN TEN

CALENDAR DAYS PRIOR TO THE VOTING DEADLINE (AS DEFINED BELOW)), AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **11:59 P.M. (PREVAILING MOUNTAIN TIME) ON OCTOBER 27, 2020,** UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR

INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT, AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS, AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**THE DEBTORS AND THE COMMITTEE SUPPORT CONFIRMATION OF THE PLAN, AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

010-9091-4666/30/AMERICAS

## TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ...................................................................... 1

    **1.1**    General. ........................................................................................... 1

    **1.2**    Combined Hearing for Disclosure Statement and Plan Confirmation. ................. 2

    **1.3**    No Substantive Consolidation .......................................................... 3

    **1.4**    Unclassified Claims and Classified Claims and Interests. ....................... 3

    **1.5**    General Voting Information; How to Vote. ......................................... 9

**ARTICLE II SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS THEREUNDER** ........ 10

    **2.1**    General Rules of Classification. ...................................................... 10

    **2.2**    Summary of Treatment of Claims and Interests Under the Plan. ................ 11

**ARTICLE III BUSINESS DESCRIPTION; HISTORICAL INFORMATION** ................. 14

    **3.1**    The Debtors' Prepetition Business. .................................................. 14

    **3.2**    Debtors' Prepetition Capital Structure. ........................................... 16

    **3.3**    Additional Obligations Owed by the Debtors. ..................................... 18

**ARTICLE IV EVENTS LEADING TO CHAPTER 11 FILING** ........................... 19

**ARTICLE V DESCRIPTION AND HISTORY OF CHAPTER 11 CASES** ...................... 21

    **5.1**    General Case Background ............................................................. 21

    **5.2**    Appointment of the Committee. ..................................................... 21

    **5.3**    Retention of Professionals. ............................................................ 22

    **5.4**    Employment Obligations. ............................................................. 23

    **5.5**    Continuing Supplier and Customer Relations ....................................... 23

    **5.6**    Cash Management System. ............................................................ 23

    **5.7**    Utilities. ................................................................................ 23

    **5.8**    Insurance Obligations. ................................................................ 24

    **5.9**    Tax Motion. ............................................................................ 24

    **5.10**    Surety Bond Motion. ................................................................. 24

    **5.11**    Schedules and Statements. .......................................................... 24

    **5.12**    Bar Dates. ............................................................................. 24

    **5.13**    Financing Motion. ................................................................... 25

    **5.14**    Sale Process. .......................................................................... 25

i

| | | |
|---|---|---|
| **5.15** | Paycheck Protection Program. | 29 |
| **5.16** | Key Employee Incentive Plan. | 29 |
| **5.17** | Committee's Motion to Convert Chapter 11 Cases. | 30 |
| **5.18** | Adversary Proceedings Against the Secured Lenders and Committee Settlement. | 30 |
| **5.19** | Agreed Orders to Lift the Automatic Stay. | 31 |
| **5.20** | Rejection of Certain Executory Contracts and Unexpired Leases. | 31 |
| **5.21** | 401(k) Plan Termination. | 32 |
| **5.22** | Omnibus Claims Objection. | 32 |

**ARTICLE VI REASONS FOR THE SOLICITATION; RECOMMENDATION** ... **32**

**ARTICLE VII THE PLAN** ... **33**

| | | |
|---|---|---|
| **7.1** | Overview of Chapter 11. | 33 |
| **7.2** | Purpose of the Plan. | 34 |
| **7.3** | Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Interests. | 34 |
| **7.4** | Means for Implementation. | 35 |
| **7.5** | Treatment of Executory Contracts and Unexpired Leases. | 39 |
| **7.6** | Liquidation Trust. | 40 |
| **7.7** | Binding Effect. | 47 |
| **7.8** | Release of Claims Against and Interests in the Debtors. | 47 |
| **7.9** | Term of Pre-Confirmation Injunctions or Stays. | 47 |
| **7.10** | Debtor Release. | 47 |
| **7.11** | Accepting Claim Holders Release. | 48 |
| **7.12** | Exculpation and Limitation of Liability. | 49 |
| **7.13** | Injunction Related to Releases and Exculpation. | 49 |
| **7.14** | Retention of Causes of Action/Reservation of Rights. | 49 |
| **7.15** | Indemnification Obligations. | 50 |

**ARTICLE VIII CONFIRMATION OF THE PLAN OF LIQUIDATION** ... **50**

| | | |
|---|---|---|
| **8.1** | Confirmation Hearing. | 50 |
| **8.2** | Confirmation. | 51 |
| **8.3** | Standards Applicable to Releases. | 55 |
| **8.4** | Classification of Claims and Interests. | 56 |
| **8.5** | Consummation. | 56 |

| | | |
|---|---|---|
| **8.6** | Exemption from Certain Transfer Taxes. ........................................................ | 56 |
| **8.7** | Dissolution of Committee. ............................................................................ | 57 |
| **8.8** | Modification of Plan. .................................................................................... | 57 |
| **8.9** | Revocation or Withdrawal of the Plan. ......................................................... | 57 |
| **8.10** | Retention of Jurisdiction. ........................................................................... | 57 |

**ARTICLE IX CERTAIN RISK FACTORS TO BE CONSIDERED ................................. 60**

| | | |
|---|---|---|
| **9.1** | Certain Bankruptcy Considerations. ............................................................. | 60 |
| **9.2** | Certain Securities Considerations. ............................................................... | 64 |

**ARTICLE X CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ............................................................................................................... 65**

| | | |
|---|---|---|
| **10.1** | Introduction. .............................................................................................. | 65 |
| **10.2** | Federal Income Tax Consequences to the Debtors. ...................................... | 65 |
| **10.3** | Federal Income Tax Consequences to Holders of Claims and Interests. ......... | 66 |
| **10.4** | Consequences of the Liquidation Trust. ....................................................... | 68 |
| **10.5** | Information Reporting and Back-Up Withholding. ......................................... | 69 |

**ARTICLE XI PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN ................... 70**

| | | |
|---|---|---|
| **11.1** | Distributions on Account of Claims Allowed as of the Effective Date. ............ | 70 |
| **11.2** | Distributions on Account of Claims Allowed After the Effective Date. ........... | 70 |
| **11.3** | Distributions to Allowed General Administrative Expense Claims ................. | 71 |
| **11.4** | Delivery of Plan Distributions. .................................................................... | 71 |
| **11.5** | Claims Paid or Payable by Third Parties. ..................................................... | 72 |
| **11.6** | No Postpetition Interest on Claims. .............................................................. | 73 |

**ARTICLE XII PROCEDURES FOR RESOLVING CLAIMS ...................................... 73**

| | | |
|---|---|---|
| **12.1** | Allowance of Claims .................................................................................... | 73 |
| **12.2** | Objections to Claims. .................................................................................. | 74 |
| **12.3** | Estimation of Claims ................................................................................... | 74 |

010-9091-4666/30/AMERICAS

Annexed as exhibits (the "<u>Exhibits</u>") to this Disclosure Statement are copies of the following documents:

- Plan of Liquidation (<u>Exhibit 1</u>)

- Liquidation Analysis (<u>Exhibit 2</u>)

- Committee Letter (<u>Exhibit 3</u>)

- Corporate Organization Chart (<u>Exhibit 4</u>)

010-9091-4666/30/AMERICAS

# ARTICLE I

# INTRODUCTION

**1.1**    *General.*

Hartshorne Holdings, LLC and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),[2] in the chapter 11 cases pending before the United States Bankruptcy Court for the Western District of Kentucky (the "Bankruptcy Court"), hereby transmit this disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the Debtors' solicitation of votes to confirm the *Joint Chapter 11 Plan of Liquidation for Hartshorne Holdings, LLC and its Affiliated Debtors*, dated as of October 5, 2020 (the "Plan").[3]  ***All Plan Documents are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan), which may result in material changes to the terms of the Plan Documents.***  On the Effective Date, the Plan, all Plan Documents, and all other agreements entered into or instruments issued in connection with the Plan and any Plan Document, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.

The purpose of this Disclosure Statement is to set forth information:  (i) regarding the history of the Debtors and their businesses; (ii) describing these Chapter 11 Cases; (iii) concerning the Plan; (iv) advising the holders of Claims and Interests of their rights under the Plan; and (v) assisting the holders of Claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.

The Debtors seek Bankruptcy Court approval of the Plan.  Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement is being submitted in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article III hereof);

- events leading to these Chapter 11 Cases (Article IV hereof);

- significant events in these Chapter 11 Cases (Article V hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article II hereof);

---

[2] This Disclosure Statement and the proposed *Joint Plan of Liquidation for Hartshorne Holdings, LLC and its Affiliated Debtors* relate to the following debtors and debtors-in-possession: Hartshorne Holdings, LLC; Hartshorne Mining Group, LLC; Hartshorne Mining, LLC; and Hartshorne Land, LLC.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

1

- certain important effects of Confirmation of the Plan (Article VIII hereof);

- releases contemplated by the Plan (Article VII hereof); and

- the statutory requirements to confirm the Plan (Article VIII hereof).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtors have approved the Plan and the transactions contemplated therein and believe the Plan is in the best interests of the Debtors, the Debtors' Estates, and the Debtors' creditors.

**THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE") ALSO RECOMMENDS THAT HOLDERS OF GENERAL UNSECURED CLAIMS ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN. THE COMMITTEE PROVIDED A LETTER URGING HOLDERS OF GENERAL UNSECURED CLAIMS TO VOTE IN FAVOR OF THE PLAN, WHICH IS INCLUDED IN THE SOLICITATION PACKAGE.**

Additional copies of this Disclosure Statement (including all Exhibits) are available upon request to the Debtors' Administrative Advisor, Stretto ("Stretto"), at the following address:

Hartshorne Holdings, LLC Case Administration
c/o Stretto
8269 East 23rd Avenue, Suite 275
Denver, Colorado 80238

Additional copies of this Disclosure Statement (including all Exhibits) can also be accessed free of charge from the following website:  http://cases.stretto.com/hartshorne (the "Case Website").

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Plan Supplement, the other exhibits attached hereto, and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

## 1.2    *Combined Hearing for Disclosure Statement and Plan Confirmation.*

In accordance with section 1128 of the Bankruptcy Code, a combined hearing will be held before a United States Bankruptcy Judge for the United States Bankruptcy Court for the Western District of Kentucky, to consider the adequacy of the Disclosure Statement and the confirmation of the Plan (the "Confirmation Hearing").  The request for an expedited process, through a combined hearing, is made to limit the administrative and professional expenses that the Debtors continue to incur while in bankruptcy given their scarce resources, with the ultimate goal of further increasing recoveries to creditors.  At the Confirmation Hearing, the Debtors will request confirmation of the

2

Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and will reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, subject to the terms of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will, among other things:

- determine whether information provided in the Disclosure Statement is adequate as defined in section 1125 of the Bankruptcy Code;

- determine whether sufficient majorities in number and amount from each Class entitled to vote have delivered properly executed votes accepting the Plan to approve the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously resolved or disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

**1.3    *No Substantive Consolidation.***

Nothing in the Plan is intended or shall be deemed to be a substantive consolidation of the Debtors' separate Estates.  Each of the Debtors' Estates shall continue to be separate from one another.  No assets belonging to one Debtor's Estate shall be joined or otherwise consolidated with the assets belonging to any of the other Debtors' Estates and no liabilities of one Debtor's Estate shall be joined or otherwise consolidated with the liabilities of any of the other Debtors' Estates.  However, nothing in the Plan is intended or shall be deemed to be a waiver of any right of the Debtors, the Liquidation Trustee, or any other party in interest to seek substantive consolidation through a separate motion with notice and opportunity to be heard.

**1.4    *Unclassified Claims and Classified Claims and Interests.***

All Claims and Interests, except for those Claims set forth in Section 1.4(a) below, are classified for voting and distribution purposes pursuant to the Plan as set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified herein.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes.  A holder of a Claim that may be asserted against more than one of the Debtors shall be entitled to a single distribution as if such holder had a single Claim against the Debtors.

(a)    **Unclassified Claims**

(i)    **Payment of Administrative Expense Claims**

(A)    **General Administrative Expense Claims**

3

Subject to the bar date provisions herein, unless otherwise agreed by the holder of a General Administrative Expense Claim and the Debtors or the Liquidation Trustee, as applicable, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed General Administrative Expense Claim will receive payment of such Allowed General Administrative Expense Claim in accordance with the Plan, as described below.  For the avoidance of doubt, 503(b)(9) Claims shall be deemed to be General Administrative Expense Claims.

Any unpaid Allowed General Administrative Expense Claim not otherwise satisfied prior to the Effective Date will receive the following treatment under the Plan.  It is unlikely that there will be sufficient cash to satisfy all Allowed General Administrative Expense Claims in full in Cash on the Effective Date.  The quantum of the Allowed General Administrative Expense Claims and the related recovery available to satisfy such Allowed General Administrative Expense Claims are dependent on a number of variables, events and conditions that are unknown at this time and/or outside the control of the Debtors.  Those variables include, but are not limited to, recoveries from the sale of the Estates' remaining Liquidation Trust Assets and the ultimate timing and manner of the closing of these chapter 11 cases.  In addition, the amounts in the Carve-Out Escrow and the Postpetition Fee Escrow (which amounts are currently in dispute) will determine whether the General Administrative Expense Claims can be paid in full or not, in accordance with the Plan.  If the aggregate amount of the Allowed Administrative Expense Claims are less than or equal to the aggregate amounts in the Carve-Out Escrow ($3 million) and Postpetition Fee Escrow ($1.5 million), then the Debtors may be in a position to pay Allowed General Administrative Expense Claims in full.

With respect to the timing of classifying a General Administrative Expense Claim as "Allowed," a timely filed General Administrative Expense Claim will be deemed "Allowed" only if and to the extent that (a) no objection to the allowance thereof has been Filed or such an objection has been Filed and the Claim thereafter has been Allowed by a Final Order, or (b) any General Administrative Expense Claim is expressly deemed allowed by the Plan or allowed by a Final Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court).  The "Administrative Bar Date" is defined as the later of:  (a) 20 calendar days after the Effective Date, and (b) such other period of limitation for objecting to General Administrative Expense Claims as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court.

If "Allowed," the earliest a holder of an Allowed General Administrative Expense Claim would be paid on account of its Claim in Cash would be the "General Administrative Initial Distribution Date," a date to be scheduled no later than 180 calendar days after the Effective Date.  While the Debtors and the Liquidation Trustee, as applicable, will make every effort to pay a 100 percent recovery with respect to the Allowed General Administrative Expense Claims, given the current financial situation of the Debtors, the distribution to Allowed General Administrative Expense Claim may be delayed and/or reduced. Therefore, while the General Administrative Initial Distribution Date will be scheduled no later than 180 calendar days after the Effective Date, the ultimate timing of the distribution and the recovery percentage for holders of Allowed General Administrative Expense Claims is currently unknown.

Certain parties were or will be paid a higher percentage on their respective General Administrative Expense Claims incurred during these chapter 11 cases because the Debtors paid the totality of such Claims in the ordinary course of business since the Petition Date. The Debtors have paid approximately $16.4 million since the Petition Date to creditors who would have otherwise been holders of General Administrative Expense Claims. In addition, the Debtors believe that the remainder of the holders of General Administrative Expense Claims will see a greater recovery under the Plan than with any other alternative path, including dismissal or conversion of these cases to cases under chapter 7 of the Bankruptcy Code. Any other exit strategy for these Debtors will further decrease such recovery, such that it is in the best interest of the General Administrative Expense Claims to support the Plan.

However, the treatment afforded to holders of General Administrative Expense Claims under the Plan is only available if each such holder agrees to such treatment. The failure to object to confirmation of the Plan by a holder of a General Administrative Expense Claim prior to the Voting Deadline shall be deemed to be such holder's consent and agreement to receive treatment for such Claim that is different from the one set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in Cash on the Effective Date.

If a holder of a General Administrative Expense Claim objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan.

#### (B)    Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930 prior to the Effective Date shall be paid by the Liquidation Trustee on the Effective Date. After the Effective Date, the Liquidation Trust and the Liquidation Trustee shall be jointly and severally liable to pay any and all fees pursuant to 28 U.S.C. § 1930 when due and payable. The Liquidation Trust and the Liquidation Trustee shall remain obligated to pay fees pursuant to 28 U.S.C. § 1930 for each and every one of the Debtors to the Office of the U.S. Trustee until the earliest of that particular Debtor's case is closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

#### (C)    Professional Compensation

#### (1)    Final Fee Applications and Payment of Professional Fee Claims

To the extent required by a Final Order of the Bankruptcy Court approving a Professional Person's retention, all final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 30 calendar days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, the Liquidation Trustee shall be authorized to pay from the Postpetition Fee Escrow and Carve-Out Escrow to the applicable Professional Person up to the full Allowed amount. Professional Fee Claims not subject to approval by separate Bankruptcy Court order will be paid from the Postpetition Fee Escrow and Carve-Out Escrow in accordance with any Final Order approving the retention of such Professional Person.

5

To the extent that funds held in the Postpetition Fee Escrow and Carve-Out Escrow are insufficient to satisfy the amount of the Professional Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with the Plan.

### (2)    Carve-Out Escrow

As soon as practicable after the Confirmation Date, the Debtors shall fund the Carve-Out Escrow with Cash in the amount of $3,000,000.  The Carve-Out Escrow shall be maintained in trust for the Professional Persons.  Such funds are not property of the Debtors' Estates.  The amount of Professional Fee Claims owing to the Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Carve-Out Escrow.  Notwithstanding anything provided in the Plan, the Carve-Out Escrow is preserved and shall continue unaffected by the Confirmation Date or the occurrence of the Effective Date.

### (3)    Postpetition Fee Escrow

Notwithstanding anything provided in the Plan, the Postpetition Fee Escrow is preserved and shall continue unaffected by the Confirmation Date or the occurrence of the Effective Date. The Postpetition Fee Escrow contains Cash in the amount of $1,500,000 maintained by the Debtors for the sole benefit of the allowed fees and expenses of those professionals retained pursuant to Bankruptcy Court orders in the Chapter 11 Cases.  There is currently a dispute between the Debtors and the Secured Lenders with respect to whether the Postpetition Fee Escrow is included in the Carve-Out Escrow.

### (4)    Allocation and Estimation of Professional Fees and Expenses

Professional Persons providing services to the Debtors shall reasonably estimate their unpaid Professional Fee Claims against the Debtors relating to the period prior to and through the Effective Date and shall deliver such estimate to the Debtors by two Business Days prior to the Confirmation Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional Person and such Professional Persons are not bound to any extent by the estimates.  If a Professional Person does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional Person.

### (D)    Post-Confirmation Date Professional Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date through the Effective Date, the Debtors or the Liquidation Trust, as applicable, will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash from the Carve-Out Escrow and the Postpetition Fee Escrow the reasonable and documented legal, professional, or other fees and expenses related to implementation and consummation of the Plan incurred by the Debtors (including the reasonable and documented fees and expenses of the Committee's Professional Persons).  Upon the Confirmation Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order

6

in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Liquidation Trustee, as applicable, may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

When all Professional Fee Claims have been paid in full, any remaining amount in the Carve-Out Escrow shall be distributed to holders of Claims in accordance with the terms of the Plan.

### (E)    Bar Date for Administrative Expense Claims

Except with respect to Professional Fee Claims or otherwise as set forth in the Plan, requests for payment of Administrative Expense Claims that arose during the period after the Petition Date and ending on the Effective Date must be Filed in the Bankruptcy Court and served on all parties in interest no later than 20 calendar days after the Effective Date. Objections to such requests for payment of Administrative Expense Claims and all requests for payment of Administrative Expense Claims must be Filed and served on the requesting party by the later of (i) 50 calendar days after the Effective Date or (ii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Expense Claims.

Holders of Administrative Expense Claims that are required to File and serve such Administrative Expense Claims and that do not timely File and serve such a request as set forth in the Plan, will be forever barred from asserting such Administrative Expense Claims against the Debtors, the Liquidation Trust or their respective property, and such Administrative Expense Claims will be deemed discharged with prejudice as of the Effective Date.

### (ii)    Payment of Priority Tax Claims

### (A)    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the Debtors or the Liquidation Trustee, as applicable, each holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Liquidation Trustee, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, satisfaction and release of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

### (B)    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary in Article II of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the holder (other than as the holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors, the Liquidation Trustee, or their respective property.

7

(iii)    **U.S. Trustee Fees**

On and after the Effective Date, the Liquidation Trustee shall pay the applicable U.S. Trustee Fees as such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Cases.

(b)    **Classification of Claims and Interests**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for voting and distribution purposes pursuant to the Plan.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Except as otherwise specifically provided for therein, the Confirmation Order, or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

| Class | Claims | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired | Presumed to Accept |
| Class 2A | DIP Loan Claims | Impaired | Entitled to Vote |
| Class 2B | Secured Lenders Claims | | |
| Class 3A | Other Secured Claims Against Hartshorne Holdings | Impaired | Entitled to Vote |
| Class 3B | Other Secured Claims Against Hartshorne Group | | |
| Class 3C | Other Secured Claims Against Hartshorne Mining | | |
| Class 3D | Other Secured Claims Against Hartshorne Land | | |
| Class 4A | General Unsecured Claims Against Hartshorne Holdings | Impaired | Entitled to Vote |
| Class 4B | General Unsecured Claims Against Hartshorne Group | | |
| Class 4C | General Unsecured Claims Against Hartshorne Mining | | |
| Class 4D | General Unsecured Claims Against Hartshorne Land | | |
| Class 5 | Interests | Impaired | Presumed to Reject |
| Class 6 | Intercompany Claims | Impaired | Presumed to Reject |

8

**1.5**    *General Voting Information; How to Vote.*

To understand whether you are entitled to cast a vote on the Plan and how to do so, you should review the content of this section of the Disclosure Statement and the voting procedures described in the Solicitation Procedures Motion (the "Voting Procedures").  You may obtain a copy of the Solicitation Procedures Motion, including the Voting Procedures, from the Case Website or by (i) calling Stretto at (833) 643-0359; (ii) emailing Stretto at TeamHartshorne@stretto.com; or (iii) writing to Stretto at Hartshorne Holdings, LLC Case Administration, c/o Stretto, 8269 East 23rd Avenue, Suite 275, Denver, Colorado 80238.

(a)    **General Voting Information.**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims that are "impaired" and not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject such proposed plan.  Generally, a claim or interest is "impaired" under a plan if the holder's legal, equitable, or contractual rights are altered under a chapter 11 plan.  Classes of claims or equity interests under such a plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected a chapter 11 plan and are not entitled to vote to accept or reject such plan.

Under the Plan and the Voting Procedures, you are entitled to cast a vote only if you hold an Allowed Claim as of the Record Date in a Class of Claims or Interests that is Impaired and not deemed to have rejected the Plan.  Specifically:

- Claims in Classes 2, 3 and 4 are Impaired, will receive a distribution on account of such Claims to the extent provided in the Plan, and are entitled to vote to accept or reject the Plan;

- Claims in Class 1 are Unimpaired and, as a result, holders of such Claims are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan; and

- Claims or Interests in Classes 5 and 6 are Impaired and the holders of such Claims or Interests will not receive any distribution on account of such Claims or Interests.  As a result, the holders of Claims or Interests in these Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the chapter 11 plan.  **Your vote on the Plan is important**.  The Bankruptcy Code requires, as a condition to confirmation of a chapter 11 plan, that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Class.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims or interests, so long as at least one impaired class of claims or interests votes to accept such plan (excluding any votes of insiders).  Under that section, a chapter 11 plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, please follow the instructions for doing so summarized below and as more fully set forth in the Voting Procedures.  This Disclosure Statement, the Exhibits attached hereto, the Plan, and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and it is the Debtors' position that such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

(b)    <b>Summary Description of How to Vote on the Plan.</b>

If you are entitled to vote to accept or reject the Plan, you will receive a Solicitation Package that contains a Ballot with instructions on pages 5–7.  **There are two ways for you to vote if you receive a Ballot**: (i) **via paper ballot** by completing, signing, and dating the Ballot and returning it (with an original signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to Hartshorne Holdings, LLC Case Administration, c/o Stretto, 8269 East 23rd Avenue, Suite 275, Denver, Colorado 80238 on or before the Voting Deadline, or (ii) via the Administrative Agent's online portal, **by visiting cases.stretto.com/hartshorne**.  Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot by using your "Unique E-Ballot ID#" located on page 5 of your Ballot.

**ARTICLE II**

**SUMMARY OF PLAN AND CLASSIFICATION AND
TREATMENT OF CLAIMS AND INTERESTS THEREUNDER**

**2.1    *General Rules of Classification.***

Pursuant to sections 1122 and 1123(a) of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

10

**2.2    *Summary of Treatment of Claims and Interests Under the Plan.***

The following table classifies Claims against, and Interests in, the Debtors into separate Classes and summarizes the treatment of each Class under the Plan.  The table also identifies which Classes are entitled to vote on the Plan based on the provisions of the Bankruptcy Code.  Finally, the table indicates the estimated recovery for each Class.  The summaries in this table are qualified in their entirety by the description and the treatment of such Claims and Interests in the Plan.  **As described in Article IX below, the representations made in this Disclosure Statement and the Plan are subject to a number of risks.  The recoveries and estimates described in the table represent the Debtors' best estimates given the information available on the date of this Disclosure Statement.  All statements relating to the aggregate amount of Claims and Interests in each Class are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Allowed Claims in any particular Class may vary significantly from these estimates.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Carve-Out Escrow, the Postpetition Fee Escrow, General Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and U.S. Trustee Fees have not been classified.  Except as specifically provided in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, the Plan does not provide for payment of postpetition interest on any Allowed Claims.

| **Important Note on Estimates** |
| --- |
| The estimates in the tables and summaries in this Disclosure Statement may differ from actual distributions because of variations in the asserted or estimated amounts of Allowed Claims, the existence of Disputed Claims, and other factors.  Statements regarding projected amounts of Claims or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts.  Except as otherwise indicated, these statements are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court. |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class ($ in thousands)[4] | Estimated Recovery |
| --- | --- | --- | --- | --- | --- |

---

[4] The amounts set forth in this chart reflect the Debtors' most current estimates of projected claim amounts, which reflect changes to the Debtors' assumptions subsequent to the filing of the Debtors' Schedules.

| | | | | | |
|---|---|---|---|---|---|
| Class 1 | Priority Claims | Except to the extent that a holder of a Priority Claim agrees to a less favorable treatment, on the first Distribution Date after such Claim becomes an Allowed Claim, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed Priority Claim shall receive payment of such Allowed Claim in full in Cash. | No | N/A | N/A |
| Class 2A | DIP Loan Claims | Except to the extent that a holder of an Allowed DIP Loan Claim or Secured Lenders Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed DIP Loan Claim or Secured Lenders Claim shall receive one of the following treatments, determined at the option of the Debtors or the Liquidation Trustee, as applicable:  (i)  the Collateral securing such Claims to the holder of such Claims;[5] (ii) retention of any valid Liens on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (iii) such other treatment as may be agreed to by the holder of such Claim and the Debtors or the Liquidation Trustee, as applicable; and any amounts received for such Claim may be reduced by the Liquidation Trustee's expenses pursuant to the Liquidation Trust Agreement.  For the avoidance of doubt, no holder of an Allowed DIP Loan Claim or Secured Lenders Claim will receive any Cash unless it has a valid, unavoidable lien on such Cash and Cash is available from Liquidation Trust Assets to satisfy such Claim.[6] | Yes | $50,218 | 1% - 4% |
| Class 2B | Secured Lenders Claims | | | | |
| Class 3A | Other Secured Claims Against Hartshorne Holdings | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed Other Secured Claim shall receive one of the following treatments, | Yes | $6,279 | 0% |
| Class 3B | Other Secured Claims Against | | | | |

---

[5] If the Secured Lenders refuse to accept the Collateral securing their Claims in satisfaction for the DIP Loan Claims and Secured Lenders Claims, an amount will be credited against the Secured Lenders' DIP Loan Claims and the Secured Lenders Claims.  The amount for such credit shall be the value of the Collateral in an amount to be determined.

[6] Pursuant to the Adversary Proceedings, the Secured Lenders and Fricke, FKC, Minova, and WVEC are litigating the priority of their Liens in the Collateral.  Upon a Final Order in these proceedings, but subject to the Final DIP Order, the Liquidation Trustee may make distribution to Classes 2 and 3, as applicable.

12

| | | | | | |
|---|---|---|---|---|---|
| | Hartshorne Group | determined at the option of the Debtors or the Liquidation Trustee, as applicable: (i) the Collateral securing such Allowed Other Secured Claim to the holder of such Claim; (ii) retention of any valid Liens on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (iii) such other treatment as may be agreed to by the holder of such Claim and the Debtors or the Liquidation Trustee, as applicable; and any amounts received for such Claim may be reduced by the Liquidation Trustee's expenses pursuant to the Liquidation Trust Agreement. For the avoidance of doubt, no holder of an Allowed Other Secured Claim will receive any Cash unless it has a valid, unavoidable lien on such Cash and Cash is available from Liquidation Trust Assets to satisfy such Claim. | | | |
| Class 3C | Other Secured Claims Against Hartshorne Mining | | | | |
| Class 3D | Other Secured Claims Against Hartshorne Land | | | | |
| Class 4A | General Unsecured Claims Against Hartshorne Holdings | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive:<br><br>A. Its *pro rata* share of the proceeds of the Liquidation Trust in excess of any amounts necessary to pay all permissible Liquidation Trust fees and expenses; *provided*, *however*, that (i) such proceeds shall only be available for payment of Allowed General Unsecured Claims to the extent that the Liquidation Trustee has paid in full pursuant to the terms of the Plan, or, in its sole discretion, fully reserved for, all: (A) the Carve-Out Escrow, (B) the Postpetition Fee Escrow, (C) U.S. Trustee Fees, (D) Allowed General Administrative Expense Claims, (E) Allowed Priority Tax Claims, (F) Allowed Priority Claims, (G) Allowed Secured Lenders Claims, and (H) Allowed Other Secured Claims; and (ii) any amounts received for such Claim may be reduced by the Liquidation Trustee's | Yes | $11,112[7] | TBD |
| Class 4B | General Unsecured Claims Against Hartshorne Group | | | | |
| Class 4C | General Unsecured Claims Against Hartshorne Mining | | | | |
| Class 4D | General Unsecured Claims Against Hartshorne Land | | | | |

[7] The Committee and the Secured Lenders have negotiated the Committee Settlement which, if approved by the Bankruptcy Court, would allow the holders of General Unsecured Claims to receive certain recoveries. The estimated recovery for holders of Class 4 Claims is contingent upon the Bankruptcy Court's approval of the Committee Settlement and the amount of General Unsecured Claims. If the Committee Settlement is approved by a Final Order of the Bankruptcy Court, the Debtors will incorporate the Committee Settlement in the Disclosure Statement and the Plan, as applicable.

13

| | | | | | |
|---|---|---|---|---|---|
| | | expenses pursuant to the Liquidation Trust Agreement; and<br><br>B. Its *pro rata* share of the amounts described in the Committee Settlement, if such settlement is approved by the Bankruptcy Court. | | | |
| Class 5 | Interests | On the Effective Date, all Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Plan Distributions to the holders of Interests. | No | $0 | 0% |
| Class 6 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Plan Distributions to the holders of Intercompany Claims. | No | $0 | 0% |

The recoveries set forth above are estimates and are contingent upon approval of the Plan as proposed.

## ARTICLE III

## BUSINESS DESCRIPTION; HISTORICAL INFORMATION

**3.1**   *The Debtors' Prepetition Business.*

(a)    **Overview**[8]

As of the Petition Date, the Debtors were engaged in the production and sale of high quality thermal coal through the operation of the Poplar Grove Mine, which is part of the Buck Creek Complex located in the Illinois Coal Basin in Western Kentucky. The Buck Creek Complex includes two mines: (i) the operating Poplar Grove Mine, and (ii) the permitted, but not constructed, Cypress Mine.  The projected production capacities of the Poplar Grove Mine and the Cypress Mine are 2.8 Mtpa and 3.8 Mtpa, respectively.  The Debtors controlled 40,114 gross acres (16,234 hectares) of reserves in Kentucky through 331 individual coal leases with private mineral owners.  Attached hereto as **Exhibit 4** is a corporate organization chart of the Debtors.

The Western Kentucky area is among the best mining areas in the United States due to its proximity to utility companies and access to low cost power, transportation and a non-union labor pool.

---

[8] While stated in the present tense, the information contained in this Overview section is accurate as of the Petition Date.  As of the date of this Disclosure Statement, however, the Debtors are no longer producing coal, have ceased operations, and closed their mine.

14

Mining conditions at the Poplar Grove Mine are generally similar to those encountered in neighboring mines, which rank as some of the most productive room-and-pillar thermal coal operations in the United States.

The Debtors commenced mining at the Poplar Grove Mine in March 2019. The first mining unit to come online consisted of two continuous mining machines. A second mining unit began operations in July 2019. The second mining unit increased the number of continuous mining machines in operation to four and resulted in more coal being mined per shift. Coal produced from the Poplar Grove Mine is processed at an onsite coal handling and processing plant and is shipped to end customers from the Debtors' Ainsworth Dock on the Green River located a few miles from the Poplar Grove Mine. The maiden shipment of coal departed the Ainsworth Dock on April 26, 2019.

The saleable coal products from the Poplar Grove Mine are designed to achieve a product energy content of approximately 11,200-11,300 Btu/lb, per the Debtors' coal sales contracts, over the life of the mine. Since the Poplar Grove Mine's initial operations, the saleable coal produced has generally had an energy content significantly higher than 11,200-11,300 Btu/lb. The Debtors have received a pricing premium for the sale of these tons of coal compared to coal with a lower energy content.

### (b)    Coal Supply Contracts

On the Petition Date, the Debtors sold their finished coal through two fixed-priced coal sales contracts.

### (i)    LG&E-KU Contract

The first contract is that certain Coal Supply Agreement (as amended, the "LG&E-KU Contract"), dated as of October 15, 2015, by and among Louisville Gas and Electric Company and Kentucky Utilities Company (together, "LG&E-KU") and Hartshorne Mining Group, LLC ("Hartshorne Group"). Pursuant to the LG&E-KU Contract, the Debtors agreed to supply LG&E-KU, one of the largest fuel buyers in the Ohio River basin, with 4,750,000 tons of coal from 2018 to 2023.

### (ii)    OVEC-IKEC Contract

The Debtors are also party to that certain Fuel Purchase Order (the "OVEC-IKEC Contract"), dated as of August 31, 2018, by and between the Ohio Valley Electric Corporation and the Indiana-Kentucky Electric Corporation ("OVEC-IKEC") and Hartshorne Group. Pursuant to the OVEC-IKEC Contract, the Debtors agreed to sell 650,000 tons of coal to OVEC-IKEC. The OVEC-IKEC Contract has a term of April 1, 2019 through December 31, 2020 and also provides for an economically beneficial price per ton, subject to quality adjustments identified in the OVEC-IKEC Contract.

### (c)    Equity Ownership

Non-debtor Paringa Resources Limited ("Paringa") is the ultimate parent of the Debtors. Paringa owns a 100% interest in non-debtor Hartshorne Coal Mining Pty Ltd. ("Hartshorne Australia"), which owns a 100% interest in HCM Resources Pty Ltd. ("HCM Resources"). HCM Resources

owns 100% of the membership units of Debtor Hartshorne Holdings, LLC ("Hartshorne Holdings"). Hartshorne Holdings owns 100% of the membership interests in each of the remaining four Debtors. Paringa's shares were previously traded on the Australian Stock Exchange and also on the NASDAQ as an American Depository Receipt under the ticker symbol "PNRL." On December 23, 2019, Paringa announced that its securities would be placed on a trading halt. As of the Petition Date, Paringa was not being traded on the NASDAQ.

**3.2** **Debtors' Prepetition Capital Structure.**

        (a)    **Secured Debt**

        (i)    **The Tribeca Term Loan Facility**

Tribeca Global Resources Credit Pty Ltd ("Tribeca") is the agent and a lender under that certain Term Facility Agreement, dated as of April 24, 2019 (as amended on November 19, 2019 and as may otherwise be amended, supplemented or otherwise modified, the "Prepetition Term Loan Agreement"), by and among Hartshorne Group, as borrower, non-debtors Paringa, Hartshorne Australia, and HCM Resources, and Debtors Hartshorne Holdings, Hartshorne Land, LLC ("Hartshorne Land"), and Hartshorne Mining, LLC ("Hartshorne Mining"), as guarantors, Tribeca, as agent, and Global Loan Agency Services Australia Nominees Pty Ltd, as security trustee (the "Security Trustee").

Pursuant to the Prepetition Term Loan Agreement, Tribeca provided Hartshorne Group with a term loan of up to $56 million, split into tranches of $40 million and $16 million, for the purposes of (a) refinancing the Debtors' previous facility with Macquarie Bank Limited, and (b) providing working capital for operations and general corporate obligations of the mine project sites at the Buck Creek Complex.

The Prepetition Term Loan Agreement was amended on November 19, 2019 to reduce the size of the second tranche to $10 million. Other operative terms of the Prepetition Term Loan Agreement, as amended, include (a) a floating interest rate consisting of the U.S. Prime Rate (subject to a floor of 5.5% per annum) plus a margin of 7.5% per annum (temporarily increased to 9.5% per annum until two consecutive quarters generate EBITDA of no less than $4 million), (b) a three year term, and (c) a maturity date of April 30, 2022. As of February 15, 2020, the first tranche of $40 million was fully drawn and the outstanding balance was $42,649,130.02.

The Prepetition Term Loan Agreement required each Debtor to execute a pledge and security agreement with respect to personal property collateral and to grant the Security Trustee a leasehold mortgage and fixture filing in real property collateral, fixtures, and as-extracted coal collateral. On April 30, 2019, the Security Trustee, the Debtors and certain non-debtor affiliates executed that certain Pledge and Security Agreement, which granted the Security Trustee liens on substantially all of the assets of the Debtors and HCM Resources (as further detailed in paragraph 3 thereof), including second liens on Komatsu Financial's (as defined below) collateral. Pursuant to Paragraph 10(d) of the Pledge and Security Agreement, the Security Trustee was authorized to file any and all necessary financing statements. On May 1, 2019, the Security Trustee filed financing statements related to the Prepetition Collateral naming each of the Debtors.

In connection with the Prepetition Term Loan Agreement, Hartshorne Land granted the Security Trustee five mortgages as further described in the Final DIP Order.

Furthermore, in connection with the Prepetition Term Loan Agreement, the Security Trustee, as the secured party, and non-debtors Paringa, Hartshorne Australia, and HCM Resources, as grantors, executed that certain General Security Agreement, dated as of April 24, 2019, whereby these three non-debtors granted the Security Trustee a security interest in substantially all of their current and future real and personal property, including all membership units in Hartshorne Holdings.

The Debtors deferred payment of the December 31, 2019 quarterly interest and fees due under the Prepetition Term Loan Agreement, which totaled approximately $1.5 million.  This deferral triggered an event of default, which gave Tribeca the right to accelerate the Prepetition Term Loan Agreement and demand payment in full of the loan.  Tribeca had issued a letter to the Debtors and the various non-debtor guarantors notifying them of the existence of the event of default and reserving its rights.

(ii)    Tribeca Royalty Interest

Six days after amending the Prepetition Term Loan Agreement, on November 25, 2019, Hartshorne Land, as grantor, and Hartshorne Group, as parent, executed that certain Assignment and Conveyance of Royalty Interest (the "Royalty Agreement") with an affiliate of the lenders under the Prepetition Term Loan Agreement, SP2 Royalty Co., LLC ("SP2"), as grantee.

The Royalty Agreement granted SP2 a real property interest equal to a 2% royalty interest of gross revenues of sales of the Subject Coal (as defined in the Royalty Agreement), which is to be paid in perpetuity by Hartshorne Land for as long as it is permitted to mine the Subject Coal from the Subject Properties (as defined in the Royalty Agreement).  In exchange for this interest, SP2 paid Hartshorne Land $9 million in immediately available funds.

In consideration for arranging the Royalty Agreement, Hartshorne Group also entered into that certain Royalty Fee Letter, dated as of November 19, 2019.  The Royalty Fee Letter required Hartshorne Group to pay Tribeca a royalty fee equal to $270,000 (for distribution to Tribeca and SP2) upon receipt of the $9 million payment provided for by the Royalty Agreement, $20,000 of which remains unpaid.

(iii)    Komatsu Equipment Sales and Financing Agreement

Hartshorne Mining and Komatsu Financial Limited Partnership ("Komatsu Financial") are parties to two equipment financing letter agreements, dated as of May 11, 2018 and August 31, 2018, respectively (the "Komatsu Letter Agreements").  The Komatsu Letter Agreements also include an Equipment Refinancing and Security Agreement and a Security Agreement-Conditional Sales Contract (collectively with the Komatsu Letter Agreements, the "Equipment Sales and Financing Agreements").

The Equipment Sales and Financing Agreements provided financing of up to $26.5 million to Hartshorne Mining for the purchase of mining equipment from Komatsu Mining Corp. and other suppliers.  Pursuant to the Equipment Sales and Financing Agreements, the Debtors executed

17

approximately 32 contracts to purchase various mining equipment necessary to operate the Poplar Grove Mine. Komatsu Financial has since filed financing statements to perfect its interests in the subject mining equipment. As of January 31, 2020, the Debtors owed approximately $25.8 million to Komatsu Financial pursuant to the Equipment Sales and Financing Agreements.

(iv)    Letter of Credit Agreements

The Debtors have also executed three letter of credit reimbursement agreements for the issuance of letters of credit (collectively, the "LOCs") with their primary banking institution, Old National Bank. Two of the LOCs, issued in the amounts of $36,797 and $88,000, respectively, are held for the benefit of the Debtors' utility provider at the Poplar Grove Mine site, Kenergy Corporation. The first LOC supports payment of the Debtors' utility obligations. The second LOC was issued as a prerequisite to Kenergy Corporation constructing the electric service equipment (*e.g.*, lines, transmitters, etc.) at the Poplar Grove Mine. The third LOC is in the amount of $38,248 and serves as the security deposit for Paringa's former office location at 28 West 44th Street, Suite 810, New York, New York 10036. Each of the LOCs is fully collateralized with cash. As of the Petition Date, no amount had been drawn on any of the LOCs.

(b)    <strong>Unsecured Debt</strong>

(i)    <strong>Unsecured Trade Debt</strong>

In the ordinary course of their business, the Debtors purchase or lease mining equipment and processing supplies and use other services and goods from numerous vendors. Also, materials to keep the mining and processing machinery running, such as oil, grease, lube, other equipment parts and hoses are purchased for the maintenance of the equipment. The Debtors have substantial costs associated with the day-to-day operation of the Poplar Grove Mine as well as costs which are less common, but are still incurred throughout the year. As of January 31, 2020, the Debtors estimated that they owed approximately $7.3 million in unsecured trade debt.

**3.3    *Additional Obligations Owed by the Debtors*.**

(a)    <strong>Asset Retirement Obligations</strong>

Like other coal companies, the Debtors have asset retirement obligations related to mine reclamation and closure costs. Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act, as well as certain analogous laws of the Commonwealth of Kentucky.

The Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at their underground mine, plant, and load-out dock sites in accordance with applicable reclamation laws in the United States, as primarily defined by each mining permit. The Debtors have three mining permits: (A) Permit no. 875-5009 for the Cypress Creek Mine, (B) Permit no. 875-6001 for the Ainsworth River Dock, and (C) Permit no. 875-8002 for the Poplar Grove Mine Site, plant, refuse area, and conveyor system. The Cypress Creek Mine is undisturbed and the Debtors plan to return the permit and apply for administrative release of its associated bond. Asset retirement obligations for the other two permits were determined using

18

various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage, and the assumption that each site would be returned to its pre-mining land use. As of the Petition Date, the Debtors have outstanding surety bonds with a total face amount of $1,386,000 to secure reclamation and other asset retirement obligations. Total reclamation costs may vary, particularly if future land use changes are approved, and may be higher or lower than current estimates and bonding.

## ARTICLE IV

## EVENTS LEADING TO CHAPTER 11 FILING

A confluence of factors contributed to the Debtors' need to commence these Chapter 11 Cases. At bottom, the Debtors have not been able to produce coal in the volumes necessary to generate a positive cash flow and stave off a liquidity crisis that ultimately necessitated the filing of these Chapter 11 cases. The Debtors' inability to meet production targets is the result of (1) ongoing operational and technical issues, and (2) the same regulatory and cost pressures that have led to an industry-wide downturn among coal companies.

### (a)    Ongoing Operational and Technical Issues

The Debtors have faced a series of ongoing operational and technical issues at the Poplar Grove Mine, including the following:

- In 2018, prior to the beginning of mining operations, the installation of the Poplar Grove mine access and slope was delayed due to unexpected geological soil issues. This required a redesign of the slope and resubmission of plans to the Mine Safety and Health Administration. Once approved, the construction proceeded more slowly than expected.

- During the early stages of mining, the first unit encountered a paleochannel. The paleochannel was a sandstone displacement. Clearing the paleochannel required extensive drilling and blasting and delayed productive mining. The paleochannel also caused water ingress, which softened the mine roadways and slowed haulage.

- In August, the second unit encountered a geological fault. While the fault was previously identified when preparing the mine plan, it was encountered in a different area than its expected location. This resulted in delays, diminished production, and required that unit two ultimately be moved away from the geological fault.

- The floor conditions of the Poplar Grove Mine have often been much softer than anticipated, which has slowed the movement of mine cars.

- The difficult floor conditions have also increased the frequency of battery changes required by the mine cars. Each car typically requires multiple battery changes per shift. This increases costs and delays the removal of coal from the mine.

19

- The Debtors' processing yields have been negatively impacted by out of seam dilution caused by several factors, including floor conditions and penetrating faults.

In the fourth quarter of 2019, the first mining unit encountered a geological fault that was previously unidentified. The coal seam was displaced approximately twelve feet and the decision was made to continue mining through the fault and up into the coal seam beyond it. Coal production was significantly impacted due to cutting rock, mining through the faulted area, and bolting through the associated adverse conditions. Processing yields were also negatively impacted by the additional rock generated while mining through the fault.

In November 2019, Paringa retained Perella Weinberg Partners LP ("PWP") to investigate a potential going concern sale of the business, the sale of an equity stake in Paringa, and/or the sale of the Cypress Mine project. This sale process was ultimately put on hold when it became clear that the Debtors had a significant liquidity problem.

(b)    **Coal Industry Downturn**

In addition to operational and technical issues encountered at the Poplar Grove Mine, the Debtors' business has been impacted by many of the same issues impacting the coal industry as a whole. Dating back to 2012, the coal industry has been under intense pressure driven by a combination of declining commodity prices, reduced domestic demand for both thermal and metallurgical coal, and increased oversight and costs associated with regulatory compliance. As a result, the industry as a whole has been operating in a generally higher cost environment than prior periods.

A combination of an abundant, cheap, and reliable alternative fuel in the form of natural gas, increased usage of renewable sources of energy, and the shutting down of coal fired power generation largely due to increased regulatory pressure and costs has severely impacted demand for thermal coal domestically. Thermal coal demand in the domestic electric power sector has declined from 935 million tons in 2011 to 636 million tons in 2018 and coal has seen its share of the domestic electricity generation market reduced from 43% in 2011 to 31% in 2017.

In this period of declining demand, enhanced federal and state regulatory scrutiny has significantly increased the overall industry cost of compliance. Changes to regulations surrounding health and safety, permitting and licensing requirements, environmental protection, and the reclamation and restoration of mining properties along with increased enforcement of existing laws has had a significant impact, reducing mine productivity and increasing the cost of maintaining compliance.

The impact of the macro and regulatory environment is not limited to the Debtors' operations: the entire U.S. coal mining complex has been impacted by these events. A growing number of peers have filed for bankruptcy over the course of the past five years. The entire industry either has gone through, or is currently going through, a period of financial distress and reorganization.

(c)    **The Debtors' Prepetition Efforts and the Potential Conversion to Care and Maintenance**

After it became clear that the Debtors were facing liquidity challenges, FTI Consulting, Inc. ("FTI") was engaged in late-December 2019 to analyze the Debtors' financial condition and make recommendations regarding a path forward. Squire Patton Boggs (US) LLP ("Squire") was

20

retained as restructuring counsel in mid-January 2020 and PWP was engaged by the Debtors shortly thereafter. The Debtors and their advisors immediately commenced discussions with the Secured Lenders regarding a consensual path forward.

The Secured Lenders indicated that they were unwilling to continue funding the Debtors' regular operations outside of a chapter 11 case and the commencement of a sale process. Given the lack of viable alternatives, the Debtors, in an exercise of their reasonable business judgment, determined that the best means of maximizing value was to commence these chapter 11 cases and seek to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code. In connection with reaching an agreement with Tribeca and certain funds it manages regarding debtor-in-possession financing and discussing the chapter 11 process in general, the Debtors agreed to continue operating the Poplar Grove mine in accordance with the Budget and Updated Budgets (as defined in the Final DIP Order), provided that the Secured Lenders, in consultation with Bertrand Troiano of FTI, the Debtors' Chief Restructuring Officer, had the right after the first two weeks in the chapter 11 cases to require the Debtors to shift to care and maintenance.

## ARTICLE V

## DESCRIPTION AND HISTORY OF CHAPTER 11 CASES

### 5.1    *General Case Background.*

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 20, 2020. On February 21, 2020, the Bankruptcy Court entered an order [Docket No. 38] authorizing the joint administration of the Chapter 11 Cases, for procedural purposes only, under Case No. 20-40133. The Debtors have continued to manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On March 10, 2020, the Office of the United States Trustee for Region 8 (the "U.S. Trustee") appointed the Committee [Docket No. 116]. No request for the appointment of a trustee or examiner has been made in these chapter 11 Cases.

The following is a brief description of certain significant events that have occurred during the pendency of these Chapter 11 Cases.

### 5.2    *Appointment of the Committee.*

The Committee was appointed by the U.S. Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code to represent the interests of the Debtors' unsecured creditors. On March 26, 2020 and March 27, 2020, the Committee filed applications seeking entry of an order authorizing the Committee to retain Dentons Bingham Greenebaum LLP and Whiteford, Taylor & Preston, LLP, respectively, as counsel [Docket Nos. 209, 219], which the Bankruptcy Court approved on April 21, 2020 [Docket Nos. 257, 260]. On May 21, 2020, the Committee filed an application seeking entry of an order authorizing the Committee to retain B. Riley FBR, Inc. as financial advisor [Docket No. 325], which the Bankruptcy Court approved on June 12, 2020 [Docket No. 397]. The members of the Committee are: (a) United Central Industrial Supply Company, L.L.C.; (b) Carroll Engineering Corporation; and (c) Trey K Mining & Electric, Inc. [Docket No. 116].

21

**5.3    *Retention of Professionals.***

On the Petition Date, the Debtors filed an application seeking entry of an order authorizing Stretto to be their claims and noticing agent [Docket No. 6], which the Bankruptcy Court approved on February 27, 2020 [Docket No. 82].

To further assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Chapter 11 Cases, on March 3, 2020, the Debtors filed applications seeking entry of orders authorizing the Debtors to retain:  (a) Squire Patton Boggs (US) LLP ("Squire"), as lead counsel [Docket No. 89]; (b) FTI Consulting, Inc., as their financial advisor [Docket No. 90]; (c) Perella Weinberg Partners LP, as their investment banker [Docket No. 91]; (d) Stretto, as their administrative advisor [Docket No. 92]; and (e) Frost Brown Todd LLC, as their local counsel [Docket No. 93].

After receiving certain informal and formal objections and comments to each retention application, the Bankruptcy Court approved the following retention applications on the following dates:

a)  On March 25, 2020, the Bankruptcy Court entered an order approving Frost Brown Todd LLC's retention [Docket No. 205];

b)  On March 27, 2020, the Bankruptcy Court entered an order approving Stretto's administrative advisor retention [Docket No. 211];

c)  On March 27, 2020, the Bankruptcy Court entered an order approving PWP's retention [Docket No. 218];

d)  On April 7, 2020, the Bankruptcy Court entered an order approving FTI's retention [Docket No. 244], which was later modified by the *Agreed Order Amending the Final Order (I) Authorizing the Debtors to (A) Retain FTI Consulting, Inc. to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel and (B) Designate Bertrand Troiano as Chief Restructuring Officer for the Debtors, Nunc Pro Tunc to the Petition Date, and (II) Granting Related Relief* on September 9, 2020 [Docket No. 583];

e)  On May 21, 2020, the Bankruptcy Court entered an order approving Squire's retention [Docket No. 322].

Additionally, on March 2, 2020, the Debtors filed a motion seeking entry of an order authorizing the employment and compensation of professionals utilized in the ordinary course of business [Docket No. 88], which was approved by the Bankruptcy Court on March 24, 2020 [Docket No. 186].

On March 2, 2020, the Debtors filed a motion seeking entry of an order establishing compensation procedures for an orderly, regular process for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals [Docket No. 95] (the "Interim Compensation Motion").  On March 23, 2020, the Bankruptcy Court entered a revised order approving the Interim Compensation Motion [Docket No. 172].

**5.4**    *Employment Obligations.*

To retain as many of their employees as possible and to minimize the impact of the filings on the employees, on the Petition Date, the Debtors sought authority, but not direction, to pay certain prepetition employee wage and benefit obligations [Docket No. 8] (the "Employee Wage Motion").  In the Employee Wage Motion, the Debtors requested, among other things, permission to satisfy certain of their prepetition obligations to their current employees, reimburse employees for prepetition business expenses, pay prepetition payroll-related taxes and withholdings associated with the Debtors' employee wage claims and the employee benefit obligations, and continue employee benefit programs in place as of the Petition Date.  On February 21, 2020, the Bankruptcy Court simultaneously granted the interim and final order approving the Employee Wage Motion [Docket No. 49].

**5.5**    *Continuing Supplier and Customer Relations.*

On the Petition Date, the Debtors filed a motion seeking entry of an order authorizing the Debtors to pay, in the ordinary course of business, prepetition claims of certain critical vendors necessary to operate their businesses, which included, but were not limited to, security, safety, parts and equipment, maintenance and repair, environmental testing, shipping, permitting, surveying and mapping, and information technology [Docket No. 12] (the "Critical Vendor Motion").  On February 27, 2020 and March 24, 2020, the Bankruptcy Court entered the interim and final orders granting approval of the Critical Vendor Motion, respectively [Docket Nos. 83, 180].

**5.6**    *Cash Management System.*

The Debtors believed that disruption in the use of their Cash management system would have severely and immediately impeded their ability to continue operating to the detriment of the Debtors' estates and all of their creditors.  Accordingly, on the Petition Date, the Debtors filed a motion seeking entry of an order authorizing the Debtors to maintain their current Cash management system, honor certain prepetition obligations related to the use of their Cash management system, maintain their existing bank accounts and business forms, and continue intercompany transactions [Docket No. 7] (the "Cash Management Motion").  On February 21, 2020, the Bankruptcy Court entered an order approving the Cash Management Motion [Docket No. 50].

**5.7**    *Utilities.*

On February 20, 2020, the Debtors filed a motion for an order: (a) determining that the Debtors' utility providers are adequately assured of future performance pursuant to certain procedures set forth therein; (b) prohibiting the Debtors' utility providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding, if any, and on account of any perceived inadequacy of the Debtors' proposed adequate assurance; and (c) approving the Debtors' proposed procedures governing a utility provider's requests for additional or different adequate assurance [Docket No. 11] (the "Utilities Motion").  On February 27, 2020, the Bankruptcy Court entered an order approving the Utilities Motion [Docket No. 81].

010-9091-4666/30/AMERICAS

Kenergy Corporation sought additional adequate assurance pursuant to Utilities Motion procedure, and on April 28, 2020, the Bankruptcy Court entered an agreed order resolving Kenergy Corporation's adequate assurance request [Docket No. 269].

**5.8    *Insurance Obligations.***

On February 20, 2020, the Debtors filed a motion seeking an order authorizing the Debtors to (a) continue their prepetition insurance coverage and continue to maintain their premium finance agreements [Docket No. 13] (the "Insurance Motion"). On February 21, 2020, the Bankruptcy Court entered an order approving the Insurance Motion [Docket No. 43], which was further amended on two separate occasions on March 4, 2020 and March 23, 2020, respectively [Docket Nos. 104, 174].

**5.9    *Tax Motion.***

On February 20, 2020, the Debtors filed a motion seeking entry of an order authorizing them to pay various prepetition taxes and fees to certain federal, state and local government agencies and direct banks to honor and process check and electronic transfer requests related to such taxes and fees [Docket No. 9] (the "Tax Motion"). On February 27, 2020 and March 23, 2020, the Bankruptcy Court entered the interim and final orders approving the Tax Motion, respectively [Docket Nos. 80, 171].

**5.10    *Surety Bond Motion.***

On February 20, 2020, the Debtors filed a motion seeking entry of an order authorizing, but not directing, them to continue, renew, supplement, and discontinue their surety bond program on an uninterrupted basis [Docket No. 10]. On February 25, 2020, the Bankruptcy Court entered the order approving the Debtors' surety bond motion [Docket No. 72].

**5.11    *Schedules and Statements.***

On the Petition Date, the Debtors filed a motion requesting entry of an order extending the time by which the Debtors must file their Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules") through and including April 10, 2020 [Docket No. 4]. On February 25, 2020, the Bankruptcy Court granted the motion [Docket No. 71]. On April 10, 2020, each Debtor filed with the Bankruptcy Court its Schedules [Docket Nos. 249–252]. The Schedules are available electronically free of charge at the Case Website at https://cases.stretto.com/hartshorne.

**5.12    *Bar Dates.***

On March 2, 2020, the Debtors filed a motion seeking entry of an order establishing deadlines for filing proofs of claim against the Debtors (each, a "Bar Date") and approving the form and manner of notice of each Bar Date [Docket No. 94] (the "Bar Date Motion"). On March 24, 2020, the Bankruptcy Court entered a revised order approving the Bar Date Motion [Docket No. 185] and fixing the Bar Date to file proofs of claim for all creditors at 11:59 p.m. (prevailing Mountain Time) on May 28, 2020 and the Bar Date for governmental units at 11:59 p.m. (prevailing Mountain Time) on August 19, 2020.

**5.13**   *Financing Motion.*

On the Petition Date, the Debtors filed a motion to obtain postpetition financing in the aggregate principal amount of $7.5 million from Tribeca, as DIP agent, and certain related Tribeca entities [Doc. No. 15] (the "DIP Motion"), which was supplemented by a budget dated February 21, 2020 [Docket No. 33] before the Debtors' first day hearing.  On February 21, 2020, the Bankruptcy Court entered the interim order approving the DIP Motion [Docket No. 54].

On March 30, 2020, after negotiations among the Debtors, Secured Lenders, Fricke, FKC, Minova, and the Committee, the Debtors filed a revised Final DIP Order [Docket No. 225], which was entered on the same day [Docket No. 228].  Pursuant to the Final DIP Order, Fricke, FKC and Minova agreed that their liens "shall be inferior to the liens securing the DIP Loans and the Prepetition Lender Liens only to the extent of the amount of the Prepetition Secured Obligations." Final DIP Order, ¶ 8.  The Final DIP Order also authorized the creation of the Carve-Out Escrow, as described above, and a Postpetition Fee Escrow.  While the Debtors continue to fund the Carve-Out Escrow in accordance with the Final DIP Order, it is the Debtors' position that the Secured Lenders funded the Postpetition Fee Escrow with $1.5 million solely for Professional Fee Claims, $250,000 of which was allocated solely to the Committee's Professional Persons. No funds have been removed from the Postpetition Fee Escrow.

There is currently a dispute between the Debtors and the Secured Lenders with respect to whether the Postpetition Fee Escrow is separate from the Carve-Out Escrow.  Based upon past projections provided to the Secured Lenders, the Debtors' position is that each escrow account is a separate account pursuant to the Final DIP Order, related exhibits, Initial Budget, and Updated Budgets (both as defined in the Final DIP Order).  The Secured Lenders may object to the Plan with respect to the respective amounts in the Carve-Out Escrow and Postpetition Fee Escrow.

**5.14**   *Sale Process.*

Since the inception of these Chapter 11 Cases, the Debtors, with the assistance of PWP, and in consultation with their counsel and other advisors, investigated and analyzed a number of strategies to preserve and maximize the value of the Debtors' assets.  The Debtors concluded that, under the circumstances, the best way to maximize the value of their assets for the benefit of their creditors was to conduct a sale process for such assets.

       (a)   **Public Sale**

On March 6, 2020, the Debtors filed a motion to (i) approve proposed bidding procedures; (ii) establish procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts; (iii) approve the form and manner of notice with respect to certain procedures, protections, schedules, and agreements; and (iv) scheduling a hearing to approve the Debtors' selection of one or more stalking horse bidders and the provision of bid protections to such stalking horse bidder, an auction if the Debtors receive one or more timely and acceptable qualified bids, and a final hearing to approve one or more sales of the Debtors' assets [Docket No. 110] (the "Bidding Procedures Motion").  That same day, the Debtors also filed a motion to (i) authorize the sale of substantially all of their assets through one or more sale; (ii) authorize the assumption and assignment of certain executory contracts and unexpired

leases [Docket No. 111] (the "Sale Motion").  On March 25, 2020, the Bankruptcy Court entered an order approving the Bidding Procedures Motion [Docket No. 200] (the "Bidding Procedures Order," and Exhibit A thereto, the "Bidding Procedures").

Upon entry of the Bidding Procedure Order, the Debtors' advisors continued their efforts to contact potentially interested purchasers and solicit bids for the Debtors' assets.  In total, 38 interested parties were contacted, nine of those executed confidentiality agreements and received access to diligence materials, but no party submitted a Qualified Bid by the Bid Deadline (each, as defined in the Bidding Procedures Order).

On June 15, 2020, the Debtors filed a notice, notifying all parties in interest that, among other things, the auction contemplated by the Bidding Procedures was being cancelled and that the Debtors were evaluating how to proceed with the sale process, including a potential transaction with the Tribeca Secured Parties (as defined in the Bidding Procedures Order) [Docket No. 409]. On June 24, 2020, the Debtors filed a second sale notice to continue the sale process deadlines [Docket No. 429].  On June 26, 2020, the Debtors filed a motion to further continue the sale process deadlines to afford the Debtors and key stakeholders additional time to continue discussions related to the sale process [Docket No. 433], which was entered on June 29, 2020 [Docket No. 435].

On June 29, 2020, the Debtors filed a notice regarding their entry into an asset sale agreement (the "APA") with the Tribeca Secured Parties for the sale of, among other things, the LG&E-KU Contract, OVEC-IKEC Contract and certain other assets [Docket No. 436] (the "Tribeca Sale Notice").  On July 2, 2020, (i) OVEC-IKEC; (ii) FKC; (iii) the Committee; (iv) LG&E-KU; and (v) Fricke filed objections to the Tribeca Sale Notice [Docket Nos. 442, 446, 447, 448, 449].  On July 6, 2020, the Debtors and Tribeca Secured Parties filed their replies to the objections to the Tribeca Sale Notice [Docket Nos. 450, 451, 452, 453, 454, 455].  On July 9, 2020, LG&E-KU and OVEC-IKEC, respectively, filed responses to the Debtors' omnibus reply and the Tribeca Secured Parties' replies challenging whether the Debtors could assume and assign the Assigned Contracts to the Tribeca Secured Parties [Docket Nos. 466, 468].

On July 10, 2020, the Debtors filed a notice that attached the executed APA with all of the exhibits [Docket No. 473].  On July 14, 2020, the Debtors filed a notice containing the proposed order to the Sale Motion to approve the APA (the "Tribeca Sale Order").  On July 16, 2020, the Debtors, Tribeca Secured Parties, LG&E-KU, and OVEC-IKEC filed supplemental briefs in support of their positions regarding the Tribeca Sale Order [Docket Nos. 502-505, 510].

On July 20, 2020, following negotiations with the Tribeca Secured Parties and the Committee, the Debtors filed a notice containing an amended APA [Docket No. 517].  The Purchase Price for the proposed sale was $14,000,000.  The Tribeca Secured Parties intended to credit-bid a portion of their secured claims to purchase the OVEC-IKEC Contract, LG&E-KU Contract, and certain other assets and the Debtors' claims under Chapter 5 of the Bankruptcy Code.

The Bankruptcy Court conducted the sale hearing from July 21, 2020 through July 23, 2020 (the "Sale Hearing") and denied the Tribeca Sale Motion on August 14, 2020 [Docket No. 517].  On August 27, 2020, the Debtors appealed the Tribeca Sale Order to the Bankruptcy Appellate Panel for the Sixth Circuit [Docket No. 570] (the "Appeal").  In the Appeal, the Debtors sought to overturn the Tribeca Sale Order based on, among other things, the Secured Lenders' ongoing

26

discussions regarding the entities who could source the coal shipments, how certain contract terms should be interpreted, and how the case law on the legal issue at hand should be evaluated in light of the facts of these chapter 11 cases. If the Tribeca Sale Order were granted, it would (1) eliminate, through the Secured Lenders' credit-bid, (i) $7.5 million of the Secured Lenders' postpetition senior secured first priority loan extended to the Debtors, (ii) $6.5 million of the Prepetition Term Loan amount, to the extent such loan is deemed to have priority over other parties' asserted liens, and (2) allow the sale of the OVEC-IKEC Contract, the LG&E-KU Contract, certain other assets, and the Debtors' claims under Chapter 5 of the Bankruptcy Code to the Secured Lenders. On September 11, 2020, LG&E-KU requested that the Appeal be transferred to the United States Bankruptcy Court for the Western District of Kentucky [Docket No. 589].

On October 2, 2020, LG&E-KU filed an objection [Docket No. 640] to the Debtors' Solicitation Procedures Motion [Docket No. 633]. On October 4, 2020, the Debtors filed a reply to LG&E-KU's objection [Docket No. 641]. That same day, LG&E-KU and the Debtors started negotiating a consensual resolution of their disputes, while keeping the Secured Lenders and the Committee apprised of all the developments in the negotiations. A settlement in principle was eventually reached by LG&E-KU and the Debtors. During the Bankruptcy Court hearing on October 5, 2020, the Debtors read the terms of the proposed settlement (the "LG&E-KU Settlement") into the record. The Debtors and LG&E-KU intend to file a motion seeking Bankruptcy Court approval of the LG&E-KU Settlement shortly. Notwithstanding anything else in this Disclosure Statement, the terms of the LG&E-KU Settlement are the following:

a)   The Debtors will file a notice to dismiss, and will obtain the dismissal of, the Appeal with prejudice as to all issues involving LG&E-KU.

b)   The Debtors will reject the LG&E-KU Contract.

c)   Neither the Debtors nor the Liquidation Trustee will assume or assume and assign the LG&E-KU Contract.

d)   Upon rejection of the LG&E-KU Contract, the LG&E-KU Contract will be deemed terminated.

e)   LG&E-KU's objection to the Debtors' Solicitation Procedures Motion is deemed withdrawn, without prejudice to the ability of LG&E-KU to move the Court for additional time on plan-related deadlines in the event that the LG&E-KU Settlement cannot be completed.

f)   LG&E-KU agrees not to object to the Plan, the Disclosure Statement, or any related documents, provided that such documents are consistent with the LG&E-KU Settlement.

g)   LG&E-KU waives any claims it may have against the Debtors, their estates, and Representatives.

h)   The Debtors and LG&E-KU will provide mutual releases to each other of any and all claims that they may have against each other. Further, for the avoidance of doubt, the Debtors are not transferring any claim against LG&E-KU to any other party and LG&E-KU are not giving any releases under the Plan.

i)    The Committee and the Secured Lenders will consent to the LG&E-KU Settlement by being signatories to the proposed order seeking approval of the LG&E-KU Settlement.

j)    The LG&E-KU Settlement is subject to being memorialized in writing, in form and substance acceptable to the parties, and being approved by the Bankruptcy Court.

k)    The LG&E-KU Settlement shall not disturb or impact the Tribeca Sale Order.

l)    The Disclosure Statement and the Plan will be amended to include the terms of the LG&E-KU Settlement.

m)    The Debtors' confirmation order with respect to the Plan will be consistent with the LG&E-KU Settlement and will provide that the terms of the LG&E-KU Settlement will control if there are any inconsistencies between any of the Debtors' confirmation order, Disclosure Statement, Plan, or Plan-related documents on the one hand, and the LG&E-KU Settlement on the other hand.

n)    If the LG&E-KU Settlement is not approved by the Bankruptcy Court, a separate post-confirmation proceeding will be held in the Bankruptcy Court as to the LG&E-KU Contract and all parties' rights and remedies are expressly retained.

After the conclusion of the hearing on October 5, 2020, OVEC-IKEC agreed to settle the Appeal and treatment of the OVEC-IKEC Contract on the same terms as the LG&E-KU Settlement as read into the record of such hearing.

(b)    **De Minimis and Private Sales**

On July 20, 2020, the Debtors filed a motion seeking approval of certain sale and abandonment procedures for assets in value up to $250,000 (the "De Minimis Asset Procedures Motion"). The Debtors' Estates contain significant personal and real property assets over and above the assets that were sought to be sold to the Secured Lenders. Thus, the De Minimis Asset Procedures Motion requested approval for the Debtors to execute the following transactions: (i) sale of assets below $75,000 in cash sale price, (ii) sale of assets between $75,000 and $250,000 in cash sale price, and (iii) abandonment of assets below $50,000 in value. On July 28, 2020, the Bankruptcy Court entered the De Minimis Asset Procedures Order [Docket No. 538]. The Debtors have closed ten sales under the De Minimis Asset Procedures Order, including (a) a surplus roof support, 11,250 5' roof bolts, and 7,000 resin to Warrior Mine to Alliance Resource Partners for $33,375 in Cash; (b) used belts, rolled belts, and slope belts to Silver Spur Conveyors for $230,368 in Cash; (c) a high voltage cable to GK Bird Associates, Inc. for $50,630 in Cash; (d) two Ocenco breathable technology to River View Coal, LLC for $18,575 in Cash; (e) two 42" Catenary Structure without legs to A&A Supplies Incorporated for $12,200 in Cash; (f) one 48" rigid belt structure to Blackhawk Mining, LLC for $7,500 in Cash; (g) three Ocenco breathable technology to River View Coal, LLC for $244,175 in Cash; (h) certain miscellaneous inventory to Warrior Coal, LLC for $57,178.81 in Cash; (i) eight Thermo Environmental Dust Pumps to Warrior Met Coal, Inc. for $94,400 in Cash; (j) four battery mantrips to ICG Beckley, LLC for $28,000 in Cash; and (k) various chargers, stamps, spotters, speakers, spare batteries, and pumps to River View Coal, LLC for $19,790.25 in Cash.

28

On August 17, 2020, the Debtors filed a motion seeking authorization from the Bankruptcy Court to close a private sale of the Debtors' dock site equipment, raw coal stacker, and clean coal stacker located in McLean County, Kentucky, free and clear of any liens, claims, and encumbrances, to Castlen Marine, LLC in return for an aggregate cash consideration of $435,000 [Docket No. 558], which was approved by the Bankruptcy Court on September 10, 2020 [Docket No. 586].

### 5.15   *Paycheck Protection Program.*

#### (a)   **Adversary Proceeding**

On May 8, 2020, the Debtors filed an adversary proceeding complaint and application for a temporary restraining order and preliminary injunction against the United States of America Small Business Administration ("SBA") in an attempt to receive approximately $2,274,400 from the Paycheck Protection Program established by Congress to help small businesses sustain their operations and maintain their payrolls for the benefit of the businesses and their employees [Docket No. 287]; (Adversary Proceeding or A/P No. 20-04012). On May 12, 2020, after holding a hearing on the Debtors' request for a preliminary injunction, the Bankruptcy Court entered an order granting the Debtors' temporary restraining order [A/P Docket No. 20]. On May 19, 2020, the Debtors withdrew one of their two loan applications, and reduced their request to $1,868,800 of Paycheck Protection Program fund [A/P Docket Nos. 30, 32]. Subsequently, the Bankruptcy Court held a hearing on the Debtors' request for a preliminary injunction prohibiting the SBA from denying the Debtors' request for the loan pursuant to the Paycheck Protection Program. The Bankruptcy Court entered an order on June 1, 2020, denying the Debtors' petition for a preliminary injunction [A/P Docket No. 35].

On June 3, 2020, the Debtors filed an emergency motion for the Bankruptcy Court to reconsider its order [A/P Docket Nos. 36, 38], which the Bankruptcy Court denied [A/P Docket No. 49]. On July 9, 2020, the Debtors and SBA filed a joint stipulation to dismiss the adversary proceeding [A/P Docket No. 54]. On July 10, 2020, the Bankruptcy Court closed the adversary proceeding.

#### (b)   **Unsecured Postpetition Financing Motion**

In connection with the Debtors' adversary proceeding against the SBA, on May 20, 2020, the Debtors filed a motion requesting entry of an order granting the Debtors authority to incur postpetition unsecured financing [Docket No. 321]. In response to the Bankruptcy Court's order denying the Debtors' emergency motion for reconsideration, on June 21, 2020, the Debtors withdrew their motion to incur postpetition unsecured financing [Docket No. 420].

### 5.16   *Key Employee Incentive Plan.*

On April 29, 2020, the Debtors filed the *Debtors' Motion for Entry of Order Approving Key Employee Incentive Plan* [Docket No. 380] (the "KEIP Motion") and the *Debtors' Motion for Order Authorizing Filing of Exhibit Under Seal* [Docket No. 274] (the "KEIP Motion to Seal") requesting that the Court approve a key employee incentive plan (the "KEIP") to pay up to $114,500 to seven of the Debtors' senior management who were critical to the continued maintenance and operation of the Debtors' business. Under the proposed KEIP, the seven employees were entitled to receive incentive payments if the Debtors met certain operational metrics and cash flow metrics over four payment periods. On June 8, 2020 and June 9, 2020, after

the Court held a hearing on the KEIP Motion and KEIP Motion to Seal, the Court granted both motions [Docket Nos. 380, 381]. As of the date of this filing, the estates have paid approximately $114,000 under the KEIP.

**5.17**    *Committee's Motion to Convert Chapter 11 Cases.*

On June 23, 2020, the Committee filed an emergency motion requesting that the Bankruptcy Court enter an order to immediately convert the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code [Docket No. 423] (the "Conversion Motion"). After lengthy negotiations, and based on the Committee Settlement (as defined below), the Committee withdrew the Conversion Motion on August 13, 2020 [Docket No. 549].

**5.18**    *Adversary Proceedings Against the Secured Lenders and Committee Settlement.*

Pursuant to the Final DIP Order, the Committee and other parties had a deadline by which an adversary proceeding could be filed against the Secured Lenders concerning prepetition or postpetition obligations and lien priority (the "Challenge Period"). On May 29, 2020, Fricke and FKC filed adversary proceedings against the Secured Lenders to contest the validity and/or priority of the parties' asserted liens on certain property of the Debtors [Docket Nos. 355, 356]; (Adversary No. 20-04014); (Adversary No. 20-04015). The Debtors are not a party to these adversary proceedings. A preliminary hearing was scheduled for both Adversary Proceedings on January 12, 2021 to determine when a trial may be scheduled to resolve the priority Lien disputes between the Secured Lenders, Fricke, FKC, Minova, and West Virginia Electric Company.

On July 8, 2020, after several agreed extensions of the Challenge Period, the Committee filed an adversary proceeding complaint against the Secured Lenders to (a) avoid and recover damages resulting from an alleged voidable transfer from the Debtors during the preference period, (b) to recharacterize certain of the Secured Lenders' claims, and (c) avoid liens on certain bank accounts constituting collateral of the Secured Lenders (Adversary No. 20-04020).

After the filing of the Committee's adversary proceeding against the Secured Lenders, the Secured Lenders and the Committee engaged in discussions to attempt to settle the adversary proceeding. During the Sale Hearing, the Committee announced that it had reached an agreement in principle to settle with the Secured Lenders, as demonstrated in the amended APA and the settlement terms read into the record at the Sale Hearing (the "Committee Settlement"). A motion seeking approval of the Committee Settlement was filed on September 14, 2020 [Docket No. 599] and the deadline to object to the Committee Settlement is October 5, 2020. The Committee Settlement provides as follows: (1) a claims administrator (the "Claims Administrator") will be appointed to administer a trust estate for the benefit of holders of General Unsecured Claims and to distribute certain settlement amounts to the beneficiaries of the trust; (2) on behalf of the Secured Lenders, the Debtors or the Liquidating Trustee (the "Liquidating Entities") will pay the Claims Administrator $50,000 out of the first dollars recovered by the Liquidation Entities payable to the Secured Lenders if the APA is not approved and $65,000 if the APA is approved, (3) on behalf of the Secured Lenders, the Liquidating Entities will pay to the Claims Administrator 3% of the Net Liquidation Proceeds (as defined in the Committee Settlement) if the APA is not approved and 10% of the Net Liquidation Proceeds if the APA is approved, (4) SP2, an affiliate of the Secured Lenders, will assign to the Claims Administrator 7.5% of the Royalty Interest (as defined in the

Committee Settlement), in the event that the APA is not approved and 22.5% in the event that the APA is approved; (5) the Secured Lenders will provide affirmative support to a plan of liquidation of the Debtors' estates that provides for a waiver of the Chapter 5 Claims of action against the General Unsecured Creditors, the Secured Lenders, and SP2, and is otherwise acceptable to the Secured Lenders; (6) mutual releases between the Committee and the Secured Lenders; and (7) the Committee would dismiss its adversary proceeding against the Secured Lenders.

On October 5, 2020, the Committee filed an amended proposed order with respect to the approval of the Committee Settlement after receiving and incorporating comments from the Debtors [Docket No. 643] (the "Committee Settlement Proposed Order"). The Committee announced at the hearing on October 5, 2020 that it had agreed to provide the U.S. Trustee extension of 48 hours to object to the Committee Settlement. If the Committee Settlement Proposed Order is approved by a Final Order of the Bankruptcy Court, the Debtors will incorporate the Committee Settlement in the Disclosure Statement and the Plan, as applicable.

**5.19    *Agreed Orders to Lift the Automatic Stay.***

On April 28, 2020, Komatsu filed a motion requesting relief from the automatic stay to retrieve equipment that served as collateral for Komatsu's financing agreements with the Debtors [Docket No. 268]. On July 15, 2020, the Debtors and Komatsu filed an agreed order to, among other things, authorize Komatsu to retrieve its equipment and reject Komatsu's service agreement related to its equipment [Docket No. 492], which was entered by the Bankruptcy Court on July 16, 2020 [Docket No. 497].

On May 22, 2020, Ally Bank filed a motion requesting relief from the automatic stay to retrieve a 2018 Chevrolet Silverado that served as collateral for Ally Bank's retail installment contract and security agreement with Hartshorne Mining [Docket Nos. 335, 336]. On July 15, 2020, the Debtors and Ally Bank filed an agreed order to authorize Ally Bank to retrieve the 2018 Chevrolet Silverado [Docket No. 488], which was entered by the Bankruptcy Court on July 16, 2020 [Docket No. 495].

**5.20    *Rejection of Certain Executory Contracts and Unexpired Leases.***

On March 31, 2020, the Debtors filed a motion to reject their employment agreement with Egan Antill, the Debtors' former Chief Executive Officer and Managing Director of Hartshorne Group from December 8, 2018 until his resignation on March 27, 2020 [Docket No. 233] (the "Antill Rejection Motion"). On April 23, 2020, the Bankruptcy Court granted the relief requested in the Antill Rejection Motion [Docket No. 264].

On June 9, 2020, the Debtors filed a motion to reject their Bristol, Tennessee office lease (the "Bristol Rejection Motion") because the Debtors no longer had any of their employees at that office [Docket No. 389]. On July 7, 2020, the Bankruptcy Court entered the Bristol Rejection Motion effective as of June 9, 2020 [Docket No. 457].

On July 15, 2020, the Debtors filed their first omnibus motion to reject five executory contracts effective as of the filing date [Docket No. 492] (the "First Omnibus Rejection Motion"). The Bankruptcy Court scheduled the hearing on the First Omnibus Rejection Motion for August 18, 2020, with objections due August 11, 2020 [Docket No. 509]. No objections were filed and the

31

Bankruptcy Court entered the order approving the First Omnibus Rejection Motion on August 17, 2020, effective as of July 15, 2020 [Docket No. 557].

On August 13, 2020, the Debtors filed four omnibus motions to reject 369 executory contracts effective as of the filing date of the omnibus motions [Docket Nos. 551-554] (the "Omnibus Rejection Motions").  No objections were filed and the Bankruptcy Court entered the orders approving the Omnibus Rejection Motions on September 16, 2020, effective as of August 13, 2020 [Docket Nos. 608–610, 612].

On September 17, 2020, the deadline passed for the Debtors to assume or reject nonresidential real property leases [Docket No. 351].  The Debtors filed a motion on September 16, 2020 to request that the time for the Debtors to assume or reject a nonresidential real property lease agreement between Hartshorne Land and E.T. Woosley Farms, LLC through and including November 2, 2020 [Docket No. 613] (the "Woosley Extension Motion").  The Bankruptcy Court entered the agreed order approving the Woosley Extension Motion on September 17, 2020 [Docket No. 614].

**5.21**    *401(k) Plan Termination.*

On August 4, 2020, the Debtors filed a motion requesting authority to reject their 401(k) plan, effective August 28, 2020, because (1) the Debtors had made the decision to cease mining operations and pivot to an orderly liquidation; (2) the 401(k) plan was not conveyed or assumed by any purchaser; and (3) the 401(k) plan no longer provided any benefit to the estates [Docket No. 543] (the "401(k) Termination Motion").  On August 27, 2020, the Bankruptcy Court entered an order approving the 401(k) Termination Motion [Docket No. 617].

**5.22**    *Omnibus Claims Objection.*

On August 18, 2020, the Debtors filed a non-substantive claims objection pursuant to Bankruptcy Rule 3007(d) to object to certain duplicated claims, wrong debtor claims, amended claims, and nonconforming claims [Docket No. 563] (the "First Omnibus Claims Objection").  On September 18, 2020, the Bankruptcy Court entered an order approving the First Omnibus Claims Objection [Docket No. 572].

## ARTICLE VI

## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan, the holders of Claims in each Class of Impaired Claims entitled to vote on the Plan must accept the Plan by the requisite majorities set forth in the Bankruptcy Code.  An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in amount of the Claims in such Class actually voting on the Plan have voted to accept it, and (b) more than one-half in number of the holders of Claims in such Class actually voting on the Plan have voted to accept it (such votes, the "Requisite Acceptances").

In view of the benefits to be attained by the Debtors and their creditors if the Plan is consummated, the Debtors and the Committee recommend that all holders of Claims entitled to vote to accept the

Plan do so.  The Debtors and the Committee reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' creditors and other stakeholders. These alternatives included liquidation of the Debtors under chapter 7 of the Bankruptcy Code or a dismissal of the Chapter 11 Cases.  The Debtors and the Committee determined, after consulting with their legal and financial advisors, that the Plan, if consummated, will maximize the value of the estates for all stakeholders, as compared to any other strategy or a liquidation under chapter 7. For all of these reasons, the Debtors and the Committee support the Plan and urge the holders of Claims entitled to vote on the Plan to accept and support it.

## ARTICLE VII

## THE PLAN

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO.**

**7.1**    *Overview of Chapter 11.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to restructure or liquidate its business for the benefit of itself, its creditors, and its equity interest holders.  In addition to permitting the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that comprises of all of the legal and equitable interests of the debtor as of the bankruptcy filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a chapter 11 plan by a bankruptcy court makes that plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of the debtor.   Subject to certain limited exceptions, the order approving confirmation of a plan discharges or releases a debtor from any debt that arose prior to the date of confirmation of the plan and, if applicable, substitutes them for the obligations specified under the confirmed plan.

In general, a chapter 11 plan of liquidation:  (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, (c) details the wind-up of the debtor, and (d) contains other provisions necessary to the liquidation of the debtor that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a chapter 11 plan may only be solicited after the commencement of a chapter 11 case upon transmission to holders of a claim of a plan and written disclosure statement containing adequate information.  Under section

1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the chapter 11 plan. To satisfy the applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are Impaired and not deemed to have rejected the Plan.

## 7.2 *Purpose of the Plan.*

The Debtors are proposing the Plan over the alternative of converting the Debtors' bankruptcy cases to chapter 7 of the Bankruptcy Code because the Debtors believe that (a) the Plan provides a more orderly liquidation and a greater recovery to creditors than a chapter 7 liquidation, and (b) the Plan avoids unnecessary costs to the Debtors' estates which would accrue should the Debtors' bankruptcy case be converted to chapter 7 of the Bankruptcy Code.

## 7.3 *Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Interests.*

### (a)    Classes Entitled To Vote.

Three classes are Impaired and entitled to vote to accept or reject the Plan: Classes 2, 3 and 4 (together, the "Voting Classes"). By operation of law, Class 1 is Unimpaired and deemed to have accepted the Plan and, therefore, holders of Class 1 Claims are not entitled to vote. By operation of law, Classes 5 and 6 are deemed to have rejected the Plan and are not entitled to vote.

### (b)    Tabulation of Votes on a Non-Consolidated Basis.

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and (10) of the Bankruptcy Code. Notwithstanding the foregoing, the Debtors reserve the right to seek to substantively consolidate any two or more Debtors; *provided*, *however*, that such substantive consolidation does not materially and adversely impact the amount of the Plan Distributions to any Person.

### (c)    Acceptance by Impaired Classes.

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### (d)    Elimination of Vacant Classes.

To the extent applicable, any Class that does not contain any Allowed Claims, Allowed Interests, or Claims or Interests temporarily allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Confirmation Hearing, for all Debtors or with respect to any particular Debtor, shall be deemed to have been eliminated from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject the Plan and

34

(b) determining whether such Class has accepted or rejected the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

> (e)    **Deemed Acceptance If No Votes Cast.**

If no holders of Claims or Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of Claims or Interests in such Class.

> (f)    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."**

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Sections 13.2 and 13.3 of the Plan, the Debtors reserve the right (i) to alter, amend, modify, revoke, or withdraw the Plan or any Plan Document to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, and (ii) to request confirmation of the Plan, as it may be modified, supplemented, or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

**7.4    *Means for Implementation.***

> (a)    **Corporate Existence.**

> > (i)    Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or members, or the Debtors' boards of managers.  On the Effective Date, to the extent not otherwise distributed to the holders of Allowed Claims or otherwise provided for in the Plan, each Debtor's assets will be transferred to the Liquidation Trust, which will liquidate and monetize such assets and make distributions to holders of Allowed Claims pursuant to the terms of the Plan.

> > (ii)    To the extent not used in the transfer of Liquidation Trust Assets and not completed prior to the Effective Date, the Debtors (and their respective boards of managers) will dissolve as of the Effective Date, and are authorized to dissolve or terminate the existence of wholly owned non-debtor subsidiaries following the Effective Date as well as any remaining health, welfare, or benefit plans.  For the avoidance of doubt, once all assets of a Debtor have been transferred to the Liquidation Trust, the applicable Debtor or the Liquidation Trustee, as applicable, will take all necessary steps to dissolve such Debtor.

> (b)    **Closing of the Debtors' Chapter 11 Cases.**

When (i) all Disputed Claims filed against a Debtor have become Allowed Claims or have been disallowed by Final Order, (ii) all Liquidation Trust Assets that were assets of such Debtor have been liquidated and the proceeds thereof distributed in accordance with the terms of the Plan, and (iii) all other actions required to be taken by the Liquidation Trust under the Plan and the Liquidation Trust Agreement have been taken, the Liquidation Trust shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(c)      **Plan Funding.**

The Plan Distributions to be made in Cash under the terms of the Plan shall be funded from the Debtors' Cash on hand and applicable proceeds deriving from the sale proceeds pursuant to the De Minimis Asset Procedures Order and other sale proceeds.

(d)      **Settlement of Intercompany Matters.**

On the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, each Debtor and its respective successors and assigns shall waive and release each other and all of its respective successors from any and all Intercompany Claims among and between any or all of the Debtors.  Such waiver and release shall be effective as a bar to all actions, Causes of Action, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim amongst or between any or all of the Debtors.

(e)      **Monetization of Assets.**

The Liquidation Trustee shall, in an expeditious but orderly manner, monetize and convert the Liquidation Trust Assets to Cash and make timely distributions to the Liquidation Trust Beneficiaries in accordance with the Plan and the Liquidation Trust Agreement.  In so doing, the Liquidation Trustee shall exercise its reasonable business judgment to maximize recoveries.  The Liquidation Trustee shall have no liability to any party for the outcome of its decisions in this regard.

(f)      **Books and Records.**

Books and records for each Debtor shall be maintained by the Liquidation Trustee to the extent necessary for the administration of the Liquidation Trust.  For the avoidance of doubt, to the extent the Debtors' books and records are not necessary for the administration of the Liquidation Trust, and except as previously ordered by the Bankruptcy Court, such books and records may be destroyed or abandoned without further order of the Bankruptcy Court as determined appropriate by the Liquidation Trustee.

(g)      **Reporting Duties.**

The Liquidation Trustee shall be responsible for filing informational returns on behalf of the Debtors and the Liquidation Trust and paying any tax liability of the Debtors and the Liquidation Trust.  Additionally, the Liquidation Trustee shall file (or cause to be filed) any other statements, returns, reports, or disclosures relating to the Debtors or the Liquidation Trust that are required by any governmental unit or applicable law.

(h)      **Tax Obligations.**

The Liquidation Trustee shall have the powers of administration regarding all of the Debtors' and the Liquidation Trust's tax obligations, including filing of returns.  The Liquidation Trustee shall (i) endeavor to complete and file, within 180 days after the Effective Date, each Debtor's final federal, state, and local tax returns, (ii) request, if necessary, an expedited determination of any unpaid tax liability of the Debtors or their Estates under section 505(b) of the Bankruptcy Code

36

for all taxable periods of the Debtors ending after the Petition Date through the dissolution of the Liquidation Trust as determined under applicable tax laws, and (iii) represent the interests and accounts of the Liquidation Trust or the Debtors' Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit.

(i)     **Cancellation of Existing Securities and Agreements.**

Except for the purpose of evidencing a right to distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all notes, stock, agreements, instruments, certificates, and other documents evidencing any Claim against or Interest in the Debtors shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be fully released.

(j)     **Indemnification Obligations.**

The Debtors shall assume and assign to the Liquidation Trust their indemnification obligations to current and former managers and officers of the Debtors, which shall in no way affect the rights and obligations of the insureds under the "tail" managers and officers insurance coverage purchased prepetition.

(k)     **Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes.**

(i)     The Debtors or the Liquidation Trustee, subject to the terms of the Liquidation Trust Agreement, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant thereto.  Any officer of any Debtor or the Liquidation Trustee shall be authorized to certify or attest to any of the foregoing actions.

(ii)    Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, managers, or partners of the Debtors or the need for any approvals, authorizations, actions, or consents.

(iii)   To the extent permitted by section 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Debtor to any Person pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform

37

Commercial Code filing or recording fee or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Liquidation Trust Assets to the Liquidation Trust and (ii) any sale or other transfer of the Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

(l)    **Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided in the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtors, the Estates, and their property and stakeholders; and (b) fair, equitable, and reasonable.

(m)    **Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, the Debtors or the Liquidation Trustee, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan; *provided*, *however*, that the Debtors shall waive all Causes of Action under Chapter 5 of the Bankruptcy Code against the holders of General Unsecured Claims. Except as stated in the preceding sentence, the Debtors or the Liquidation Trustee, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Estates and Liquidation Trust.  The Debtors or the Liquidation Trustee, as applicable, shall retain and may exclusively enforce any and all such Causes of Action.  The Debtors or the Liquidation Trustee, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Liquidation Trustee, as applicable, will not pursue any and all available Causes of Action against it.  Unless any such Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or transferred, or settled in the Plan or a Final Order, the Debtors or the Liquidation Trustee, as applicable, expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata,

38

collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Date or Effective Date.

**7.5**    ***Treatment of Executory Contracts and Unexpired Leases.***

(a)    **Assumption of Executory Contracts and Unexpired Leases.**

On the Effective Date, the Debtors shall assume only the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Contracts and Leases. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section 8.1 of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of such Executory Contract or Unexpired Lease, including objecting to the proposed cure amount related thereto, will be deemed to have consented to such assumption and agreed to the specified cure amount. Neither the Debtors nor the Liquidation Trustee will assume or assume and assign the LG&E-KU Contract if the LG&E-KU Settlement is approved.

(b)    **Rejection of Executory Contracts and Unexpired Leases.**

(i)    Each Executory Contract and Unexpired Lease shall be deemed automatically rejected in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is listed on the Schedule of Assumed Contracts and Leases or (b) has already been assumed pursuant to an order of the Bankruptcy Court or is otherwise assumed pursuant to the terms of the Plan; *provided, however,* that any Executory Contracts or Unexpired Leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided in the Final Order resolving such motion in the Debtors' favor. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in Section 8.2 of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Debtors reserve the right to amend the Schedule of Assumed Contracts and Leases at any time before the Effective Date. The Debtors will reject the LG&E-KU Contract pursuant to the LG&E-KU Settlement if the LG&E-KU Settlement is approved.

(ii)    Non-debtor parties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including Claims under section 503 of the Bankruptcy Code; *provided* that such Claims must be filed in accordance with the procedures set forth in Section 8.3 of the Plan.

(c)    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

(i)    All Claims arising from the rejection of Executory Contracts or Unexpired Leases must be filed with the Claims Agent according to the procedures established for the filing of proof of claim or before the later of (i) the applicable Bar Date and (ii) 30 days after the entry of the order approving the rejection of such Executory Contract or Unexpired Lease. All Claims

39

arising from the rejection of Executory Contracts or Unexpired Leases that are evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims. Upon receipt of the Plan Distribution provided in Section 3.3.3 of the Plan, all such Claims shall be satisfied, settled, and released as of the Effective Date, and shall not be enforceable against the Debtors, the Estates, the Liquidation Trust, or their respective properties or interests in property.

(ii) Any Person that is required to file a proof of claim arising from the rejection of an Executory Contract or Unexpired Lease that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Estates, the Liquidation Trust, or their respective properties or interests in property, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

(d) **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

(i) Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may agree. In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Liquidation Trustee or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

(ii) No later than ten days prior to the deadline for parties to vote to accept or reject the Plan, the Debtors shall file a schedule setting forth the proposed cure amount, if any, for each Executory Contract and Unexpired Lease to be assumed pursuant to Section 7.5(a) of the Plan, and serve such schedule on each applicable counterparty, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to the proposed assumption of an Executory Contract or Unexpired Lease or related cure amount must be filed, served and actually received by the Debtors at least ten Business Days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have consented to such assumption and agreed to the specified cure amount.

**7.6** *Liquidation Trust.*

(a) **Generally.**

On the Effective Date, the Liquidation Trust shall be established and become effective for the benefit of Liquidation Trust Beneficiaries. The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in and shall be governed by the Plan and the Liquidation Trust Agreement. In the event of any conflict between the terms of the Liquidation Trust Agreement and the Plan, the Plan shall control. The Liquidation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable

40

circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidation Trust as a grantor trust and the Liquidation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  The Debtors shall transfer, without recourse, to the Liquidation Trust all of their right, title, and interest in the Liquidation Trust Assets.  Upon the transfer by the Debtors of the Liquidation Trust Assets to the Liquidation Trust, the Debtors will have no reversionary or further interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

(b)      **Purposes and Establishment of the Liquidation Trust.**

(i)      On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purposes of liquidating and administering the Liquidation Trust Assets and making distributions on account thereof as provided for under the Plan.  The Liquidation Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust.  The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidation Trust Agreement.

(ii)      On the Effective Date, the Liquidation Trustee, on behalf of the Debtors, shall execute the Liquidation Trust Agreement and shall take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement and consistent with the Plan.

(c)      **Liquidation Trust Assets.**

(i)      On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all right, title, and interest in all of the Liquidation Trust Assets, as well as the rights and powers of each Debtor in such Liquidation Trust Assets, shall automatically vest in the Liquidation Trust, free and clear of all Claims and Interests for the benefit of the Liquidation Trust Beneficiaries.  Upon the transfer of the Liquidation Trust Assets, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidation Trust Assets to the Liquidation Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust shall vest in the Liquidation Trust and its representatives, and the Debtors and the Liquidation Trustee are directed to take all necessary actions to effectuate the transfer of such privileges.  The Liquidation Trustee shall agree to accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and the Liquidation Trust Agreement.

(ii)      The Debtors, the Liquidation Trustee, the Liquidation Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments

41

and shall take all other steps as necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust.

(d)    **Valuation of Assets.**

(i)    As soon as practicable after the establishment of the Liquidation Trust, the Liquidation Trustee shall determine the value of the assets transferred to the Liquidation Trust, and the Liquidation Trustee shall apprise, in writing, the Liquidation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Liquidation Trustee and Liquidation Trust Beneficiaries) for all federal income tax purposes.

(ii)    In connection with the preparation of the valuation contemplated by the Plan and the Liquidation Trust Agreement, the Liquidation Trust shall be entitled to retain such professionals and advisors as the Liquidation Trust shall determine to be appropriate or necessary, and the Liquidation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Liquidation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

(e)    **Appointment of the Liquidation Trustee.**

On the Effective Date and in compliance with the provisions of the Plan and the Liquidation Trust Agreement, the Committee and Secured Lenders shall appoint a person or firm as Liquidation Trustee. The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, to the extent not set forth in the Plan, shall be set forth in the Liquidation Trust Agreement, to be filed in accordance with Section 1.1.87 of the Plan, or the Confirmation Order.

(f)    **Duties and Powers of the Liquidation Trustee.**

(i)    Authority.

The duties and powers of the Liquidation Trustee shall include all powers necessary to implement the Plan with respect to all Debtors and monetize, sell, transfer, liquidate, and transact with respect to the Liquidation Trust Assets, including, without limitation, the duties and powers listed in the Plan. The Liquidation Trustee will administer the Liquidation Trust in accordance with the Liquidation Trust Agreement. The Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely Plan Distributions, and not unduly prolong the duration of the Liquidation Trust. As further provided in the Liquidation Trust Agreement, the Liquidation Trustee may abandon property of the Estates and the Liquidation Trust Assets, including, but not limited to, mining permits, when deemed appropriate.

(ii)    Claims and Causes of Action.

The Liquidation Trustee may object to, seek to estimate, seek to subordinate, compromise, or settle any and all Claims against the Debtors and Causes of Action of the Debtors that have not already been deemed Allowed Claims as of the Effective Date. The Liquidation Trustee shall have the absolute right to pursue or not to pursue any and all Liquidation Trust Assets as it determines in

42

the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence.  If any, Liquidation Trust Causes of Action may only be prosecuted or settled by the Liquidation Trustee, in its sole discretion.  The Liquidation Trust Causes of Action will be transferred to the Liquidation Trust on the Effective Date.

(iii)    Retention of Professionals.

The Liquidation Trustee may enter into employment agreements and retain professionals to pursue the sale of the Liquidation Trust Assets and otherwise advise the Liquidation Trustee and provide services to the Liquidation Trust in connection with the matters contemplated by the Plan, the Confirmation Order, and the Liquidation Trust Agreement without further order of the Bankruptcy Court.  Unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court or with the consent of the Liquidation Trustee), professionals retained by the Liquidation Trustee shall be compensated from the proceeds of the Liquidation Trust Assets in accordance with Section 9.6.5 of the Plan.

(iv)    Distributions; Withholding.

As described in Article 7 of the Plan, the Liquidation Trustee shall make distributions to the Liquidation Trust Beneficiaries in accordance with the terms of the Liquidation Trust Agreement and the Plan.  The Liquidation Trustee may withhold from amounts otherwise distributable to any entity any and all amounts, determined in the Liquidation Trustee's sole discretion, required by the Liquidation Trust Agreement, any law, regulation, rule, ruling, directive, treaty, or other governmental requirement.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.  The Liquidation Trustee may require, as a condition to the receipt of a Plan Distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within 180 days, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 7.4.5 of the Plan.  Further, the Allowed Claim of any such holder shall be deemed released and the holder thereof shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Liquidation Trust, or the Liquidation Trustee.

(v)    Reasonable Fees and Expenses.

The Liquidation Trustee may incur any reasonable and necessary expenses in connection with the performance of its duties under the Plan, including in connection with retaining professionals and/or entering into agreements pursuant to Sections 9.6.3 and 9.6.9 of the Plan.  The Liquidation Trustee shall be paid from the proceeds of the Liquidation Trust Assets pursuant to the Liquidation Trust Agreement.

(vi)    Investment Powers.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust shall be limited to the right and power to

43

invest in such assets only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; *provided, however,* that (a) the scope of any such permissible investments shall be further limited to include only those investments that a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) may be permitted to hold and (b) the Liquidation Trustee may expend the Liquidation Trust Assets (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Liquidation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the Liquidation Trust Assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement.

(vii)    Liquidation Trustee's Tax Power for Debtors.

As described in Section 5.7 of the Plan, following the Effective Date, the Liquidation Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns required to be filed or that the Liquidation Trustee otherwise deems appropriate.  In the event that the Liquidation Trust shall fail or cease to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), the Liquidation Trustee shall take any and all necessary actions as it shall deem appropriate to have the Liquidation Trust classified as a partnership for federal tax purposes under Treasury Regulation section 301.7701-3, including, if necessary, creating or converting the Liquidation Trust into a Delaware limited liability partnership or limited liability company that is so classified.

(viii)    Insurance.

The Liquidation Trustee will maintain customary insurance coverage for the protection of the Liquidation Trustee on and after the Effective Date.

(ix)    Agreements and Other Actions.

The Liquidation Trustee may enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' and Liquidation Trust's obligations thereunder.  The Liquidation Trustee may take all other actions not inconsistent with the provisions of the Plan and the Liquidation Trust Agreement that the Liquidation Trustee deems reasonably necessary or desirable with respect to administering the Plan.

(g)    <b>Funding of the Liquidation Trust.</b>

On the Effective Date, the Liquidation Trust Reserve shall be transferred to, and vest in, the Liquidation Trust for purposes of funding the Liquidation Trust.  Thereafter, the terms of the Liquidation Trust Agreement shall govern the funding of the Liquidation Trust.

(h)    <b>Exculpation; Indemnification.</b>

The Liquidation Trustee, the Liquidation Trust, the professionals of the Liquidation Trust, and their representatives will be exculpated and indemnified pursuant to the terms of the Liquidation Trust Agreement.  The indemnification described in the Liquidation Trust Agreement will exclude

44

willful misconduct and gross negligence. Any indemnification claim of the Liquidation Trustee or the other individuals entitled to indemnification under this subsection shall be satisfied solely from the Liquidation Trust Assets and shall be entitled to a priority distribution therefrom, ahead of any other claim to or interest in such assets. The Liquidation Trustee and its representatives shall be entitled to rely, in good faith, on the advice of their retained professionals.

(i)    **Federal Income Tax Treatment of Liquidation Trust.**

(i)    Pursuant to Revenue Procedure 94-45, for all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date as (A) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to the Liquidation Trust Beneficiaries, in exchange for those Liquidation Trust Beneficiaries relinquishing their claims, followed by (B) the transfer by the Liquidation Trust Beneficiaries to the Liquidation Trust of the Liquidation Trust Assets (other than the Liquidation Trust Assets allocable to any disputed ownership fund) in exchange for interests in Liquidation Trust. Accordingly, the Liquidation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets (other than such Liquidation Trust Assets as are allocable to any disputed ownership fund). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(ii)    Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee may (A) timely elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidation Trustee, the Debtors and the Liquidation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

(j)    **Tax Reporting.**

(i)    The Liquidation Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 9.10 of the Plan. The Liquidation Trustee also will annually send to each Liquidation Trust Beneficiary a separate statement setting forth the Liquidation Trust Beneficiary's share of items of income, gain, loss, deduction, or credit (including the receipts and expenditures of the Liquidation Trust) as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Liquidation Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Liquidation Trust that is required by any governmental unit.

45

(ii)    The valuation of the Liquidation Trust Assets prepared pursuant to Section 9.4 of the Plan shall be used consistently by all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

(iii)    The Liquidation Trustee shall be responsible for payment, out of the Liquidation Trust Assets, of any taxes imposed on the Liquidation Trust or the Liquidation Trust Assets, including any disputed ownership fund.  In the event, and to the extent, any Cash retained on account of Disputed Claims in a disputed ownership fund is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (A) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (B) to the extent that such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidation Trustee as a result of the resolution of such Disputed Claims.

(iv)    The Liquidation Trustee may request an expedited determination of taxes of the Liquidation Trust, including the Disputed Claims Reserve, or the Plan Debtors under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Liquidation Trust or the Plan Debtors for all taxable periods through the dissolution of the Liquidation Trust.

(k)    **Tax Withholdings by Liquidation Trustee.**

The Liquidation Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Liquidation Trust Beneficiaries.  All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Liquidation Trust Beneficiaries for all purposes of the Liquidation Trust Agreement.  The Liquidation Trustee shall be authorized to collect such tax information from the Liquidation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Liquidation Trust Agreement.  To receive distributions under the Plan, all Liquidation Trust Beneficiaries will need to identify themselves to the Liquidation Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidation Trustee deems appropriate.  This identification requirement may, in certain cases, extend to holders who hold their securities in street name.  The Liquidation Trustee may refuse to make a distribution to any Liquidation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Liquidation Trust Beneficiary, the Liquidation Trustee shall make such distribution to which the Liquidation Trust Beneficiary is entitled, without interest; and, *provided*, *further*, that, if the Liquidation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidation Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidation Trustee for such liability.

(l)    **Dissolution.**

The Liquidation Trust shall be dissolved at such time as (i) all of the Liquidation Trust Assets have been distributed pursuant to the Plan and the Liquidation Trust Agreement, (ii) the Liquidation Trustee determines that the administration of any remaining Liquidation Trust Assets is not likely

46

to yield sufficient additional proceeds to justify further pursuit, or (iii) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made; *provided, however*, that in no event shall the Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court determines that a fixed period extension (not to exceed two years, including any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. If at any time the Liquidation Trustee determines, in reliance upon such professionals as the Liquidation Trustee may retain, that the expense of administering the Liquidation Trust so as to make a final distribution to the Liquidation Trust Beneficiaries is likely to exceed the value of the remaining Liquidation Trust Assets, the Liquidation Trustee may (i) reserve any amount necessary to dissolve the Liquidation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Liquidation Trust, and any insider of the Liquidation Trustee, and (iii) dissolve the Liquidation Trust.

### 7.7    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 7.8    *Release of Claims Against and Interests in the Debtors.*

Unless otherwise provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction, and release of such Allowed Claims. Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims; *provided, however*, that in no case shall the aggregate value of all property received or retained under the Plan (or from third parties) by a holder of an Allowed Claim exceed 100% of such holder's underlying Allowed Claim plus any postpetition interest on such Claim, to the extent such interest is permitted by Section 7.6 of the Plan.

### 7.9    *Term of Pre-Confirmation Injunctions or Stays.*

Unless otherwise provided in the Plan, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 7.10    *Debtor Release.*

(a)    **Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, the services of the Debtors' officers and directors in facilitating the expeditious implementation of the Debtors' restructuring, each of the Debtors hereby provides a full release, waiver, and discharge to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtors) and their respective properties from any**

47

and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, or thereafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, including, without limitation, those that any of the Debtors, the Liquidation Trustee, or the Liquidation Trust would have been legally entitled to assert or that any holder of a Claim or Interest or other entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan.

(b)      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good-faith settlement and compromise of the Claims released by the Debtors; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to these releases by the Debtors.

**7.11**    *Accepting Claim Holders Release.*

(a)      Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all Releasing Parties shall be deemed to have forever released, waived, and discharged all causes of action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases, or the Plan against the Releasees (the "Accepting Claim Holders Release").

(b)      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Accepting Claim Holders Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Accepting Claim Holders Release is:  (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good-faith settlement and compromise of the claims released by the Accepting Claim Holders Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasees asserting any claim or cause of action released pursuant to the Accepting Claim Holders Release.

48

**7.12** *Exculpation and Limitation of Liability.*

**Except as otherwise specifically provided in the Plan and to the extent not prohibited by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim; *provided*, *however*, that the foregoing exculpation shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided*, *further*, that in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (and each of their respective affiliates, agents, managers, directors, officers, employees, advisors, and attorneys) have complied with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan and the Plan Distributions and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Plan Distributions.**

**7.13** *Injunction Related to Releases and Exculpation.*

**Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, or Confirmation Order, all entities who have held, hold, or may hold Claims against or Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, their Estates, the Liquidation Trust, the Releasees, or the Exculpated Parties on account of any such Claims or Interests including, but not limited to: (1) commencing or continuing in any manner any action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any encumbrance of any kind; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors' Estates or the Liquidation Trust notwithstanding an indication in a proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (5) commencing or continuing in any manner any action or other proceeding of any kind that does not comply with or is inconsistent with the Plan, including any right of action against an Exculpated Party for any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim; and (6) taking any actions to interfere with the implementation or consummation of the Plan; *provided*, *however*, that nothing in the Plan shall preclude any entity from exercising rights pursuant to and consistent with the terms of the Plan or the Confirmation Order.**

**7.14** *Retention of Causes of Action/Reservation of Rights.*

The Liquidation Trustee may object to, seek to estimate, seek to subordinate, compromise, or settle any and all Claims against the Debtors and Causes of Action of the Debtors that have not already been deemed Allowed Claims as of the Effective Date. The Liquidation Trustee shall have the absolute right to pursue or not to pursue any and all Liquidation Trust Assets as it determines in the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any

49

damages caused by willful misconduct or gross negligence. If any, Liquidation Trust Causes of Action may only be prosecuted or settled by the Liquidation Trustee, in its sole discretion. The Liquidation Trust Causes of Action will be transferred to the Liquidation Trust on the Effective Date.

**7.15    *Indemnification Obligations.***

The Debtors shall assume and assign to the Liquidation Trust their indemnification obligations to current and former managers, members, and officers of the Company, which shall in no way affect the rights and obligations of the insureds under the "tail" directors and officers insurance coverage purchased pre-petition.

**ARTICLE VIII**

**CONFIRMATION OF THE PLAN OF LIQUIDATION**

**8.1    *Confirmation Hearing.***

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan of liquidation. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Clerk of the Bankruptcy Court electronically using the Bankruptcy Court's Case Management/Electronic Case File ("CM/ECF") System at https://ecf.kywb.uscourts.gov/ (a CM/ECF password will be required),[9] or by mailing a hard copy of such objection to the Clerk of the Bankruptcy Court, United States Bankruptcy Court, 601 W. Broadway, Suite 450, Louisville, Kentucky 40202, together with proof of service, and served upon: (i) the Debtors, Hartshorne Holdings, LLC, 373 Whobry Road, Rumsey, Kentucky 42371, Attn: Bertrand Troiano, Chief Restructuring Officer (bertrand.troiano@fticonsulting.com); (ii) counsel for the Debtors, Squire Patton Boggs (US) LLP, 201 East 4th Street, Suite 1900, Cincinnati, Ohio 45202, Attn: Stephen D. Lerner (stephen.lerner@squirepb.com); (iii) Kentucky counsel for the Debtors, Frost Brown Todd LLC, 400 West Market Street, Suite 3200, Louisville, Kentucky 40202, Attn: Edward M. King (tking@fbtlaw.com); (iv) counsel for the Committee, Whiteford Taylor Preston LLP, 200 First Avenue, Floor 3, Pittsburgh, PA 15222, Attn: Michael Roeschenthaler (MRoeschenthaler@wtplaw.com) and Dentons Bingham Greenebaum LLP, 3500 PNC Tower, 101 S. Fifth Street, Louisville, KY 40202, Attn: James R. Irving (james.irving@dentons.com); (vi) counsel to Tribeca Global Resources Credit Pty Ltd, Global Loan Agency Services Australia Nominees Pty Ltd, Tribeca Global Natural Resources Credit Fund, Tribeca Global Natural Resources Limited, and Tribeca Global Natural Resources Credit Master Fund, Wyatt, Tarrant & Combs LLP, 250 West Main Street, Suite 1600, Lexington, Kentucky 40507, Attn: John P. Brice

---

[9]    An CM/ECF account may be obtained via the Bankruptcy Court's CM/ECF website at https://ecf.kywb.uscourts.gov/.

50

(jbrice@wyattfirm.com); and (x) the U.S. Trustee, 601 West Broadway, Suite 512, Louisville, Kentucky 40202, Attn: Timothy E. Ruppel (Tim.Ruppel@usdoj.gov).

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### 8.2    *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

#### (a)    **Confirmation Requirements.**

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full;

- if a class of claims is impaired, at least one impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

(i)      *Acceptance*.

The Voting Classes are Impaired under the Plan and are entitled to vote to accept or reject the Plan. Class 1 is Unimpaired and, therefore, holders of Class 1 Claims are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 5 and 6 are Impaired and not receiving any property under the Plan, and thus holders of Classes 5 and 6 Claims are deemed to have rejected the Plan.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, to alter, amend, modify, revoke, or withdraw the Plan, any exhibit, or schedule thereto or any Plan Document to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtors believe that the Plan satisfies the "cramdown" requirements of section 1129(b) of the Bankruptcy Code.

The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class. There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

52

(ii)    *Unfair Discrimination and Fair and Equitable Test*.

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

(iii)    *Feasibility*.

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless contemplated by the plan. The Plan provides for the liquidation and distribution of the Debtors' remaining assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

(b)    **Best Interests of Creditors – Liquidation Analysis.**

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7.

The Debtors believe that the Plan satisfies the best interests of creditors test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be at least as great as the recoveries expected to be available in a hypothetical chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established under the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If

53

any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are paid next. Unsecured creditors are paid from any remaining liquidation proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid in full.

Substantially all of the Debtors' business has or will be liquidated through past and future sale transactions discussed above, and the Plan effects a liquidation of the remaining assets of the Debtors' Estates. Although a chapter 7 liquidation would achieve a substantially similar outcome, the Debtors believe that the Plan provides a greater recovery to holders of Allowed Claims than would a chapter 7 liquidation. Liquidating the Debtors' Estates under the Plan would likely provide holders of Allowed Claims with a larger, more timely recovery due to the potential for delay and administrative friction that would result from converting to a chapter 7 liquidation at this stage of the Chapter 11 Cases.

In particular, delays caused by the chapter 7 trustee becoming familiar with the remaining assets would result in the Debtors' Estates incurring additional expenses, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' businesses that the Debtors and their Professionals have in proposing the Plan.

In addition to the expected delays, recoveries would be further reduced (in comparison with those provided for the under the Plan) by the expenses that would be incurred in a chapter 7 liquidation, including the additional expenses incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' Estates and assets and these specific Chapter 11 Cases, in order to complete the administration of the Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustees professionals).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professional Persons), which may constitute Allowed Claims. Moreover, the conversion to chapter 7 would also require the establishment of a new bar date for filing claims that would be at least 90 days following conversion. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors' Estates could materially increase upon conversion, thereby further reducing creditor recoveries compared to those available under the Plan.

In light of the foregoing, the Debtors believe that the Plan provides their creditors with a significantly superior recovery compared to what they could reasonably expect to realize in a hypothetical chapter 7 liquidation.

(c)    **Dismissal of the Chapter 11 Cases**

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Chapter 11 Cases, the Debtors would lose the

54

protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiations with their creditors, possibly resulting in costly and protracted litigation in various jurisdictions.  Moreover, holders of Secured Claims may be permitted to foreclose upon the assets that are subject to their Liens.  Dismissal may also permit certain unpaid unsecured creditors to obtain and enforce judgments against the Debtors.  Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

(d)     **Alternative Plans**

The Debtors have evaluated alternatives to the Plan, including alternative structures and terms of the Plan.  The Debtors do not believe that any feasible alternative plan structures exist, and that the only alternatives to the Plan are (a) the conversion of the Chapter 11 Cases to chapter 7 and liquidation of the Debtors pursuant to chapter 7 and (b) a structured dismissal of the Chapter 11 Cases.  The Debtors do not believe that either of these alternatives is preferable to the Plan, and that the Plan, as described herein, enables holders of Claims to realize the greatest possible value under the circumstances.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN **WILL RESULT IN SUBSTANTIAL DELAYS AND REDUCTIONS IN THE DISTRIBUTION OF ANY RECOVERIES**.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

**8.3     *Standards Applicable to Releases.***

Article 11 of the Plan provides for releases of certain claims against non-debtors in consideration of services provided to the Debtors and the contributions made by the Releasees to the Debtors' chapter 11 cases.  The Releasees are, collectively, in each case solely in their capacity as such:  the Debtors, their officers and directors that served in such capacity at any time, and each of their respective Representatives.  The Representatives are, with regard to any entity, its officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents, and other representatives (including their respective officers, directors, employees, members, and professionals).

As set forth in the Plan, the releases are given by (a) the Releasees; (b) all holders of Claims against a Debtor who vote to accept the Plan; (c) all holders of Claims against a Debtor who are entitled to vote to accept the Plan and who do not vote or opt-out of such release; and (d) all holders of Claims against a Debtor who are deemed to accept the Plan.  The released claims and exculpated claims are limited to those claims or causes of action that are based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasees, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Documents, and related agreements, instruments, or other documents, upon any other act or omission, transaction,

55

agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Releasee that constitutes willful misconduct or gross negligence.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Releasees has provided value to the Debtors and aided in the chapter 11 process. The Debtors believe that each of the Releasees has played an integral role in these chapter 11 cases and has expended significant time and resources in these cases.

### 8.4    *Classification of Claims and Interests.*

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### 8.5    *Consummation.*

The Plan will be consummated on the Effective Date. The Effective Date shall be the earlier of (a) the first Business Day on which all of the conditions set forth in Article 10 of the Plan have been satisfied or waived by the Debtors and no stay of the Confirmation Order is in effect.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

### 8.6    *Exemption from Certain Transfer Taxes.*

Pursuant to sections 106, 1141, and 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Debtor to any Person pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; (b) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Liquidation Trust Assets to the Liquidation Trust and (ii) any sale or other transfer of the Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

56

**8.7** *Dissolution of Committee.*

The Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Committee (including each officer, director, employee, agent, consultant, or representative thereof) and each Professional Person retained by the Committee shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to the Debtors and the Chapter 11 Cases; *provided, however,* that the foregoing shall not apply to any matters concerning any Professional Fee Claims held or asserted by any Professional Persons retained by the Committee.

**8.8** *Modification of Plan.*

The Debtors reserve the right in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan before the entry of the Confirmation Order. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors or the Liquidation Trustee, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Subject to the foregoing, a holder of a Claim that had accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

**8.9** *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan in accordance with the preceding sentence prior to the Confirmation Date as to any or all of the Debtors, or if confirmation or the Effective Date does not occur with respect to one or more of the Debtors, then, with respect to such Debtors: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor(s) or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

**8.10** *Retention of Jurisdiction.*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over all matters arising out of, and related to the Chapter 11 Cases or the Plan pursuant to, and for purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim, the resolution of any and all objections

to the allowance or priority of any Claims and the resolution of any and all issues related to the release of Liens upon payment of a secured Claim;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)     determine any and all disputes among creditors with respect to the priority, amount, or secured or unsecured status of their Claims;

(d)     resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to adjudicate and, if necessary, liquidate any Claims arising therefrom; (ii) any potential contractual obligation under any assumed Executory Contract or Unexpired Lease; and (iii) any dispute regarding whether a contract or lease is or was an Executory Contract or Unexpired Lease, as applicable;

(e)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(f)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(g)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, and other agreements or documents adopted in connection with the Plan or Disclosure Statement;

(h)     resolve any cases, Claims, controversies, suits, disputes, or causes of action that may arise in connection with the occurrence of the Effective Date, confirmation, interpretation, implementation or enforcement of the Plan or the extent of any entity's obligations incurred in connection with or released under the Plan;

(i)     hear and determine any disputes arising from the sale of Liquidation Trust Assets and any related payment or claim disputes arising thereunder;

(j)     hear and determine all Causes of Action that are pending as of the date hereof or that may be commenced in the future, including, but not limited to, the Liquidation Trust Causes of Action;

(k)     issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or the consummation, implementation or enforcement of the Plan, except as otherwise provided in the Plan;

(l)     resolve any ambiguities between the Liquidation Trust Agreement and the Plan;

(m)     enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes that may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement, or the transactions contemplated by the Liquidation Trust Agreement;

(n)     resolve any matters related to the Liquidation Trust;

(o)     resolve any Disputed Claims;

(p)     resolve any cases, controversies, suits, or disputes with respect to the releases, exculpations, and other provisions contained in Article 11 of the Plan and enter such orders as may be necessary or appropriate to implement or enforce all such releases, exculpations, and other provisions;

(q)     recover all assets of the Debtors and property of the Debtors' Estates wherever located;

(r)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(s)     consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including, without limitation, the Confirmation Order;

(t)     enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(u)     resolve any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(v)     adjudicate any and all disputes arising from or relating to Plan Distributions;

(w)     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professional Persons for payment of accrued professional compensation;

(x)     enforce all orders previously entered by the Bankruptcy Court;

(y)     hear any other matter not inconsistent with the Bankruptcy Code or related statutory provisions setting forth the jurisdiction of the Bankruptcy Court; and

(z)     enter a final decree closing the Chapter 11 Cases.

59

# ARTICLE IX

# CERTAIN RISK FACTORS TO BE CONSIDERED

> **Important Risks to Be Considered**
>
> Holders of Claims should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement, and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan, before voting to accept or reject the Plan.
>
> These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

**9.1**    ***Certain Bankruptcy Considerations.***

(a)    **General.**

Although the Plan is designed to implement the liquidation of the Debtors' remaining assets and provide distributions to creditors in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of challenges to the adequacy of this Disclosure Statement, to confirmation of the Plan, or a failure to satisfy the conditions to consummation of the Plan, they may be forced to remain in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed. Such a scenario could result in a material deterioration in the Debtors' assets and likely would diminish recoveries under any subsequent chapter 11 plan. Further, in such event, the Debtors may not have sufficient Cash to fund their operations in bankruptcy for such an extended period.

(b)    **Failure to Receive Requisite Acceptances.**

Claims in Classes 2, 3, and 4 are the only Claims entitled to vote to accept or reject the Plan. Although the Debtors believe they will receive the requisite acceptances, the Debtors cannot provide assurances that the requisite acceptances to confirm the Plan will be received for Class 2, 3, or 4. If the requisite acceptances are not received for any Voting Class, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code because at least one Impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. In such a circumstance, the Debtors may seek to obtain acceptances of an alternative chapter 11 plan, or otherwise, that may not have sufficient support from their necessary creditors for confirmation of a plan, or may be required to liquidate these estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative plan would be similar to, or as favorable to the Debtors' creditors as, those proposed in the Plan.

> (c)    **Failure to Pay General Administrative Expense Claims on the Effective Date.**

It is unlikely at this time that there will be enough Cash to satisfy all Allowed General Administrative Expense Claims in full in Cash on the Effective Date.  The quantum of Allowed General Administrative Expense Claims and the related recovery available to satisfy such General Administrative Expense Claims are dependent on a number of variables, events and conditions that are outside the control of the Debtors.  Those variables include, but are not limited to, recoveries from the sale of the Estates' remaining Liquidation Trust Assets and the ultimate timing and manner of the closing of these chapter 11 cases.  In addition, the amounts in the Carve-Out Escrow and the Postpetition Fee Escrow (which amounts are currently in dispute) will determine whether the General Administrative Expense Claims can be paid in full or not, in accordance with the Plan.

If "Allowed," the earliest a holder of an Allowed General Administrative Expense Claim would be paid on account of its Claim in Cash would be the "General Administrative Initial Distribution Date," a date to be scheduled no later than 180 calendar days after the Effective Date.  While the Debtors and the Liquidation Trustee, as applicable, will make every effort to pay a 100 percent recovery to holders of the Allowed General Administrative Expense Claims, given the current financial situation of the Debtors, the distribution to Allowed General Administrative Expense Claim may be delayed and/or reduced. Therefore, while the General Administrative Initial Distribution Date will be scheduled no later than 180 calendar days after the Effective Date, the ultimate timing of the distribution and the recovery percentage for Allowed General Administrative Expense Claim is currently unknown.

The treatment afforded to holders of General Administrative Expense Claims under the Plan is only available if each such holder agrees to such treatment.  The failure to object to confirmation of the Plan by a holder of a General Administrative Expense Claim prior to the Voting Deadline shall be deemed to be such holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in Cash.

If a holder of a General Administrative Expense Claim objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan.  It is possible that holders of General Administrative Expense Claims may receive a smaller distribution on account of their Claims under any alternative to the Plan.

There is currently a dispute between the Debtors and the Secured Lenders with respect to whether the Postpetition Fee Escrow is separate from the Carve-Out Escrow.  Based upon past projections provided to the Secured Lenders, the Debtors' position is that each escrow account is a separate account pursuant to the Final DIP Order, related exhibits, Initial Budget, and Updated Budgets (both as defined in the Final DIP Order).  The Secured Lenders may object to the Plan with respect to the respective amounts in the Carve-Out Escrow and the Postpetition Fee Escrow.  If the Bankruptcy Court rules that the Postpetition Fee Escrow is part of the Carve-Out Escrow, it is highly unlikely that holders of Allowed Administrative Expense Claims will have a full recovery.

(d)     **Failure to Secure Confirmation of the Plan.**

Even if the requisite acceptances are received, the Debtors cannot provide assurances that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of Claims or Interests of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation have not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that any non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 liquidation of the Debtors' remaining assets could be implemented and what distribution holders of Claims ultimately would receive with respect to their Claims.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

(e)     **Failure to Consummate the Plan.**

Section 10.4 of the Plan contains various conditions to consummation of the Plan, including the Confirmation Order having become final and non-appealable, the Debtors having entered into the Plan Documents and all conditions precedent to effectiveness of such agreements having been satisfied or waived in accordance with the terms thereof.  As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

(f)     **Objections to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are

62

substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Further, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is or may be subject to an objection or is not yet Allowed.  Any holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(g)      <strong>The Effective Date May Not Occur.</strong>

Although the Debtors believe that the Effective Date could occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

(h)      <strong>Amount of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims.</strong>

The Plan Distributions available to holders of Allowed Claims in the Voting Classes can be affected by a variety of contingencies, including, without limitation, (i) the aggregate amount of Allowed Claims in the Voting Classes, (ii) the amount of Allowed Class 1 and Priority Tax Claims, (iii) the amount of Allowed Administrative Expense Claims, including Professional Fee Claims after receiving partial payment pursuant to the Carve-Out Escrow and Postpetition Fee Escrow, and (iv) the outcome of the Adversary Proceedings.  The Debtors cannot determine with any certainty at this time the number or amount of such Claims that will ultimately be Allowed, and thus the projected recoveries for the Voting Classes disclosed in this Disclosure Statement are highly speculative.

(i)      <strong>Recovery to Holders of General Unsecured Claims Highly Uncertain.</strong>

It is highly unlikely that holders of General Unsecured Claims will receive a Plan Distribution unless the Committee Settlement is approved by the Bankruptcy Court.  The Bankruptcy Court has not yet convened a hearing on the Committee Settlement.  The Debtors will implement the terms of the Committee Settlement if it is approved by a Final Order of the Bankruptcy Court.

(j)      <strong>Valuation of Assets to be Distributed Under the Plan is Speculative.</strong>

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative.  Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors.

(k)      <strong>The Debtors Cannot Guarantee the Timing of Recoveries.</strong>

The timing of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

63

(l)      **Risks Associated with the Liquidation Trust.**

The ultimate amount of Cash available to make distributions to the Liquidation Trust Beneficiaries depends, in part, on the manner in which the Liquidation Trustee operates the Liquidation Trust and the expenses the Liquidation Trustee incurs.  The expenses of the Liquidation Trustee will be given priority over distributions to the Liquidation Trust Beneficiaries.  As a result, if the Liquidation Trustee incurs professional or other expenses in excess of current expectations, the amount of distributions to the Liquidation Trust Beneficiaries will decrease.

The ultimate amount of Cash available for distributions to the Liquidation Trust Beneficiaries also will be affected by the performance and relative success of selling the Liquidation Trust Assets.  The less successful the Liquidation Trustee is in selling such assets, the less Cash there will be available for distribution to the Liquidation Trust Beneficiaries.

**9.2**    *Certain Securities Considerations.*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (b) the recipients of the securities must hold a pre-petition or administrative expense claim against the debtor or an interest in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  To the extent that the rights to distributions from the Liquidation Trust are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

(a)      **Non-Transferability.**

Liquidation Trust Beneficiaries should be aware that their rights to distributions from the Liquidation Trust are not transferable.  Therefore, there will not be any trading market for such rights, nor will those rights be listed on any public exchange or other market.  The lack of liquidity of the rights to distributions from the Liquidation Trust may have a negative impact on their value.

(b)      **Uncertainty of Value.**

In addition to the prohibition on the transfer of rights to distributions from the Liquidation Trust as discussed above, the value of such rights will depend on various significant risks and uncertainties, including, without limitation, (a) the success of the Liquidation Trust selling the Liquidation Trust Assets for their estimated value; (b) the effect of substantial delays in liquidating the Liquidation Trust Assets; and (c) the effects of any changes in tax and other government rules and regulations applicable to the Liquidation Trust.  All of these risks are beyond the control of the Liquidation Trust and the Liquidation Trustee.  The amount of any recovery realized by the Liquidation Trust Beneficiaries will vary depending upon the extent to which these risks materialize.  In addition, the sale of substantially all of the Liquidation Trust Assets may require a

64

substantial amount of time to be resolved and liquidated.  The associated delays could reduce the value of any recovery.

## ARTICLE X

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 10.1    *Introduction.*

The following discussion is a summary of the proponents' analysis of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and certain holders of Claims and Interests.  This summary is based on the Tax Code, the Treasury Regulations, judicial authorities, published administrative positions of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  The proponents have not requested, nor do they intend to request, a private letter ruling from the IRS or an opinion of counsel with respect to any of the aspects of the Plan.  The discussion below is not binding upon the IRS or any court and does not reflect any independent analysis by the Debtors.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the Tax Code) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such holders in light of their individual circumstances. This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, passthrough entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, and regulated investment companies).  No aspect of state, local, estate, gift or non-U.S. taxation is addressed. The following discussion assumes that each holder of a Claim holds its Claim as a "capital asset" within the meaning of section 1221 of the Tax Code.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

### 10.2    *Federal Income Tax Consequences to the Debtors.*

Taxpayers generally must include in gross income the amount of any cancellation of debt income, which is the difference between the amount of a taxpayer's indebtedness that is cancelled and the amount or value of the consideration exchanged therefore.  Even if indebtedness of the Debtors is discharged or released under the Plan, the Debtors should not recognize taxable cancellation of debt income if the discharge or release is pursuant to a chapter 11 bankruptcy proceeding.

65

Although the Debtors will not be required to recognize cancellation of indebtedness income, it must instead reduce certain tax attributes by the amount of unrecognized cancellation of indebtedness income after the determination of the tax for the year of discharge or release in the manner prescribed by section 108(b) of the Tax Code. Tax attributes include net operating losses ("NOLs"), capital losses and loss carryovers, certain tax credits and, subject to certain limitations, the tax basis of property.

Pursuant to the Plan, all of the Debtors' remaining assets other than those sold prior to the Effective Date will be transferred directly or indirectly to Liquidation Trust Beneficiaries. For federal income tax purposes, any such assets transferred to the Liquidation Trust will be treated by the Debtors and by the Liquidation Trust Beneficiaries as having been distributed to the Liquidation Trust Beneficiaries, with such Liquidation Trust Beneficiaries then transferring the assets to the Liquidation Trust in exchange for beneficial interests in the Liquidation Trust. The Debtors will not retain a beneficial interest in the Liquidation Trust; instead, the beneficial interest in the Liquidation Trust will be held by the Liquidation Trust Beneficiaries. It is intended that the Liquidation Trust be treated, for U.S. federal income tax purposes, as a liquidating trust and as a grantor trust, with the Liquidation Trust Beneficiaries receiving Liquidation Trust Interests being treated as the grantors and deemed owners of the Liquidation Trust Assets.

The Debtors' transfer of their assets pursuant to the Plan will constitute a taxable disposition of such assets, and the Debtors will recognize gain or loss based on the difference between the fair market value and the tax basis of the assets transferred. The Debtors expect that they will recognize a loss on the transfer.

**10.3    *Federal Income Tax Consequences to Holders of Claims and Interests.***

The U.S. federal income tax consequences to holders of Allowed Claims arising from the distributions pursuant to the Plan may vary, depending upon, among other things: (a) the manner in which a holder acquired an Allowed Claim; (b) the type of consideration received by the holder of an Allowed Claim in exchange for the interest it holds; (c) the nature of the indebtedness owed to it; (d) whether the holder previously claimed a bad debt or worthless securities deduction in respect of the Allowed Claim; (e) whether the holder of the Allowed Claim is a citizen or a resident of the U.S. for tax purposes; (f) whether the holder of the Allowed Claim reports income on the accrual or cash basis method of accounting; and (g) whether the holder receives distributions in more than one taxable year. In addition, where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed Claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, and whether the Allowed Claim was acquired at a market discount.

In general, the receipt of Cash and/or interests in the Liquidation Trust in exchange for an Allowed Claim should result in the recognition of gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any interests in the Liquidation Trust received (other than any Cash or interests in the Liquidation Trust attributable to accrued but unpaid interest) and (ii) the holder's tax basis in its Allowed Claim (other than any Claim for accrued but unpaid interest).

If the Claim in the holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the holder held such Claim or Interest for longer than one year or short-term capital gain or loss if the holder held such Claim or Interest for one year or less. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation.

The Liquidation Trustee will determine the fair market value of the assets transferred to the Liquidation Trust and of the beneficial interests in the Liquidation Trust. These values must be used by the Debtors, the Liquidation Trustee, and all beneficiaries of the Liquidation Trust for all federal income tax purposes. It is possible that the IRS may disagree with the valuations for this purpose. If the IRS were to successfully assert that different valuations should apply, the amount of taxable gain or loss recognized by holders of Allowed Claims would be subject to adjustment.

Holders of Claims who were not previously required to include any accrued but unpaid interest in their gross income on a Claim may be treated as receiving taxable interest income taxable at tax rates for ordinary income to the extent any consideration they receive under the Plan is allocable to such interest. Holders of Claims previously required to include in their gross income any accrued but unpaid interest on a claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan. Under the Plan, to the extent that any Allowed Claim entitled to a distribution is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the distribution exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

A holder of an Allowed Claim who receives, in respect of its Claim, an amount that is less than its tax basis in such claim or equity interest may be entitled to a bad debt deduction under section 166(a) of the Tax Code or a loss under section 165(a) of the Tax Code. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Accordingly, holders are urged to consult their tax advisors with respect to their ability to take such a deduction. A holder that has previously recognized a loss or deduction in respect of its claim or equity interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such Claim.

Whether the holder of Claims will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims or Interests. Accordingly, holders of Claims and Interests should consult their own tax advisors.

A holder of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Tax Code.

If a holder of an Allowed Claim purchased the Claim at a discount, the difference may constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a holder of a

debt obligation with market discount should be treated as ordinary interest income to the extent of any market discount accrued on the Claim by the holder on or prior to the date of the exchange.

**10.4    *Consequences of the Liquidation Trust.***

The Liquidation Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Thus, the Liquidation Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d). The provisions of the Liquidation Trust Agreement and the Plan are intended to satisfy the guidelines for classification as a liquidating trust that are set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. Under the Plan, all parties are required to treat the Liquidation Trust as a liquidating trust, subject to contrary definitive guidance from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to sections 671 through 679 of the Tax Code, owned by the persons who are treated as transferring assets to the Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust. If the IRS were to challenge successfully the classification of the Liquidation Trust as a grantor trust, the federal income tax consequences to the Liquidation Trust and the Liquidation Trust Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS may characterize some or all of the Liquidation Trust as a grantor trust for the benefit of the Debtors or as otherwise owned by and taxable to the Debtors. Alternatively, the IRS could characterize the Liquidation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

Consistent with the intended treatment, Liquidation Trust Beneficiaries will be treated for federal income tax purposes as the grantors and owners of their share of the assets held by the Liquidation Trust. No tax should be imposed on the Liquidation Trust on earnings generated by the assets held by the Liquidation Trust. Instead, each Liquidation Trust Beneficiary holding a beneficial interest in the Liquidation Trust must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidation Trust. None of the Debtors' loss carryforwards will be available to reduce any income or gain of the Liquidation Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any Liquidation Trust Asset, each Liquidation Trust Beneficiary holding a beneficial interest in the Liquidation Trust must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Liquidation Trust in exchange for the Liquidation Trust Asset so sold or otherwise disposed of and (2) such Liquidation Trust Beneficiary's adjusted tax basis in its share of the Liquidation Trust Asset. The character of any such gain or loss to the Liquidation Trust Beneficiary will be determined as if such Liquidation Trust Beneficiary itself had directly sold or otherwise disposed of the Liquidation Trust Asset. The character of items of income, gain, loss, deduction, and credit to any Liquidation Trust Beneficiary holding a beneficial interest in the Liquidation Trust, and the

68

ability of the Liquidation Trust Beneficiary to benefit from any deductions or losses, may depend on the particular circumstances or status of the Liquidation Trust Beneficiary.

Given the treatment of the Liquidation Trust as a grantor trust, each Liquidation Trust Beneficiary holding a beneficial interest in the Liquidation Trust has an obligation to report its share of the Liquidation Trust's tax items (including gain on the sale or other disposition of a Liquidation Trust Asset) which is not dependent on the distribution of any cash or other Liquidation Trust Assets by the Liquidation Trust. Accordingly, a Liquidation Trust Beneficiary holding a beneficial interest in the Liquidation Trust may incur a tax liability as a result of owning a share of the Liquidation Trust Assets, regardless of whether the Liquidation Trust distributes cash or other assets. Due to the requirement that the Liquidation Trust maintain certain reserves, the Liquidation Trust's ability to make current Cash distributions may be limited or precluded. In addition, due to possible differences in the timing of income on, and the receipt of cash from the Liquidation Trust Assets, a Liquidation Trust Beneficiary holding a beneficial interest in the Liquidation Trust may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the Liquidation Trust Beneficiary during the year.

The Liquidation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidation Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Liquidation Trust Beneficiary holding a beneficial interest in the Liquidation Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidation Trust will pertain to Liquidation Trust Beneficiaries who received their interests in the Liquidation Trust in connection with the Plan.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee may (A) elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, any Disputed Claims reserve may be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets in such reserves, and all distributions from such reserves (which distributions will be net of the related expenses of the reserve) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

**10.5    *Information Reporting and Back-Up Withholding.***

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made

to a holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. holder, such non-U.S. holder provides a properly executed applicable IRS Form W-8BEN or W-8BEN-E (or otherwise establishes such Non-U.S. holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE. THE DEBTORS AND THEIR PROFESSIONALS DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES THE HOLDER OF A CLAIM OR INTEREST MAY INCUR AS A RESULT OF THE TREATMENT AFFORDED ITS CLAIM OR INTEREST UNDER THE PLAN AND DO NOT REPRESENT WHETHER THERE COULD BE ADDITIONAL TAX EXPOSURE TO THEMSELVES OR THEIR NON-DEBTOR AFFILIATES AS A RESULT OF THE PLAN.**

## ARTICLE XI

## PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN

**11.1**    *Distributions on Account of Claims Allowed as of the Effective Date.*

The Liquidation Trustee may not make any payments to Allowed Claims as of the Effective Date.

**11.2**    *Distributions on Account of Claims Allowed After the Effective Date.*

The Liquidation Trustee may pay Allowed Claims as of the Initial Distribution or any subsequent Periodic Distribution Dates, as applicable.

**11.3** *Distributions to Allowed General Administrative Expense Claims*

Holders of General Administrative Expense Claims may not be paid in full in Cash as of the Effective Date and the payment by the Liquidation Trustee of the Allowed General Administrative Expense Claims may be delayed and reduced. The recovery on such claims is currently unknown.

**11.4** *Delivery of Plan Distributions.*

    (a)    **Distribution Record Date.**

As of the close of business on the Distribution Record Date, the Claims Register shall be closed and there shall be no further changes in the record holders of any Claims or Interests. The Debtors or Liquidation Trustee shall have no obligation to recognize any transfer of Claims occurring after 5:00 p.m. (prevailing Mountain Time) on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of records as of the close of business on the Distribution Record Date. Additionally, with respect to payment of any cure amounts or any cure disputes in connection with the assumption and assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors nor the Liquidation Trustee shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a cure amount. Absent anything provided in this Disclosure Statement, all parties' rights under section 506 of the Bankruptcy Code are expressly preserved.

    (b)    **Address for Plan Distributions.**

Plan Distributions to holders of Allowed Claims shall be made by the Liquidation Trustee at (a) the addresses of such holders on the books and records of the Debtors or their agent; or (b) the addresses in any written notice of address change delivered to the Debtors or the Liquidation Trustee, including any addresses on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.

    (c)    **Setoffs.**

In the event that the value of a Debtor's claim, right, or Cause of Action against a particular claimant is undisputed, resolved by settlement, or has been adjudicated by Final Order of any court, the Liquidation Trustee may set off such undisputed, resolved, or adjudicated amount against any Plan Distributions that would otherwise become due to such claimant. Neither the failure to effectuate such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Liquidation Trustee of any claims, rights, or Causes of Action that the Debtors or the Liquidation Trust may possess against such claimant.

    (d)    *De Minimis* **and Fractional Plan Distributions.**

Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee shall not be required to make on account of any Allowed Claim (a) partial Plan Distributions or payments of fractions of dollars or (b) any Plan Distribution if the amount to be distributed is less than $50.00. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required,

the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all Cash shall be distributed in the final distribution of the Liquidation Trust.

(e)     **Undeliverable Plan Distributions.**

If any Plan Distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidation Trustee has been notified of the then-current address of such holder, at which time such Plan Distribution shall be made as soon as reasonably practicable thereafter without interest, dividends, or accruals of any kind; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of the later of six months from the first Distribution Date after such holder's Claim is first Allowed. After such date, all "unclaimed property" or interests in property shall revert to the Liquidation Trust (notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and the Liquidation Trust Agreement, and the Claim of any holder to such property or interest in property shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Estates, the Liquidation Trust, or the Liquidation Trustee. Nothing contained in the Plan shall require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

(f)     **Failure To Present Checks.**

Any check issued by the Liquidation Trust on account of an Allowed Claim shall be null and void if not negotiated within 120 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Liquidation Trust by the holder of the relevant Allowed Claim with respect to which such check originally was issued. If any holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within six months after the date the check was mailed or otherwise delivered to the holder, that Allowed Claim shall be released and the holder thereof shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Liquidation Trust, or the Liquidation Trustee. In such cases, any Cash held for payment on account of such Claims shall be property of the Liquidation Trust, free of any Claims of such holder with respect thereto, and shall be redistributed to the other holders of Allowed Claims in accordance with the Plan and Liquidation Trust Agreement.

**11.5    *Claims Paid or Payable by Third Parties.***

(a)     **Claims Paid by Third Parties.**

To the extent the holder of a Claim receives payment on account of such Claim from a party that is not a Debtor or the Liquidation Trust, the Liquidation Trustee shall reduce the Claim (in full or to the extent of payment by the third party), and such Claim shall be disallowed to the extent of payment from such third party without an objection to such Claim having to be filed and without further notice to, action, order or approval of the Bankruptcy Court. Further, to the extent a holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidation Trust on account of such Claim, such holder shall,

within 14 calendar days of receipt thereof, repay or return the distribution to the Liquidation Trustee, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution. The failure of such holder to timely repay or return such Plan Distribution shall result in such holder owing the Liquidation Trust annualized interest at the federal judgment rate on such amount owed for each Business Day after the 14-calendar day grace period specified above until such amount is repaid.

(b)    **Claims Payable by Insurance.**

Holders of Claims that are covered by the Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Debtors and the Liquidation Trust, as applicable, shall have no obligation to pay any amounts in respect of prepetition deductibles or self-insured retention amounts. No Plan Distributions shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors or the Liquidation Trustee, as applicable, may direct the Claims Agent to expunge the applicable portion of such Claim from the Claims Register without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Policies.**

Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as otherwise released, enjoined, or exculpated pursuant to Article 11 of the Plan against the Releasees and the Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Liquidation Trust, or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**11.6    *No Postpetition Interest on Claims.***

Other than as specifically provided in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claim, and no holder of a prepetition Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

## ARTICLE XII

## PROCEDURES FOR RESOLVING CLAIMS

**12.1    *Allowance of Claims.***

After the Effective Date, the Liquidation Trustee shall have and retain any and all rights and defenses, including rights of setoff, which the Debtors had with respect to any Claim. Except as

expressly provided in the Plan or in any order entered in the Debtors' Chapter 11 Cases before the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed an Allowed Claim under the Plan.

**12.2    *Objections to Claims.***

(a)    After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Liquidation Trustee, shall have the exclusive authority to file objections to Claims and settle, compromise, withdraw, or litigate to judgment objections to any and all Claims. From and after the Effective Date, the Liquidation Trustee may settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court. The Liquidation Trustee shall have the sole and exclusive authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)    Any objections to Claims shall be served and filed on or before the later of: (i) the date that is 40 calendar days after the Effective Date; and (ii) such other later date as may be fixed by the Bankruptcy Court. Any Claims filed after the Bar Date shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Liquidation Trustee, unless the Person seeking to file such untimely Claim has received the Bankruptcy Court's authorization to do so.

**12.3    *Estimation of Claims.***

(a)    After the Confirmation Date, but before the Effective Date, the Debtors, and after the Effective Date, the Liquidation Trustee, may request that the Bankruptcy Court estimate any Claim, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time (including during the pendency of any appeal with respect to the allowance or disallowance of such Claims).

(b)    In the event that the Bankruptcy Court estimates any disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the amount of such Allowed Claim or a maximum limitation on the amount of such Allowed Claim. If the estimated amount constitutes a maximum limitation on such Allowed Claim, the Debtors or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Plan Distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 14 calendar days after the date on which such Claim is estimated. All of the Claims objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved, or withdrawn by any mechanism approved by the Bankruptcy Court.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims. Other alternatives would involve significant delay, uncertainty, and substantial administrative costs and are likely to reduce any return to creditors who hold Claims. The Debtors and the Committee urge the holders of Impaired Secured Lenders Claims, Impaired Other Secured Claims, and Impaired General Unsecured Claims who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 11:59 p.m. (prevailing Mountain Time) on October 27, 2020.

Dated:  October 5, 2020

       Rumsey, Kentucky

                              Respectfully submitted,

                              Hartshorne Holdings, LLC
                              on behalf of itself and its affiliated Debtors

                              By: */s/ David Gay* _____
                                   David Gay
                                   President

010-9091-4666/30/AMERICAS

**<u>EXHIBIT 1</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**(Owensboro Division)**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hartshorne Holdings, LLC, *et al.*, | ) | Case No. 20-40133 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

---

## JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR HARTSHORNE HOLDINGS, LLC AND ITS AFFILIATED DEBTORS

---

Dated:        October 5, 2020

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Hartshorne Holdings, LLC (3948); Hartshorne Mining Group, LLC (0063); Hartshorne Mining, LLC (1941); and Hartshorne Land, LLC (5582). The Debtors' headquarters are located at 373 Whobry Road, Rumsey, Kentucky 42371.

## TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS AND INTERPRETATION ...................................................1

    1.1    Definitions. .......................................................................................................1
    1.2    Interpretation; Application of Definitions and Rules of Construction. ...........12
    1.3    Appendices and Plan Documents. ...................................................................12

ARTICLE 2. UNCLASSIFIED CLAIMS ........................................................................13

    2.1    Overview. .........................................................................................................13
    2.2    Payment of Administrative Expense Claims. ..................................................13
    2.3    U.S. Trustee Fees. ............................................................................................17

ARTICLE 3. CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ...................................................................................................17

    3.1    Summary. .........................................................................................................17
    3.2    Classification of Claims and Interests. ...........................................................17
    3.3    Treatment of Claims and Equity Interests. .....................................................18

ARTICLE 4. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
INTERESTS ...................................................................................................21

    4.1    Classes Entitled To Vote. ................................................................................21
    4.2    Tabulation of Votes on a Non-Consolidated Basis. ........................................21
    4.3    Acceptance by Impaired Classes. ....................................................................22
    4.4    Elimination of Vacant Classes. .......................................................................22
    4.5    Deemed Acceptance If No Votes Cast. ...........................................................22
    4.6    Confirmation Pursuant to Section 1129(b) or "Cramdown." ..........................22

ARTICLE 5. MEANS FOR IMPLEMENTATION ........................................................22

    5.1    Corporate Existence. ........................................................................................22
    5.2    Closing of the Debtors' Chapter 11 Cases. .....................................................23
    5.3    Plan Funding. ...................................................................................................23
    5.4    Settlement of Intercompany Matters. ..............................................................23
    5.5    Monetization of Assets. ...................................................................................23
    5.6    Books and Records. ..........................................................................................23
    5.7    Reporting Duties. .............................................................................................24
    5.8    Tax Obligations. ..............................................................................................24
    5.9    Cancellation of Existing Securities and Agreements. .....................................24
    5.10   Indemnification Obligations. ...........................................................................24
    5.11   No Substantive Consolidation. ........................................................................24
    5.12   Effectuating Documents; Further Transactions; Exemption from
             Certain Transfer Taxes. ...................................................................................25
    5.13   Comprehensive Settlement of Claims and Controversies. ..............................25
    5.14   Preservation of Causes of Action. ...................................................................26

**ARTICLE 6. PROCEDURES FOR RESOLVING CLAIMS** ...................................26

    6.1    **Allowance of Claims.** ....................................................................26
    6.2    **Objections to Claims.** ...................................................................27
    6.3    **Estimation of Claims.** ...................................................................27

**ARTICLE 7. PROVISIONS GOVERNING DISTRIBUTIONS** ..............................28

    7.1    **Release of Claims Against and Interests in the Debtors.** .....................28
    7.2    **Distributions on Account of Claims Allowed as of the Effective Date.** ...........28
    7.3    **Distributions on Account of Claims Allowed After the Effective Date.** .........28
    7.4    **Distribution to Allowed General Administrative Expense Claims.** ................28
    7.5    **Delivery of Plan Distributions.** ......................................................28
    7.6    **Claims Paid or Payable by Third Parties.** .......................................30
    7.7    **No Postpetition Interest on Claims.** ...............................................31

**ARTICLE 8. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......................31

    8.1    **Assumption of Executory Contracts and Unexpired Leases.** .....................31
    8.2    **Rejection of Executory Contracts and Unexpired Leases.** .......................31
    8.3    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.** ...........................................................................32
    8.4    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.** ...........................................................................32

**ARTICLE 9. LIQUIDATION TRUST** ...........................................................33

    9.1    **Generally.** .................................................................................33
    9.2    **Purposes and Establishment of the Liquidation Trust.** ........................33
    9.3    **Liquidation Trust Assets.** ............................................................33
    9.4    **Valuation of Assets.** ...................................................................34
    9.5    **Appointment of the Liquidation Trustee.** ........................................34
    9.6    **Duties and Powers of the Liquidation Trustee.** .................................35
    9.7    **Funding of the Liquidation Trust.** ..................................................37
    9.8    **Exculpation; Indemnification.** ......................................................37
    9.9    **Federal Income Tax Treatment of Liquidation Trust.** ..........................37
    9.10    **Tax Reporting.** .........................................................................38
    9.11    **Tax Withholdings by Liquidation Trustee.** ......................................39
    9.12    **Dissolution.** .............................................................................39

**ARTICLE 10. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** ...........................................................................40

    10.1    **Conditions Precedent to the Effective Date.** ....................................40
    10.2    **Satisfaction and Waiver of Conditions Precedent.** .............................40
    10.3    **Effect of Non-Occurrence of Conditions to the Effective Date.** ...............40

**ARTICLE 11. EFFECT OF CONFIRMATION** ...............................................41

    11.1    **Binding Effect.** .........................................................................41
    11.2    **Term of Pre-Confirmation Injunctions or Stays.** ...............................41
    11.3    **Debtor Release.** ........................................................................41
    11.4    **Accepting Claim Holders Release.** .................................................42

| | | |
|---|---|---|
| **11.5** | **Exculpation and Limitation of Liability.** | 42 |
| **11.6** | **Injunction Related to Releases and Exculpation.** | 43 |

**ARTICLE 12. RETENTION OF JURISDICTION** .................................................43

**ARTICLE 13. MISCELLANEOUS PROVISIONS** ..............................................45

| | | |
|---|---|---|
| **13.1** | **Dissolution of Committee.** | 45 |
| **13.2** | **Modification of Plan.** | 46 |
| **13.3** | **Revocation or Withdrawal of Plan.** | 46 |
| **13.4** | **Allocation of Plan Distributions Between Principal and Interest.** | 46 |
| **13.5** | **Severability.** | 46 |
| **13.6** | **Governing Law.** | 47 |
| **13.7** | **Inconsistency.** | 47 |
| **13.8** | **Time.** | 47 |
| **13.9** | **Exhibits.** | 47 |
| **13.10** | **Notices.** | 47 |
| **13.11** | **Filing of Additional Documents.** | 48 |

## INTRODUCTION[2]

Hartshorne Holdings, LLC and the three other debtors and debtors in possession in the above-captioned cases propose the following joint chapter 11 plan of liquidation. In reviewing the Plan, readers should refer to the Disclosure Statement, including the exhibits and supplements thereto, for a discussion of the Debtors' business history and operations, risk factors, a summary and analysis of the Plan, and certain related matters including, among other things, certain tax matters and other consideration to be issued and distributed under the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 13.2 and 13.3 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

The only Persons that are entitled to vote on the Plan are holders of Allowed Claims in Classes 2, 3, and 4. Such Persons are encouraged to read the Plan and the Disclosure Statement and their respective exhibits and schedules in their entirety before voting to accept or reject the Plan. No materials other than the Disclosure Statement and the respective schedules, notices, and exhibits attached thereto and referenced therein have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE 1.

## DEFINITIONS AND INTERPRETATION

### 1.1    Definitions.

The following terms shall have the meanings set forth below. Such meanings shall be equally applicable to both the singular and plural forms of such terms.

1.1.1      "*503(b)(9) Claims*" means Claims that have been timely and properly filed prior to the Bar Date and that are granted administrative expense priority treatment pursuant to section 503(b)(9) of the Bankruptcy Code.

1.1.2      "*Accepting Claim Holders Release*" means the release provision set forth in Section 11.4 hereof.

1.1.3      "*Administrative Bar Date*" means no later than 20 calendar days after the Effective Date.

1.1.4      "*Administrative Expense Claim*" means, collectively, (a) General Administrative Expense Claims, (b) Statutory Fees, (c) Professional Fee Claims, (d) Priority Tax Claims, and (e) U.S. Trustee Fees.

1.1.5      "*Adversary Proceedings*" mean those two adversary proceedings in the Bankruptcy Court, Adversary Case Nos. 20-4014 and 20-04015, filed by FKC and Fricke,

---

[2] All capitalized terms used but not defined in this Introduction have the meanings set forth in article 1 of the Plan.

respectively, related to the priority and validity of the Liens on the Collateral allegedly held by the Secured Lenders, FKC, Fricke, Minova, and WVEC.

      1.1.6      "*Allowed*" means with respect to Claims: (a) any Claim (i) for which a proof of Claim has been timely Filed on or before the applicable Bar Date (or for which a proof of Claim is not required to be Filed pursuant to the Bankruptcy Code or a Final Order) or (ii) that is identified in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no proof of Claim has been timely Filed; *provided* that, in the case of (i), any such Claim shall be considered Allowed only if and to the extent that (a) no objection to the allowance thereof has been Filed by the Claims Objection Bar Date or such an objection has been Filed and the Claim thereafter has been Allowed by a Final Order; or (b) any Claim expressly deemed allowed by the Plan or allowed by a Final Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court). Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims.

      1.1.7      "*Appeal*" means the Debtors' appeal filed on August 27, 2020 [Docket No. 570] to the Bankruptcy Appellate Panel for the Sixth Circuit with respect to the Bankruptcy Court's order denying the Debtors' proposed sale of, among other things, the Coal Supply Contracts and the Causes of Action under Chapter 5 of the Bankruptcy Code, to the Secured Lenders.

      1.1.8      "*Ballot*" means the ballots substantially in the form attached as Exhibits C, D, and E to the Solicitation Procedures Motion.

      1.1.9      "*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

      1.1.10      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Western District of Kentucky, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

      1.1.11      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as amended from time to time, as applicable to the Chapter 11 Cases, and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Western District of Kentucky.

      1.1.12      "*Bar Date*" means May 28, 2020 for the general claims bar date, as established by the Bar Date Order.

      1.1.13      "*Bar Date Order*" means *the Order (A) Setting Bar Dates for Submitting Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, and (C) Approving Notice Thereof* [Docket No. 185] entered by the Bankruptcy Court on March 24, 2020.

      1.1.14      "*Business Day*" means any day other than a Saturday, Sunday, or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a)(6).

- 2 -

1.1.15    "*Carve-Out*" means any amount so designated in the Initial Budget or an Updated Budget (both as defined in the Final DIP Order), not to exceed $3 million.

1.1.16    "*Carve-Out Escrow*" means that certain escrow as defined in Paragraph 10 of the Final DIP Order, which is maintained by the Debtors or Liquidation Trustee, as applicable, until such time as all obligations under the Carve-Out have been indefeasibly paid in full.  For the avoidance of doubt, the Carve-Out Escrow is separate and distinct from the Postpetition Fee Escrow.

1.1.17    "*Cash*" means the legal currency of the United States and equivalents thereof.

1.1.18    "*Causes of Action*" means any and all actions, causes of action, suits, accounts, controversies, obligations, judgments, damages, demands, debts, rights, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and Claims, whether known or unknown, reduced to judgment or not, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or tort, arising in law, equity, or otherwise, though excluding causes of action under chapter 5 of the Bankruptcy Code against the holders of General Unsecured Claims.

1.1.19    "*Chapter 11 Cases*" means the cases that are being jointly administered under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and captioned *In re Hartshorne Holdings, LLC*, *et al.*, Case No. 20-40133 (THF).

1.1.20    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

1.1.21    "*Claims Agent*" means Stretto, or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. § 156(c).

1.1.22    "*Claims Objection Bar Date*" means for all Claims other than Administrative Expense Claims, the later of:  (a) 40 days after the Effective Date and (b) such other period of limitation for objecting to Claims as may be specifically fixed by this Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court.  For the avoidance of doubt, the Claims Objection Bar Date may be extended one or more times by the Bankruptcy Court.

1.1.23    "*Claims Register*" means the official register of Claims against the Debtors maintained by the Claims Agent.

1.1.24    "*Class*" means each category of Claims and Interests established under article 3 of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.1.25    "*Class 2*" means Classes 2A and 2B.

1.1.26    "*Class 3*" means Classes 3A through 3D.

- 3 -

**1.1.27**    "*Class 4*" means Classes 4A through 4D.

**1.1.28**    "*Coal Supply Contracts*" mean the LG&E-KU Contract and the OVEC-IKEC Contract.

**1.1.29**    "*Collateral*" means any property or interest in property of the Estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

**1.1.30**    "*Committee*" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, which consists of (a) United Central Industrial Supply Co LLC, (b) Carroll Engineering Co., and (c) Trey K. Mining and Electric.

**1.1.31**    "*Committee Settlement*" means that certain *Settlement Agreement and Mutual Release* between the Committee, Tribeca Global Resources Credit Pty Ltd., and SP2 Royalty Co., LLC attached as Exhibit A to the *Motion for Settlement Between The Official Committee of Unsecured Creditors, Tribeca Global Resources Credit Pty Ltd. and SP2 Royalty Co., LLC* [Docket No. 599], if approved by a Final Order of the Bankruptcy Court, pursuant to which holders of General Unsecured Claims may receive certain consideration.

**1.1.32**    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Debtors' Chapter 11 Cases.

**1.1.33**    "*Confirmation Hearing*" means a hearing to be held by the Bankruptcy Court on November 9, 2020 at 10:00 a.m. (prevailing Eastern Time) regarding confirmation of the Plan and the adequacy of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.1.34**    "*Confirmation Order*" means an order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices, supplements, and related documents.

**1.1.35**    "*De Minimis Asset Procedures Order*" means that *Order Establishing Procedures to Sell, Transfer, or Abandon Certain De Minimis Assets* [Docket No. 538] entered by the Bankruptcy Court on July 28, 2020.

**1.1.36**    "*Debtor(s)*" means, individually or collectively, as the context requires: Hartshorne Holdings; Hartshorne Group; Hartshorne Mining; and Hartshorne Land.

**1.1.37**    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Releasees as set forth in Section 11.3 hereof.

**1.1.38**    "*DIP Loan*" means the secured postpetition financing in an aggregate principal amount of $7.625 million provided to the Debtors by the Secured Lenders and approved by the Bankruptcy Court pursuant to the Final DIP Order.

- 4 -

**1.1.39**    "*DIP Loan Claims*" mean, collectively, any of the Secured Lenders' Allowed Secured Claims evidenced by, arising under, or in connection with the DIP Loan; *provided however* that such Claim does not include Secured Lenders Claims.

**1.1.40**    "*Disallowed*" means a finding of the Bankruptcy Court in a Final Order, or provision in the Plan providing, that a Disputed Claim shall not be an Allowed Claim.

**1.1.41**    "*Disclosure Statement*" means the disclosure statement in respect of the Plan and all exhibits, schedules, supplements, modifications, and amendments thereto.

**1.1.42**    "*Disputed*" means, with respect to any Claim against a Debtor, including any portion thereof, any Claim (a) that is listed on the Schedules as contingent, unliquidated, or disputed, (b) as to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and Bankruptcy Rules or that is otherwise disputed by any Debtor or the Liquidation Trustee in accordance with applicable law, which objection, request for estimation, or dispute has not been determined by a Final Order, or (c) with respect to which a proof of claim was required to be filed by order of the Bankruptcy Court but as to which such proof of claim was not timely or properly filed.

**1.1.43**    "*Distribution Date*" means the Initial Distribution Date or any of the Periodic Distribution Dates, as applicable.

**1.1.44**    "*Distribution Record Date*" means, with respect to all Classes for which Plan Distributions are to be made, the third Business Day after the Confirmation Date or such other later date as shall be established by the Bankruptcy Court in the Confirmation Order.

**1.1.45**    "*Effective Date*" means a day, as determined by the Debtors, that is the business day as soon as reasonably practicable after all conditions to the Effective Date in Section 10.1 of the Plan have been met or waived.

**1.1.46**    "*Estate(s)*" means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.1.47**    "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' post-petition restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, filing, solicitation of acceptances, confirmation, approval, implementation, or administration of the Disclosure Statement, the Plan, the settlements and agreements contained in the Plan, the property to be distributed under the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Debtors' Chapter 11 Cases, the pursuit of entry of a Confirmation Order, the distribution of property under the Plan, or any other related agreement; *provided, however,* that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted willful misconduct or gross negligence.  For the avoidance of doubt, no Claim, Cause of Action, obligation, or liability expressly set forth in or preserved by the Plan constitutes an Exculpated Claim.

- 5 -

**1.1.48** "*Exculpated Party*" means, collectively, the Debtors, each of the Debtors' current officers and directors that served in such capacities between the Petition Date and the Effective Date, the Committee and each of the Committee's members acting in their respective capacities as members thereof, and the Professional Persons of each of the foregoing acting in their respective capacities as such that served in such capacities between the Petition Date and the Effective Date.

**1.1.49** "*Executory Contract*" means any contract to which any of the Debtors is a party that is subject to assumption or rejection under sections 365 and 1123 of the Bankruptcy Code.

**1.1.50** "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

**1.1.51** "*Final DIP Order*" means that *Final DIP Order (A) Authorizing Postpetition Secured Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Providing Adequate Protection to the Prepetition Secured Parties, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* [Docket No. 223] entered by the Bankruptcy Court on March 27, 2020.

**1.1.52** "*Final Order*" means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered on the docket in the Debtors' Chapter 11 Cases (or on the docket of such other court of competent jurisdiction), which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; *provided, further*, that the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.1.53** "*Fricke*" means Fricke Management & Contracting, Inc.

**1.1.54** "*FKC*" means Frontier-Kemper Constructors, Inc.

**1.1.55** "*General Administrative Expense Claims*" mean any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (other than Professional Fee Claims, Statutory Fees, Priority Tax Claims, or U.S. Trustee Fees) incurred during the period from the Petition Date to the Effective Date, including, without limitation: (a) any actual and necessary

- 6 -

costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and any indebtedness or obligations incurred or assumed by any of the Debtors during the Chapter 11 Cases; (b) 503(b)(9) Claims; and (c) any payment to be made under the Plan to cure a default under an assumed executory contract or unexpired lease, the full payment of which is uncertain under the Plan.

       **1.1.56**      "***General Unsecured Claim***" means any unsecured Claim against any Debtor, including (a) trade Claims, (b) unsecured Claims held by a non-Debtor affiliate of the Debtors against the Debtors, (c) Claims arising out of the rejection of Executory Contracts and Unexpired Leases by any Debtor, but excluding any Intercompany Claim, and (d) any deficiency Claim arising out of a Secured Lenders Claim or Other Secured Claim.

       **1.1.57**      "***Governmental Bar Date***" means August 19, 2020, as established by the *Order (A) Setting Bar Dates for Submitting Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, and (C) Approving Notice Thereof* [Docket No. 185] entered by the Bankruptcy Court on March 24, 2020.

       **1.1.58**      "***Hartshorne Group***" means Hartshorne Mining Group, LLC.

       **1.1.59**      "***Hartshorne Holdings***" means Hartshorne Holdings, LLC.

       **1.1.60**      "***Hartshorne Land***" means Hartshorne Land, LLC.

       **1.1.61**      "***Hartshorne Mining***" means Hartshorne Mining, LLC.

       **1.1.62**      "***Impaired***" means impaired within the meaning of section 1124 of the Bankruptcy Code.

       **1.1.63**      "***Initial Distribution Date***" means the date occurring no later than 90 calendar days after the Effective Date when Plan Distributions shall commence.

       **1.1.64**      "***Intercompany Claim***" means any Claim (including an Administrative Expense Claim), Cause of Action, or remedy asserted against a Debtor by another Debtor.

       **1.1.65**      "***Interest***" means the interest (whether legal, equitable, contractual, or otherwise) of any holders of equity securities of any of the Debtors represented by membership units or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

       **1.1.66**      "***Interim Compensation Order***" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and Granting Related Relief* [Docket No. 186] entered by the Bankruptcy Court on March 24, 2020.

       **1.1.67**      "***LG&E-KU Contract***" means, as amended, that certain Coal Supply Agreement, dated as of October 15, 2015, by and among Louisville Gas and Electric Company and Kentucky Utilities Company and Hartshorne Group.

- 7 -

1.1.68    "*LG&E-KU Settlement*" means the proposed settlement between the Debtors and Louisville Gas and Electric Company and Kentucky Utilities Company related to the LG&E-KU Contract, which was read into the record during the October 5, 2020 hearing.

1.1.69    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.1.70    "*Liquidation Trust*" means the trust created pursuant to the Liquidation Trust Agreement on the Effective Date in accordance with the Plan, the Confirmation Order, and the Liquidation Trust Agreement.

1.1.71    "*Liquidation Trust Agreement*" means the Liquidation Trust Agreement to be dated as of the Effective Date establishing the terms and conditions of the Liquidation Trust, substantially in the form attached to the Plan Supplement.

1.1.72    "*Liquidation Trust Assets*" means the assets to be transferred to the Liquidation Trust on the Effective Date including, without limitation, the Liquidation Trust Causes of Action, the Liquidation Trust Reserve, and all other property and assets of the Debtors, but excluding all of the Debtors' Cash necessary to fully fund the Carve-Out Escrow.

1.1.73    "*Liquidation Trust Beneficiaries*" means the holders of the Liquidation Trust Interests.

1.1.74    "*Liquidation Trust Causes of Action*" means collectively, the Causes of Action transferred to the Liquidation Trust on the Effective Date, including any defense or counterclaim to any Disputed Claim, but excluding any and all Causes of Action released and/or exculpated pursuant to the terms of the Plan.

1.1.75    "*Liquidation Trust Interests*" means the uncertified beneficial interests in the Liquidation Trust representing the right of each holder of an Allowed Claim to receive Cash distributions from the Liquidation Trust on account of such Liquidation Trust Interests in accordance with the terms of this Plan and the Liquidation Trust Agreement.

1.1.76    "*Liquidation Trust Reserve*" means, as more fully described in the Liquidation Trust Agreement, the Cash transferred to the Liquidation Trust on the Effective Date to fund the initial operations of the Liquidation Trust.

1.1.77    "*Liquidation Trustee*" means the person or firm to be appointed to manage the Liquidation Trust pursuant to Section 9.5 of the Plan and the Liquidation Trust Agreement.

1.1.78    "*Minova*" means Minova USA, Inc.

1.1.79    "*Ordinary Course Professionals Order*" means the *Order Authorizing the Debtors to Employ and Pay Professionals Utilized by the Debtors in the Ordinary Course of Business* [Docket No. 172] entered by the Bankruptcy Court on March 23, 2020.

- 8 -

1.1.80    "*Other Secured Claim*" means a Claim:  (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code, excluding the Secured Lenders' Claims.

1.1.81    "*OVEC-IKEC Contract*" means, as amended, that certain Fuel Purchase Order, dated as of August 31, 2018, by and between the Ohio Valley Electric Corporation and the Indiana-Kentucky Electric Corporation and Hartshorne Group.

1.1.82    "*Periodic Distribution Date*" means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is 60 days after the Initial Distribution Date, and thereafter, the first Business Day that is 30 days after the immediately preceding Periodic Distribution Date until liquidation of the Liquidation Trust Assets is complete.

1.1.83    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

1.1.84    "*Petition Date*" means February 20, 2020.

1.1.85    "*Plan*" means the joint chapter 11 plan of liquidation proposed by the Debtors, including, without limitation, all applicable exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of the Plan.

1.1.86    "*Plan Distributions*" means the distributions to be made under the Plan to holders of Allowed Claims at the Distribution Date(s).

1.1.87    "*Plan Documents*" means the documents, other than the Plan, to be executed, delivered, assumed, or performed in connection with the consummation of the Plan, including, without limitation, the documents to be included in the Plan Supplement, any and all exhibits to the Plan, the Disclosure Statement, and any and all exhibits to the Disclosure Statement.

1.1.88    "*Plan Supplement*" means the supplemental appendix to the Plan to be filed no later than ten days prior to the deadline for parties to vote to accept or reject the Plan, which may contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of (i) the Liquidation Trust Agreement filed by the Debtors with the consent of the Committee and the Secured Lenders, (ii) the Schedule of Assumed Contracts and Leases, and (iii) additional documents filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.

1.1.89    "*Postpetition Fee Escrow*" means the $1,500,000 deposited into an escrow account by the Secured Lenders pursuant to the Final DIP Order, which was maintained by the Debtors for the sole benefit of the holders of Professional Fee Claims.  For the avoidance of doubt, the Postpetition Fee Escrow is separate and distinct from the Carve-Out Escrow.

- 9 -

**1.1.90** "*Prepetition Term Loan Agreement*" means that certain Term Facility Agreement, dated as of April 24, 2019 (as amended on November 19, 2019) by and among Hartshorne Group, as borrower, non-debtors Paringa Resources Limited, Hartshorne Coal Mining Pty Ltd, HCM Resources Pty Ltd, and Debtors Hartshorne Holdings, Hartshorne Land, and Hartshorne Mining, as guarantors, Tribeca Global Resources Credit Pty Ltd, as agent, and Global Loan Agency Services Australia Nominees Pty Ltd, as security trustee, and Equity Trustees Limited as trustee of the Tribeca Global Natural Resources Credit Fund, Tribeca Global Natural Resources Credit Master Fund, and Tribeca Global Natural Resources Limited as lenders.

**1.1.91** "*Priority Claim*" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim or a Priority Tax Claim.

**1.1.92** "*Priority Tax Claim*" means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.1.93** "*Professional Fee Claim*" means any Administrative Expense Claim for the compensation of Professional Persons and the reimbursement of expenses incurred by such Professional Persons through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional Person's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**1.1.94** "*Professional Person(s)*" means all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code, excluding any ordinary course professionals.

**1.1.95** "*Releasees*" mean, collectively, the Debtors, officers and directors of the Debtors that served in such capacity, and each of their respective Representatives; *provided however* that Paringa Resources Limited and any Representative of Paringa Resources Limited are expressly excluded from this definition, except for David Gay and Bruce Czachor in each of their capacities as directors or officers of Paringa Resources Limited or any related non-debtor entity.

**1.1.96** "*Releasing Parties*" mean each of the following in its capacity as such: (a) the Releasees; (b) all holders of Claims against a Debtor who vote to accept the Plan; (c) all holders of Claims against a Debtor who are entitled to vote to accept the Plan and who do not vote or opt-out of such release; and (d) all holders of Claims against a Debtor who are deemed to accept the Plan.

**1.1.97** "*Representatives*" mean, with regard to any entity, its officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents, and other representatives (including their respective officers, directors, employees, members, and professionals).

- 10 -

**1.1.98** "*Schedule of Assumed Contracts and Leases*" means a schedule of the Executory Contracts and Unexpired Leases to be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and Article 8.1 of the Plan, which shall be included in the Plan Supplement.

**1.1.99** "*Schedules*" means the schedules of assets and liabilities filed in the Chapter 11 Cases, as amended or supplemented from time to time.

**1.1.100** "*Secured Claim*" means a Claim: (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.1.101** "*Secured Lenders*" mean, collectively, the lenders party to the Prepetition Term Loan Agreement, the DIP Loan, or other agreements related thereto.

**1.1.102** "*Secured Lenders Claims*" mean, collectively, any of the Secured Lenders' Allowed Secured Claims evidenced by, arising under, or in connection with the Prepetition Term Loan Agreement, the Final DIP Order, or other agreements related thereto that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; *provided however* that such Claim does not include DIP Loan Claims.

**1.1.103** "*Solicitation Package*" means the Plan, Disclosure Statement, Ballot, Confirmation Hearing Notice, a letter from the Committee urging holders of General Unsecured Claims to vote in favor of the Plan, a pre-addressed return envelope, and the entered order to the Solicitation Procedures Motion.

**1.1.104** "*Solicitation Procedures Motion*" means that motion filed contemporaneously with the Plan and Disclosure Statement titled the *Debtors' Motion for an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures, Tabulation Procedures, and Dates, Deadlines, and Notices Related Thereto, and (III) Granting Related Relief*.

**1.1.105** "*Statutory Fees*" means those fees as defined in Section 2.2.2 of the Plan.

**1.1.106** "*Subsidiary*" means any corporation, association, or other business entity of which at least the majority of the securities or other ownership interest is owned or controlled by a Debtor and/or one or more subsidiaries of the Debtor.

**1.1.107** "*Tax Code*" means the Internal Revenue Code of 1986, as amended.

**1.1.108** "*Unexpired Lease*" means a lease of nonresidential real property to which any of the Debtors is a party that is subject to assumption or rejection under sections 365 and 1123 of the Bankruptcy Code.

**1.1.109** "*Unimpaired*" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

- 11 -

**1.1.110**    "*U.S. Trustee*" means the United States Trustee, Region 8.

**1.1.111**    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.1.112**    "*Voting Classes*" mean Class 2, Class 3, and Class 4.

**1.1.113**    "*Voting Deadline*" means October 27, 2020 at 11:59 p.m. (prevailing Mountain Time) as the deadline for holders of Claims in the Voting Classes to complete, execute, and return their Ballots so as to be actually received by the Claims Agent in accordance with the Ballot instructions.

**1.1.114**    "*WVEC*" means the West Virginia Electric Corporation.

### 1.2    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  Any term that is not defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  The captions and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.  Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.

### 1.3    Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if fully set forth in the Plan. The documents contained in the exhibits to the Plan and in the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at https://cases.stretto.com/hartshorne/, or may obtain a copy of the Plan Documents by a request to the Claims Agent as follows:

Hartshorne Holdings, LLC Case Administration
c/o Stretto
8269 East 23rd Avenue, Suite 275
Denver, Colorado 80238
TeamHartshorne@stretto.com

# ARTICLE 2.
# UNCLASSIFIED CLAIMS

### 2.1    Overview.

All Claims and Interests, except for those Claims set forth in Article 2 of the Plan, are classified for voting and distribution purposes pursuant to the Plan as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, General Administrative Expense Claims and Priority Tax Claims are not classified herein. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes. A holder of a Claim that may be asserted against more than one of the Debtors shall be entitled to a single distribution as if such holder had a single Claim against the Debtors.

### 2.2    Payment of Administrative Expense Claims.

#### 2.2.1    *General Administrative Expense Claims*.

Subject to the bar date provisions herein, unless otherwise agreed by the holder of a General Administrative Expense Claim and the Debtors or the Liquidation Trustee, as applicable, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed General Administrative Expense Claim will receive payment of such Allowed General Administrative Expense Claim in accordance with this Plan, as described below. For the avoidance of doubt, 503(b)(9) Claims shall be deemed to be General Administrative Expense Claims.

Any unpaid Allowed General Administrative Expense Claim not otherwise satisfied prior to the Effective Date will receive the following treatment under this Plan. It is unlikely that there will be sufficient cash to satisfy all Allowed General Administrative Expense Claims in full in Cash on the Effective Date. The quantum of the Allowed General Administrative Expense Claims and the related recovery available to satisfy such Allowed General Administrative Expense Claims are dependent on a number of variables, events and conditions that are unknown at this time and/or outside the control of the Debtors. Those variables include, but are not limited to, recoveries from the sale of the Estates' remaining Liquidation Trust Assets and the ultimate timing and manner of the closing of these chapter 11 cases. In addition, the amounts in the Carve-Out Escrow and the Postpetition Fee Escrow (which amounts are currently in dispute) will determine whether the General Administrative Expense Claims can be paid in full or not, in accordance with the Plan. If the aggregate amount of the Allowed Administrative Expense Claims are less than or equal to the aggregate amounts in the Carve-Out Escrow ($3 million) and Postpetition Fee Escrow ($1.5 million), then the Debtors may be in a position to pay Allowed General Administrative Expense Claims in full.

With respect to the timing of classifying a General Administrative Expense Claim as "Allowed," a timely filed General Administrative Expense Claim will be deemed "Allowed" only if and to the extent that (a) no objection to the allowance thereof has been Filed or such an objection has been Filed and the Claim thereafter has been Allowed by a Final Order, or (b) any General Administrative Expense Claim is expressly deemed allowed by the Plan or allowed by a Final

- 13 -

Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court). The "Administrative Bar Date" is defined as the later of: (a) 20 calendar days after the Effective Date, and (b) such other period of limitation for objecting to General Administrative Expense Claims as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court.

If "Allowed," the earliest a holder of an Allowed General Administrative Expense Claim would be paid on account of its Claim in Cash would be the "General Administrative Initial Distribution Date," a date to be scheduled no later than 180 calendar days after the Effective Date. While the Debtors and the Liquidation Trustee, as applicable, will make every effort to pay a 100 percent recovery with respect to the Allowed General Administrative Expense Claims, given the current financial situation of the Debtors, the distribution to Allowed General Administrative Expense Claim may be delayed and/or reduced. Therefore, while the General Administrative Initial Distribution Date will be scheduled no later than 180 calendar days after the Effective Date, the ultimate timing of the distribution and the recovery percentage for holders of Allowed General Administrative Expense Claims is currently unknown.

Although it is likely that certain parties will be paid a higher percentage of their respective General Administrative Expense Claims incurred during these chapter 11 cases due to payment of such Claims by the Debtors in the ordinary course of business, the Debtors believe that holders of General Administrative Expense Claims will see a greater recovery under this Plan than with any other alternative path, including dismissal or conversion of these cases to cases under chapter 7 of the Bankruptcy Code. Any other exit strategy for these Debtors will further decrease such recovery, such that it is in the best interest of the General Administrative Expense Claims to support the Plan.

However, the treatment afforded to holders of General Administrative Expense Claims under the Plan is only available if each such holder agrees to such treatment. The failure to object to confirmation of the Plan by a holder of a General Administrative Expense Claim prior to the Voting Deadline shall be deemed to be such holder's consent and agreement to receive treatment for such Claim that is different from the one set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in Cash on the Effective Date.

If a holder of a General Administrative Expense Claim objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan.

### 2.2.2    *Statutory Fees.*

All fees due and payable pursuant to 28 U.S.C. § 1930 prior to the Effective Date shall be paid by the Liquidation Trustee on the Effective Date. After the Effective Date, the Liquidation Trust and the Liquidation Trustee shall be jointly and severally liable to pay any and all fees pursuant to 28 U.S.C. § 1930 when due and payable. The Liquidation Trust and the Liquidation Trustee shall remain obligated to pay fees pursuant to 28 U.S.C. § 1930 for each and every one of the Debtors to the Office of the U.S. Trustee until the earliest of that particular Debtor's case is closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### 2.2.3    *Professional Compensation.*

(a)    Final Fee Applications and Payment of Professional Fee Claims.

To the extent required by a Final Order of the Bankruptcy Court approving a Professional Person's retention, all final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 30 calendar days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, the Liquidation Trustee shall be authorized to pay from the Postpetition Fee Escrow and Carve-Out Escrow to the applicable Professional Person up to the full Allowed amount.  Professional Fee Claims not subject to approval by separate Bankruptcy Court order will be paid from the Postpetition Fee Escrow and Carve-Out Escrow in accordance with any Final Order approving the retention of such Professional Person.

To the extent that funds held in the Postpetition Fee Escrow and Carve-Out Escrow are insufficient to satisfy the amount of the Professional Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with the Plan.

(b)    Carve-Out Escrow.

As soon as practicable after the Confirmation Date, the Debtors shall fund the Carve-Out Escrow with Cash in the amount of $3,000,000.  The Carve-Out Escrow shall be maintained in trust for the Professional Persons.  Such funds are not property of the Debtors' Estates.  The amount of Professional Fee Claims owing to the Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Carve-Out Escrow.  Notwithstanding anything provided in the Plan, the Carve-Out Escrow is preserved and shall continue unaffected by the Confirmation Date or the occurrence of the Effective Date.

(c)    Postpetition Fee Escrow.

Notwithstanding anything provided in the Plan, the Postpetition Fee Escrow is preserved and shall continue unaffected by the Confirmation Date or the occurrence of the Effective Date.  The Postpetition Fee Escrow contains Cash in the amount of $1,500,000 maintained by the Debtors for the sole benefit of the allowed fees and expenses of those professionals retained pursuant to Bankruptcy Court orders in the Chapter 11 Cases.  There is currently a dispute between the Debtors and the Secured Lenders with respect to whether the Postpetition Fee Escrow is included in the Carve-Out Escrow.

(d)    Allocation and Estimation of Professional Fees and Expenses.

Professional Persons providing services to the Debtors shall reasonably estimate their unpaid Professional Fee Claims against the Debtors relating to the period prior to and through the Effective Date and shall deliver such estimate to the Debtors by two Business Days prior to the Confirmation Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional Person and such Professional Persons are not bound

- 15 -

to any extent by the estimates. If a Professional Person does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional Person.

   (e)  Post-Confirmation Date Professional Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date through the Effective Date, the Debtors or the Liquidation Trust, as applicable, will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash from the Carve-Out Escrow and Postpetition Fee Escrow the reasonable and documented legal, professional, or other fees and expenses related to implementation and consummation of the Plan incurred by the Debtors (including the reasonable and documented fees and expenses of the Committee's Professional Persons). Upon the Confirmation Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Liquidation Trustee, as applicable, may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

When all Professional Fee Claims have been paid in full, any remaining amount in the Carve-Out Escrow shall be distributed to holders of Claims in accordance with the terms of the Plan.

   (f)  Bar Date for Administrative Expense Claims.

Except with respect to Professional Fee Claims or otherwise as set forth in the Plan, requests for payment of Administrative Expense Claims that arose during the period after the Petition Date and ending on the Effective Date must be Filed in the Bankruptcy Court and served on all parties in interest no later than 20 calendar days after the Effective Date. Objections to such requests for payment of Administrative Expense Claims and all requests for payment of Administrative Expense Claims must be Filed and served on the requesting party by the later of (i) 50 calendar days after the Effective Date or (ii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Expense Claims.

Holders of Administrative Expense Claims that are required to File and serve such Administrative Expense Claims and that do not timely File and serve such a request as set forth in the Plan, will be forever barred from asserting such Administrative Expense Claims against the Debtors, the Liquidation Trust or their respective property, and such Administrative Expense Claims will be deemed discharged with prejudice as of the Effective Date.

   **2.2.4**  *Payment of Priority Tax Claims.*

   (a)  Priority Tax Claims.

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the Debtors or the Liquidation Trustee, as applicable, each holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Liquidation Trustee, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or

before the Effective Date, on account of and in full and complete settlement, satisfaction and release of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

> (b)    Other Provision Concerning Treatment of Priority Tax Claims.

Notwithstanding anything to the contrary in Article II of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the holder (other than as the holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors, the Liquidation Trustee, or their respective property.

### 2.3    U.S. Trustee Fees.

On and after the Effective Date, the Liquidation Trustee shall pay the applicable U.S. Trustee Fees as such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Cases.

## ARTICLE 3.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1    Summary.

The Plan constitutes a separate plan of liquidation for each of the Debtors.  The Plan does not seek to effect a substantive consolidation or other combination of the separate Estates of each Debtor, but instead provides that creditors of each Debtor will be permitted to assert their Claims only against the Debtor(s) against which they hold Allowed Claims and will receive a recovery based on the value of the related Estate(s).

### 3.2    Classification of Claims and Interests.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan, to the extent applicable, and receiving distributions pursuant to the Plan, to the extent applicable, only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Carve-Out Escrow, the Postpetition Fee Escrow, Professional Fee Claims, General Administrative Expense Claims, Statutory Fees, U.S. Trustee Fees, and Priority Tax Claims have not been classified.

| Class | Claims | Status | Voting Rights |
|-------|--------|--------|---------------|
| Class 1 | Priority Claims | Unimpaired | Presumed to Accept |
| Class 2A | DIP Loan Claims | Impaired | Entitled to Vote |

- 17 -

| | | | |
|---|---|---|---|
| Class 2B | Secured Lenders Claims | | |
| Class 3A | Other Secured Claims Against Hartshorne Holdings | Impaired | Entitled to Vote |
| Class 3B | Other Secured Claims Against Hartshorne Group | | |
| Class 3C | Other Secured Claims Against Hartshorne Mining | | |
| Class 3D | Other Secured Claims Against Hartshorne Land | | |
| Class 4A | General Unsecured Claims Against Hartshorne Holdings | Impaired | Entitled to Vote |
| Class 4B | General Unsecured Claims Against Hartshorne Group | | |
| Class 4C | General Unsecured Claims Against Hartshorne Mining | | |
| Class 4D | General Unsecured Claims Against Hartshorne Land | | |
| Class 5 | Interests | Impaired | Presumed to Reject |
| Class 6 | Intercompany Claims | Impaired | Presumed to Reject |

### 3.3    Treatment of Claims and Equity Interests.

#### 3.3.1    *Class 1—Priority Claims.*

(a)    *Classification*:  Class 1 consists of the Priority Claims against each Debtor.

(b)    *Treatment*:  Except to the extent that a holder of a Priority Claim agrees to a less favorable treatment, on the first Distribution Date after such Claim becomes an Allowed Claim, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed Priority Claim shall receive payment of such Allowed Claim in full in Cash.

(c)    *Voting*:  Claims in Class 1 are Unimpaired.  Each holder of a Claim in Class 1 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

#### 3.3.2    *Class 2—DIP Loan Claims and Secured Lenders Claims.*

(a)    *Classification*:  Class 2 consists of DIP Loan Claims and Secured Lenders Claims against each Debtor.

(b)    *Treatment*: Except to the extent that a holder of an Allowed DIP Loan Claim or Secured Lenders Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder

- 18 -

of an Allowed DIP Loan Claim or Secured Lenders Claim shall receive one of the following treatments, determined at the option of the Debtors or the Liquidation Trustee, as applicable:  (i)  the Collateral securing such Claims to the holder of such Claim;[3] (ii) retention of any valid Liens on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date;  or (iii) such other treatment as may be agreed to by the holder of such Claim and the Debtors or the Liquidation Trustee, as applicable; and any amounts received for such Claim may be reduced by the Liquidation Trustee's expenses pursuant to the Liquidation Trust Agreement.  For the avoidance of doubt, no holder of an Allowed DIP Loan Claim or Secured Lenders Claim will receive any Cash unless it has a valid, unavoidable lien on such Cash and Cash is available from Liquidation Trust Assets to satisfy such Claim.  Pursuant to the Adversary Proceedings, the Secured Lenders and Fricke, FKC, Minova, and WVEC are litigating the priority of their Liens in the Collateral.  Upon a Final Order in these proceedings, but subject to the Final DIP Order, the Liquidation Trustee may make distribution to Classes 2 and 3, as applicable.

(c)    *Voting*: Claims in Class 2 are Impaired.  Each holder of a Claim in Class 2 is, therefore, entitled to vote on the Plan.

### 3.3.3    *Class 3—Other Secured Claims.*

(a)    *Classification*:  Class 3A consists of Other Secured Claims against Hartshorne Holdings, Class 3B consists of Other Secured Claims against Hartshorne Group, Class 3C consists of Other Secured Claims against Hartshorne Mining, and Class 3D consists of Other Secured Claims against Hartshorne Land (collectively, "Class 3").

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed Other Secured Claim shall receive one of the following treatments, determined at the option of the Debtors or the Liquidation Trustee, as applicable:  (i)  the Collateral securing such Allowed Other Secured Claim to the holder of such Claim; (ii) retention of any valid Liens on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (iii) such other treatment as may be agreed to by the holder of such Claim and the Debtors or the Liquidation Trustee, as applicable; and any amounts received for such Claim may be reduced by the Liquidation Trustee's expenses pursuant to the Liquidation Trust Agreement.  For the avoidance of doubt, no holder of an Allowed Other Secured Claim will receive any Cash unless it has a valid, unavoidable lien on such Cash and Cash is available from Liquidation Trust Assets to satisfy such Claim.

---

[3] If the Secured Lenders refuse to accept the Collateral securing their Claims in satisfaction for the DIP Loan Claims and Secured Lenders Claims, an amount will be credited against the Secured Lenders' DIP Loan Claims and the Secured Lenders Claims.  The amount for such credit shall be the value of the Collateral in an amount to be determined.

(c)     *Voting*: Claims in Class 3 are Impaired.  Each holder of a Claim in Class 3 is, therefore, entitled to vote on the Plan.

### 3.3.4    *Class 4—General Unsecured Claims.*

(a)     *Classification*:  Class 4A consists of General Unsecured Claims against Hartshorne Holdings, Class 4B consists of General Unsecured Claims against Hartshorne Group, Class 4C consists of General Unsecured Claims against Hartshorne Mining, and Class 4D consists of General Unsecured Claims against Hartshorne Land (collectively, "Class 4").

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive:

(A) Its *pro rata* share of the proceeds of the Liquidation Trust in excess of any amounts necessary to pay all permissible Liquidation Trust fees and expenses; *provided*, *however*, that (i) such proceeds shall only be available for payment of Allowed General Unsecured Claims to the extent that the Liquidation Trustee has paid in full pursuant to the terms of the Plan, or, in its sole discretion, fully reserved for, all: (A) the Carve-Out Escrow, (B) the Postpetition Fee Escrow, (C) U.S. Trustee Fees, (D) Allowed General Administrative Expense Claims, (E) Allowed Priority Tax Claims, (F) Allowed Priority Claims, (G) Allowed Secured Lenders Claims, and (H) Allowed Other Secured Claims; and (ii) any amounts received for such Claim may be reduced by the Liquidation Trustee's expenses pursuant to the Liquidation Trust Agreement; and

(B) Its *pro rata* share of the amounts described in the Committee Settlement, if such settlement is approved by the Bankruptcy Court. The Committee and the Secured Lenders have negotiated the Committee Settlement which, if approved by the Bankruptcy Court, would allow the holders of General Unsecured Claims to receive certain recoveries. The estimated recovery for holders of Class 4 Claims is contingent upon the Bankruptcy Court's approval of the Committee Settlement and the amount of General Unsecured Claims.  If the Committee Settlement is approved by a Final Order of the Bankruptcy Court, the Debtors will incorporate the Committee Settlement in the Disclosure Statement and the Plan, as applicable.

(c)     *Voting*:  Claims in Class 4 are Impaired.  Each holder of a Claim in Class 4 is, therefore, entitled to vote on the Plan.

- 20 -

### 3.3.5    *Class 5—Interests.*

(a)    *Classification*:  Class 5 consists of all Interests.

(b)    *Treatment*:  On the Effective Date, all Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Plan Distributions to the holders of Interests.

(c)    *Voting*:  Each holder of a Class 5 Interest will be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan.

### 3.3.6    *Class 6—Intercompany Claims.*

(a)    *Classification*:  Class 6 consists of all Intercompany Claims.

(b)    *Treatment*:  On the Effective Date, all Intercompany Claims shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Plan Distributions to the holders of Intercompany Claims.

(c)    *Voting*:  Each holder of a Class 6 Intercompany Claim will be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan.

## ARTICLE 4.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

### 4.1    Classes Entitled To Vote.

Three classes are Impaired and entitled to vote to accept or reject the Plan:  (i) Classes 2A and 2B (collectively, "Class 2"); (ii) Classes 3A through 3D (collectively, "Class 3"), and Classes 4A through 4D (collectively, "Class 4," together with Class 2 and Class 3, the "Voting Classes").  By operation of law, Class 1 is Unimpaired and deemed to have accepted the Plan and, therefore, is not entitled to vote.  By operation of law, Classes 5 and 6 are deemed to have rejected the Plan and are not entitled to vote.

### 4.2    Tabulation of Votes on a Non-Consolidated Basis.

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and (10) of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtors reserve the right to seek to substantively consolidate any two or more Debtors; *provided*, *however*, that such substantive consolidation does not materially and adversely impact the amount of the Plan Distributions to any Person.

- 21 -

### 4.3    Acceptance by Impaired Classes.

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### 4.4    Elimination of Vacant Classes.

To the extent applicable, any Class that does not contain any Allowed Claims, Allowed Interests, or Claims or Interests temporarily allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Confirmation Hearing, for all Debtors or with respect to any particular Debtor, shall be deemed to have been eliminated from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject the Plan and (b) determining whether such Class has accepted or rejected the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 4.5    Deemed Acceptance If No Votes Cast.

If no holders of Claims or Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of Claims or Interests in such Class.

### 4.6    Confirmation Pursuant to Section 1129(b) or "Cramdown."

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Sections 13.2 and 13.3 of the Plan, the Debtors reserve the right (i) to alter, amend, modify, revoke, or withdraw the Plan or any Plan Document to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, and (ii) to request confirmation of the Plan, as it may be modified, supplemented, or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

## ARTICLE 5.

## MEANS FOR IMPLEMENTATION

### 5.1    Corporate Existence.

**5.1.1**    Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or members, or the Debtors' boards of managers.  On the Effective Date, to the extent not otherwise distributed to the holders of Allowed Claims or otherwise provided for in the Plan, each Debtor's assets will be transferred to the Liquidation Trust, which will liquidate and monetize such assets and make distributions to holders of Allowed Claims pursuant to the terms of the Plan.

- 22 -

**5.1.2** To the extent not used in the transfer of Liquidation Trust Assets and not completed prior to the Effective Date, the Debtors (and their respective boards of managers) will dissolve as of the Effective Date, and are authorized to dissolve or terminate the existence of wholly owned non-debtor subsidiaries following the Effective Date as well as any remaining health, welfare, or benefit plans. For the avoidance of doubt, once all assets of a Debtor have been transferred to the Liquidation Trust, the applicable Debtor or the Liquidation Trustee, as applicable, will take all necessary steps to dissolve such Debtor.

**5.2** **Closing of the Debtors' Chapter 11 Cases.**

When (i) all Disputed Claims filed against a Debtor have become Allowed Claims or have been disallowed by Final Order, (ii) all Liquidation Trust Assets that were assets of such Debtor have been liquidated and the proceeds thereof distributed in accordance with the terms of the Plan, and (iii) all other actions required to be taken by the Liquidation Trust under the Plan and the Liquidation Trust Agreement have been taken, the Liquidation Trust shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**5.3** **Plan Funding.**

The Plan Distributions to be made in Cash under the terms of the Plan shall be funded from the Debtors' Cash on hand and applicable proceeds deriving from the sale proceeds pursuant to the De Minimis Asset Procedures Order and other sale proceeds.

**5.4** **Settlement of Intercompany Matters.**

On the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, each Debtor and its respective successors and assigns shall waive and release each other and all of its respective successors from any and all Intercompany Claims among and between any or all of the Debtors. Such waiver and release shall be effective as a bar to all actions, Causes of Action, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim amongst or between any or all of the Debtors.

**5.5** **Monetization of Assets.**

The Liquidation Trustee shall, in an expeditious but orderly manner, monetize and convert the Liquidation Trust Assets to Cash and make timely distributions to the Liquidation Trust Beneficiaries in accordance with the Plan and the Liquidation Trust Agreement. In so doing, the Liquidation Trustee shall exercise its reasonable business judgment to maximize recoveries. The Liquidation Trustee shall have no liability to any party for the outcome of its decisions in this regard.

**5.6** **Books and Records.**

Books and records for each Debtor shall be maintained by the Liquidation Trustee to the extent necessary for the administration of the Liquidation Trust. For the avoidance of doubt, to the extent the Debtors' books and records are not necessary for the administration of the Liquidation Trust, and except as previously ordered by the Bankruptcy Court, such books and records may be

- 23 -

destroyed or abandoned without further order of the Bankruptcy Court as determined appropriate by the Liquidation Trustee.

### 5.7    Reporting Duties.

The Liquidation Trustee shall be responsible for filing informational returns on behalf of the Debtors and the Liquidation Trust and paying any tax liability of the Debtors and the Liquidation Trust.  Additionally, the Liquidation Trustee shall file (or cause to be filed) any other statements, returns, reports, or disclosures relating to the Debtors or the Liquidation Trust that are required by any governmental unit or applicable law.

### 5.8    Tax Obligations.

The Liquidation Trustee shall have the powers of administration regarding all of the Debtors' and the Liquidation Trust's tax obligations, including filing of returns.  The Liquidation Trustee shall (i) endeavor to complete and file, within 180 days after the Effective Date, each Debtor's final federal, state, and local tax returns, (ii) request, if necessary, an expedited determination of any unpaid tax liability of the Debtors or their Estates under section 505(b) of the Bankruptcy Code for all taxable periods of the Debtors ending after the Petition Date through the dissolution of the Liquidation Trust as determined under applicable tax laws, and (iii) represent the interests and accounts of the Liquidation Trust or the Debtors' Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit.

### 5.9    Cancellation of Existing Securities and Agreements.

Except for the purpose of evidencing a right to distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all notes, stock, agreements, instruments, certificates, and other documents evidencing any Claim against or Interest in the Debtors shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be fully released.

### 5.10    Indemnification Obligations.

The Debtors shall assume and assign to the Liquidation Trust their indemnification obligations to current and former managers and officers of the Debtors, which shall in no way affect the rights and obligations of the insureds under the "tail" managers and officers insurance coverage purchased prepetition.

### 5.11    No Substantive Consolidation.

Nothing in the Plan is intended or shall be deemed to be a substantive consolidation of the Debtors' separate Estates.  Each of the Debtors' Estates shall continue to be separate from one another.  No assets belonging to one Debtor's Estate shall be joined or otherwise consolidated with the assets belonging to any of the other Debtors' Estates and no liabilities of one Debtor's Estate shall be joined or otherwise consolidated with the liabilities of any of the other Debtors' Estates.  However, nothing in the Plan is intended or shall be deemed to be a waiver of any right of the Debtors, the

- 24 -

Liquidation Trustee, or any other party in interest to seek substantive consolidation through a separate motion with notice and opportunity to be heard.

**5.12    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes.**

**5.12.1**    The Debtors or the Liquidation Trustee, subject to the terms of the Liquidation Trust Agreement, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant thereto.  Any officer of any Debtor or the Liquidation Trustee shall be authorized to certify or attest to any of the foregoing actions.

**5.12.2**    Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, managers, or partners of the Debtors or the need for any approvals, authorizations, actions, or consents.

**5.12.3**    To the extent permitted by section 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Debtor to any Person pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors;  (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Liquidation Trust Assets to the Liquidation Trust and (ii) any sale or other transfer of the Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

**5.13    Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided in the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies relating to the rights that a holder of a Claim or

- 25 -

Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtors, the Estates, and their property and stakeholders; and (b) fair, equitable, and reasonable.

### 5.14    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Debtors or the Liquidation Trustee, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan; *provided*, *however*, that the Debtors waive all Causes of Action under Chapter 5 of the Bankruptcy Code against holders of General Unsecured Claims. Except as stated in the preceding sentence, the Debtors or the Liquidation Trustee, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Estates and Liquidation Trust. The Debtors or the Liquidation Trustee, as applicable, shall retain and may exclusively enforce any and all such Causes of Action. The Debtors or the Liquidation Trustee, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Liquidation Trustee, as applicable, will not pursue any and all available Causes of Action against it. Unless any such Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or transferred, or settled in the Plan or a Final Order, the Debtors or the Liquidation Trustee, as applicable, expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Date or Effective Date.

## ARTICLE 6.

## PROCEDURES FOR RESOLVING CLAIMS

### 6.1    Allowance of Claims.

After the Effective Date, the Liquidation Trustee shall have and retain any and all rights and defenses, including rights of setoff, which the Debtors had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Debtors' Chapter 11 Cases before the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed an Allowed Claim under the Plan.

- 26 -

6.2    **Objections to Claims.**

6.2.1    The Plan Distributions available to holders of Allowed Claims in the Voting Classes can be affected by a variety of contingencies, including, without limitation, (i) the aggregate amount of Allowed Claims in the Voting Classes, (ii) the amount of Allowed Class 1 and Priority Tax Claims, (iii) the amount of Allowed Administrative Expense Claims, including Professional Fee Claims after receiving partial payment pursuant to the Carve-Out Escrow and Postpetition Fee Escrow, and (iv) the outcome of the Adversary Proceedings. The Debtors cannot determine with any certainty at this time the number or amount of such Claims that will ultimately be Allowed, and thus the projected recoveries for the Voting Classes disclosed in this Disclosure Statement are highly speculative.

6.2.2    Any objections to Claims shall be served and filed on or before the later of: (i) the date that is 40 calendar days after the Effective Date; and (ii) such other later date as may be fixed by the Bankruptcy Court. Any Claims filed after the Bar Date shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Liquidation Trustee, unless the Person seeking to file such untimely Claim has received the Bankruptcy Court's authorization to do so.

6.3    **Estimation of Claims.**

6.3.1    After the Confirmation Date, but before the Effective Date, the Debtors, and after the Effective Date, the Liquidation Trustee, may request that the Bankruptcy Court estimate any Claim, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time (including during the pendency of any appeal with respect to the allowance or disallowance of such Claims).

6.3.2    In the event that the Bankruptcy Court estimates any disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the amount of such Allowed Claim or a maximum limitation on the amount of such Allowed Claim. If the estimated amount constitutes a maximum limitation on such Allowed Claim, the Debtors or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Plan Distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 14 calendar days after the date on which such Claim is estimated. All of the Claims objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved, or withdrawn by any mechanism approved by the Bankruptcy Court.

## ARTICLE 7.

## PROVISIONS GOVERNING DISTRIBUTIONS

**7.1      Release of Claims Against and Interests in the Debtors.**

Unless otherwise provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction, and release of such Allowed Claims.   Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims; *provided*, *however*, that in no case shall the aggregate value of all property received or retained under the Plan (or from third parties) by a holder of an Allowed Claim exceed 100% of such holder's underlying Allowed Claim plus any postpetition interest on such Claim, to the extent such interest is permitted by Section 7.7 of the Plan.

**7.2      Distributions on Account of Claims Allowed as of the Effective Date.**

The Liquidation Trustee may not make any payments to Allowed Claims as of the Effective Date.

**7.3      Distributions on Account of Claims Allowed After the Effective Date.**

The Liquidation Trustee may pay Allowed Claims as of the Initial Distribution or any subsequent Periodic Distribution Dates, as applicable.

**7.4      Distribution to Allowed General Administrative Expense Claims.**

Holders of General Administrative Expense Claims may not be paid in full in Cash as of the Effective Date and the payment by the Liquidation Trustee of the Allowed General Administrative Expense Claims may be delayed and reduced.   The recovery on such claims is currently unknown.

**7.5      Delivery of Plan Distributions.**

**7.5.1      *Distribution Record Date*.**

As of the close of business on the Distribution Record Date, the Claims Register shall be closed and there shall be no further changes in the record holders of any Claims or Interests.   The Debtors and the Liquidation Trustee shall have no obligation to recognize any transfer of Claims occurring after 5:00 p.m. (prevailing Mountain Time) on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of records as of the close of business on the Distribution Record Date.   Additionally, with respect to payment of any cure amounts or any cure disputes in connection with the assumption and assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors nor the Liquidation Trustee shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a cure amount.   Notwithstanding anything contained in the Plan, all parties' rights under section 506 of the Bankruptcy Code are expressly preserved.

- 28 -

### 7.5.2    *Address for Plan Distributions*.

Plan Distributions to holders of Allowed Claims shall be made by the Liquidation Trustee at (a) the addresses of such holders on the books and records of the Debtors or their agent; or (b) the addresses in any written notice of address change delivered to the Debtors or the Liquidation Trustee, including any addresses on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.

### 7.5.3    *Setoffs*.

In the event that the value of a Debtor's claim, right, or Cause of Action against a particular claimant is undisputed, resolved by settlement, or has been adjudicated by Final Order of any court, the Liquidation Trustee may set off such undisputed, resolved, or adjudicated amount against any Plan Distributions that would otherwise become due to such claimant. Neither the failure to effectuate such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Liquidation Trustee of any claims, rights, or Causes of Action that the Debtors or the Liquidation Trust may possess against such claimant.

### 7.5.4    *De Minimis and Fractional Plan Distributions*.

Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee shall not be required to make on account of any Allowed Claim (a) partial Plan Distributions or payments of fractions of dollars or (b) any Plan Distribution if the amount to be distributed is less than $50.00. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all Cash shall be distributed in the final distribution of the Liquidation Trust.

### 7.5.5    *Undeliverable Plan Distributions*.

If any Plan Distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidation Trustee has been notified of the then-current address of such holder, at which time such Plan Distribution shall be made as soon as reasonably practicable thereafter without interest, dividends, or accruals of any kind; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of the later of six months from the first Distribution Date after such holder's Claim is first Allowed. After such date, all "unclaimed property" or interests in property shall revert to the Liquidation Trust (notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and the Liquidation Trust Agreement, and the Claim of any holder to such property or interest in property shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Estates, the Liquidation Trust, or the Liquidation Trustee. Nothing contained in the Plan shall require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

### 7.5.6    *Failure To Present Checks*.

Any check issued by the Liquidation Trust or the Liquidation Trustee on account of an Allowed Claim shall be null and void if not negotiated within 120 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Liquidation Trust by the holder of the relevant Allowed Claim with respect to which such check originally was issued. If any holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within six months after the date the check was mailed or otherwise delivered to the holder, that Allowed Claim shall be released and the holder thereof shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Liquidation Trust, or the Liquidation Trustee. In such cases, any Cash held for payment on account of such Claims shall be property of the Liquidation Trust, free of any Claims of such holder with respect thereto, and shall be redistributed to the other holders of Allowed Claims in accordance with the Plan and Liquidation Trust Agreement.

### 7.6    **Claims Paid or Payable by Third Parties.**

### 7.6.1    *Claims Paid by Third Parties.*

To the extent the holder of a Claim receives payment on account of such Claim from a party that is not a Debtor or the Liquidation Trust, the Liquidation Trustee shall reduce the Claim (in full or to the extent of payment by the third party), and such Claim shall be disallowed to the extent of payment from such third party without an objection to such Claim having to be filed and without further notice to, action, order or approval of the Bankruptcy Court. Further, to the extent a holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidation Trust on account of such Claim, such holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Liquidation Trustee, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution. The failure of such holder to timely repay or return such Plan Distribution shall result in such holder owing the Liquidation Trust annualized interest at the federal judgment rate on such amount owed for each Business Day after the 14-calendar day grace period specified above until such amount is repaid.

### 7.6.2    *Claims Payable by Insurance.*

Holders of Claims that are covered by the Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Debtors and the Liquidation Trust, as applicable, shall have no obligation to pay any amounts in respect of prepetition deductibles or self-insured retention amounts. No Plan Distributions shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors or the Liquidation Trustee, as applicable, may direct the Claims Agent to expunge the applicable portion of such Claim from the Claims Register without a Claim objection

- 30 -

having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.6.3    *Applicability of Insurance Policies.*

Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as otherwise released, enjoined, or exculpated pursuant to Article 11 of the Plan against the Releasees and the Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Liquidation Trust, or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 7.7    No Postpetition Interest on Claims.

Other than as specifically provided in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claim, and no holder of a prepetition Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

## ARTICLE 8.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    Assumption of Executory Contracts and Unexpired Leases.

On the Effective Date, the Debtors shall assume only the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Contracts and Leases.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in this Section 8.1 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of such Executory Contract or Unexpired Lease, including objecting to the proposed cure amount related thereto, will be deemed to have consented to such assumption and agreed to the specified cure amount.  Neither the Debtors nor the Liquidation Trustee will assume or assume and assign the LG&E-KU Contract if the LG&E-KU Settlement is approved.

### 8.2    Rejection of Executory Contracts and Unexpired Leases.

8.2.1    Each Executory Contract and Unexpired Lease shall be deemed automatically rejected in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease:  (a) is listed on the Schedule of Assumed Contracts and Leases or (b) has already been assumed pursuant to an order of the Bankruptcy Court or is otherwise assumed pursuant to the terms of the Plan; *provided, however*, that any Executory Contracts or Unexpired Leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided in the Final Order resolving such motion in the Debtors' favor.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in Section 8.2 of the Plan pursuant to sections 365 and 1123 of

the Bankruptcy Code as of the Effective Date. The Debtors reserve the right to amend the Schedule of Assumed Contracts and Leases at any time before the Effective Date. The Debtors will reject the LG&E-KU Contract pursuant to the LG&E-KU Settlement if the LG&E-KU Settlement is approved.

        **8.2.2**    Non-debtor parties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including Claims under section 503 of the Bankruptcy Code; *provided* that such Claims must be filed in accordance with the procedures set forth in Section 8.3 of the Plan.

        **8.3**    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

        **8.3.1**    All Claims arising from the rejection of Executory Contracts or Unexpired Leases must be filed with the Claims Agent according to the procedures established for the filing of proof of claim or before the later of (i) the applicable Bar Date and (ii) 30 days after the entry of the order approving the rejection of such Executory Contract or Unexpired Lease. All Claims arising from the rejection of Executory Contracts or Unexpired Leases that are evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims. Upon receipt of the Plan Distribution provided in Section 3.3.3 of the Plan, all such Claims shall be satisfied, settled, and released as of the Effective Date, and shall not be enforceable against the Debtors, the Estates, the Liquidation Trust, or their respective properties or interests in property.

        **8.3.2**    Any Person that is required to file a proof of claim arising from the rejection of an Executory Contract or Unexpired Lease that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Estates, the Liquidation Trust, or their respective properties or interests in property, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

        **8.4**    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

        **8.4.1**    Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may agree. In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Liquidation Trustee or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

        **8.4.2**    No later than ten days prior to the deadline for parties to vote to accept or reject the Plan, the Debtors shall file a schedule setting forth the proposed cure amount, if any, for each Executory Contract and Unexpired Lease to be assumed pursuant to Section 8.1 herein, and serve such schedule on each applicable counterparty, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to the

- 32 -

proposed assumption of an Executory Contract or Unexpired Lease or related cure amount must be filed, served and actually received by the Debtors at least ten Business Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have consented to such assumption and agreed to the specified cure amount.

# ARTICLE 9.

## LIQUIDATION TRUST

### 9.1    Generally.

On the Effective Date, the Liquidation Trust shall be established and become effective for the benefit of Liquidation Trust Beneficiaries.  The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in and shall be governed by the Plan and the Liquidation Trust Agreement.  In the event of any conflict between the terms of the Liquidation Trust Agreement and the Plan, the Plan shall control.  The Liquidation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidation Trust as a grantor trust and the Liquidation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  The Debtors shall transfer, without recourse, to the Liquidation Trust all of their right, title, and interest in the Liquidation Trust Assets.  Upon the transfer by the Debtors of the Liquidation Trust Assets to the Liquidation Trust, the Debtors will have no reversionary or further interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

### 9.2    Purposes and Establishment of the Liquidation Trust.

9.2.1    On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purposes of liquidating and administering the Liquidation Trust Assets and making distributions on account thereof as provided for under the Plan.  The Liquidation Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust.  The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidation Trust Agreement.

9.2.2    On the Effective Date, the Liquidation Trustee, on behalf of the Debtors, shall execute the Liquidation Trust Agreement and shall take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement and consistent with the Plan.

### 9.3    Liquidation Trust Assets.

9.3.1    On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all right, title, and interest in all of the Liquidation Trust Assets, as well as the rights and powers of each Debtor in such Liquidation Trust Assets, shall automatically vest in the Liquidation Trust, free and clear of all Claims and Interests

- 33 -

for the benefit of the Liquidation Trust Beneficiaries. Upon the transfer of the Liquidation Trust Assets, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidation Trust Assets to the Liquidation Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust shall vest in the Liquidation Trust and its representatives, and the Debtors and the Liquidation Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidation Trustee shall agree to accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and the Liquidation Trust Agreement.

9.3.2    The Debtors, the Liquidation Trustee, the Liquidation Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust.

### 9.4    Valuation of Assets.

9.4.1    As soon as practicable after the establishment of the Liquidation Trust, the Liquidation Trustee shall determine the value of the assets transferred to the Liquidation Trust, and the Liquidation Trustee shall apprise, in writing, the Liquidation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Liquidation Trustee and Liquidation Trust Beneficiaries) for all federal income tax purposes.

9.4.2    In connection with the preparation of the valuation contemplated by the Plan and the Liquidation Trust Agreement, the Liquidation Trust shall be entitled to retain such professionals and advisors as the Liquidation Trust shall determine to be appropriate or necessary, and the Liquidation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Liquidation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

### 9.5    Appointment of the Liquidation Trustee.

On the Effective Date and in compliance with the provisions of the Plan and the Liquidation Trust Agreement, the Committee and Secured Lenders shall appoint a person or firm as Liquidation Trustee. The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, to the extent not set forth in the Plan, shall be set forth in the Liquidation Trust Agreement, to be filed in accordance with Section 1.1.87 of the Plan, or the Confirmation Order.

- 34 -

### 9.6    Duties and Powers of the Liquidation Trustee.

#### 9.6.1    *Authority.*

The duties and powers of the Liquidation Trustee shall include all powers necessary to implement the Plan with respect to all Debtors and monetize, sell, transfer, liquidate, and transact with respect to the Liquidation Trust Assets, including, without limitation, the duties and powers listed in the Plan. The Liquidation Trustee will administer the Liquidation Trust in accordance with the Liquidation Trust Agreement. The Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely Plan Distributions, and not unduly prolong the duration of the Liquidation Trust. As further provided in the Liquidation Trust Agreement, the Liquidation Trustee may abandon property of the Estates and the Liquidation Trust Assets, including, but not limited to, mining permits, when deemed appropriate.

#### 9.6.2    *Claims and Causes of Action.*

The Liquidation Trustee may object to, seek to estimate, seek to subordinate, compromise, or settle any and all Claims against the Debtors and Causes of Action of the Debtors that have not already been deemed Allowed Claims as of the Effective Date. The Liquidation Trustee shall have the absolute right to pursue or not to pursue any and all Liquidation Trust Assets as it determines in the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence. If any, Liquidation Trust Causes of Action may only be prosecuted or settled by the Liquidation Trustee, in its sole discretion. The Liquidation Trust Causes of Action will be transferred to the Liquidation Trust on the Effective Date.

#### 9.6.3    *Retention of Professionals.*

The Liquidation Trustee may enter into employment agreements and retain professionals to pursue the sale of the Liquidation Trust Assets and otherwise advise the Liquidation Trustee and provide services to the Liquidation Trust in connection with the matters contemplated by the Plan, the Confirmation Order, and the Liquidation Trust Agreement without further order of the Bankruptcy Court. Unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court or with the consent of the Liquidation Trustee), professionals retained by the Liquidation Trustee shall be compensated from the proceeds of the Liquidation Trust Assets in accordance with Section 9.6.5 of the Plan.

#### 9.6.4    *Distributions; Withholding.*

As described in article 7 herein, the Liquidation Trustee shall make distributions to the Liquidation Trust Beneficiaries in accordance with the terms of the Liquidation Trust Agreement and the Plan. The Liquidation Trustee may withhold from amounts otherwise distributable to any Liquidating Trust Beneficiary any and all amounts, determined in the Liquidation Trustee's sole discretion, required by the Liquidation Trust Agreement, any law, regulation, rule, ruling, directive, treaty, or other governmental requirement. Notwithstanding the above, each Liquidating Trust Beneficiary that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

- 35 -

The Liquidation Trustee may require, as a condition to the receipt of a Plan Distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within 180 days, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 7.5.5 herein. Further, the Allowed Claim of any such holder shall be deemed released and the holder thereof shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Liquidation Trust, or the Liquidation Trustee. Any amounts withheld from a distribution shall nonetheless be deemed distributed to the Liquidation Trust Beneficiary subject to such withholding. The Liquidation Trustee shall not be liable for any excess withholding; in the event of an over-withholding, a Liquidation Trust Beneficiary's sole recourse shall be to apply for a refund with the appropriate authority.

### 9.6.5    *Reasonable Fees and Expenses*.

The Liquidation Trustee may incur any reasonable and necessary expenses in connection with the performance of its duties under the Plan, including in connection with retaining professionals and/or entering into agreements pursuant to Sections 9.6.3 and 9.6.9 hereof. The Liquidation Trustee shall be paid from the proceeds of the Liquidation Trust Assets pursuant to the Liquidation Trust Agreement.

### 9.6.6    *Investment Powers*.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust shall be limited to the right and power to invest in such assets only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; *provided, however,* that (a) the scope of any such permissible investments shall be further limited to include only those investments that a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) may be permitted to hold and (b) the Liquidation Trustee may expend the Liquidation Trust Assets (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Liquidation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the Liquidation Trust Assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement.

### 9.6.7    *Liquidation Trustee's Tax Power for Debtors.*

As described in Section 5.7 herein, following the Effective Date, the Liquidation Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns required to be filed or that the Liquidation Trustee otherwise deems appropriate. In the event that the Liquidation Trust shall fail or cease to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), the Liquidation Trustee shall take any and all necessary actions as it shall deem appropriate to have the Liquidation Trust classified as a partnership for federal tax purposes under Treasury Regulation section 301.7701-3, including, if necessary, creating or converting the Liquidation Trust into a Delaware limited liability partnership or limited liability company that is so classified.

- 36 -

### 9.6.8    *Insurance.*

The Liquidation Trustee will maintain customary insurance coverage for the protection of the Liquidation Trustee on and after the Effective Date.

### 9.6.9    *Agreements and Other Actions.*

The Liquidation Trustee may enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' and Liquidation Trust's obligations thereunder.  The Liquidation Trustee may take all other actions not inconsistent with the provisions of the Plan and the Liquidation Trust Agreement that the Liquidation Trustee deems reasonably necessary or desirable with respect to administering the Plan.

### 9.7    **Funding of the Liquidation Trust.**

On the Effective Date, the Liquidation Trust Reserve shall be transferred to, and vest in, the Liquidation Trust for purposes of funding the Liquidation Trust.  Thereafter, the terms of the Liquidation Trust Agreement shall govern the funding of the Liquidation Trust.

### 9.8    **Exculpation; Indemnification.**

The Liquidation Trustee, the Liquidation Trust, the professionals of the Liquidation Trust, and their representatives will be exculpated and indemnified pursuant to the terms of the Liquidation Trust Agreement.  The indemnification described in the Liquidation Trust Agreement will exclude willful misconduct and gross negligence.  Any indemnification claim of the Liquidation Trustee or the other individuals entitled to indemnification under this subsection shall be satisfied solely from the Liquidation Trust Assets and shall be entitled to a priority distribution therefrom, ahead of any other claim to or interest in such assets.  The Liquidation Trustee and its representatives shall be entitled to rely, in good faith, on the advice of their retained professionals.

### 9.9    **Federal Income Tax Treatment of Liquidation Trust.**

9.9.1    Pursuant to Revenue Procedure 94-45, for all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date as (A) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to the Liquidation Trust Beneficiaries, in exchange for those Liquidation Trust Beneficiaries relinquishing their claims, followed by (B) the transfer by the Liquidation Trust Beneficiaries to the Liquidation Trust of the Liquidation Trust Assets (other than the Liquidation Trust Assets allocable to any disputed ownership fund) in exchange for interests in Liquidation Trust.  Accordingly, the Liquidation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets (other than such Liquidation Trust Assets as are allocable to any disputed ownership fund).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

- 37 -

9.9.2     Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee may (A) timely elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidation Trustee, the Debtors and the Liquidation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

### 9.10     Tax Reporting.

9.10.1     The Liquidation Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 9.10 of the Plan.  The Liquidation Trustee also will annually send to each Liquidation Trust Beneficiary a separate statement setting forth the Liquidation Trust Beneficiary's share of items of income, gain, loss, deduction, or credit (including the receipts and expenditures of the Liquidation Trust) as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  The Liquidation Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Liquidation Trust that is required by any governmental unit.

9.10.2     The valuation of the Liquidation Trust Assets prepared pursuant to Section 9.4 of the Plan shall be used consistently by all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

9.10.4     The Liquidation Trustee shall be responsible for payment, out of the Liquidation Trust Assets, of any taxes imposed on the Liquidation Trust or the Liquidation Trust Assets, including any disputed ownership fund.  In the event, and to the extent, any Cash retained on account of Disputed Claims in a disputed ownership fund is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (A) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (B) to the extent that such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidation Trustee as a result of the resolution of such Disputed Claims.

9.10.5     The Liquidation Trustee may request an expedited determination of taxes of the Liquidation Trust, including the Disputed Claims Reserve, or the Plan Debtors under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Liquidation Trust or the Plan Debtors for all taxable periods through the dissolution of the Liquidation Trust.

- 38 -

### 9.11    Tax Withholdings by Liquidation Trustee.

The Liquidation Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Liquidation Trust Beneficiaries. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Liquidation Trust Beneficiaries for all purposes of the Liquidation Trust Agreement. The Liquidation Trustee shall be authorized to collect such tax information from the Liquidation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Liquidation Trust Agreement. To receive distributions under the Plan, all Liquidation Trust Beneficiaries will need to identify themselves to the Liquidation Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidation Trustee deems appropriate. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The Liquidation Trustee may refuse to make a distribution to any Liquidation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Liquidation Trust Beneficiary, the Liquidation Trustee shall make such distribution to which the Liquidation Trust Beneficiary is entitled, without interest; and, *provided*, *further*, that, if the Liquidation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidation Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidation Trustee for such liability. The Liquidation Trustee shall not be liable for any excess taxes withheld; in the event of an over-withholding, a Liquidation Trust Beneficiary's sole recourse shall be to apply for a refund with the appropriate taxing authority.

### 9.12    Dissolution.

The Liquidation Trust shall be dissolved at such time as (i) all of the Liquidation Trust Assets have been distributed pursuant to the Plan and the Liquidation Trust Agreement, (ii) the Liquidation Trustee determines that the administration of any remaining Liquidation Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made; *provided, however*, that in no event shall the Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court determines that a fixed period extension (not to exceed two years, including any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. If at any time the Liquidation Trustee determines, in reliance upon such professionals as the Liquidation Trustee may retain, that the expense of administering the Liquidation Trust so as to make a final distribution to the Liquidation Trust Beneficiaries is likely to exceed the value of the remaining Liquidation Trust Assets, the Liquidation Trustee may (i) reserve any amount necessary to dissolve the Liquidation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Liquidation Trust, and any insider of the Liquidation Trustee, and (iii) dissolve the Liquidation Trust.

# ARTICLE 10.

## CONDITIONS PRECEDENT TO
## CONSUMMATION OF THE PLAN

**10.1    Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived by the Debtors pursuant to the provisions of Section 10.2 of the Plan:

      **10.1.1**    The Confirmation Order shall have been entered, become a Final Order, and remain in full force and effect;

      **10.1.2**    The Plan Documents, including the Plan Supplement, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein shall have been satisfied or waived pursuant to the terms of such documents or agreements;

      **10.1.3**    All material governmental, regulatory, and third-party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers, and consents required in connection with the Plan, if any, shall have been obtained and remain in full force and effect, and there shall exist no Claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;[4] and

      **10.1.4**    The Liquidation Trust shall be established and funded and the Liquidation Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the Liquidation Trust Agreement.

For the avoidance of doubt, the approval by the Bankruptcy Court of the Committee Settlement shall not be a condition precedent to the consummation of the Plan.

**10.2    Satisfaction and Waiver of Conditions Precedent.**

Except as otherwise provided in the Plan, any actions taken on the Effective Date shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Section 10.1 hereof may be waived in whole or part by the Debtors in consultation with the Secured Lenders and the Committee, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

**10.3    Effect of Non-Occurrence of Conditions to the Effective Date.**

Unless the Bankruptcy Court rules otherwise, if the Effective Date does not occur on or before 40 calendar days after entry of the Confirmation Order, (i) the Confirmation Order shall be vacated,

---

[4] For the avoidance of doubt, the case styled *Frontier-Kemper Constructors, Inc. v. Hartshorne Mining*, LLC, AAA Case No. 01-19-0002-1697 does not prohibit the consummation of the Plan.

(ii) no Plan Distributions shall be made, (iii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iv) the Debtors' obligations with respect to Claims and Interests shall remain unchanged, and (v) the Plan shall be null and void in all respects. If the Confirmation Order is vacated pursuant to this Section 10.3, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgement, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

## ARTICLE 11.

## EFFECT OF CONFIRMATION

### 11.1    Binding Effect.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 11.2    Term of Pre-Confirmation Injunctions or Stays.

Unless otherwise provided in the Plan, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 11.3    Debtor Release.

**11.3.1    Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, the services of the Debtors' officers and directors in facilitating the expeditious implementation of the Debtors' restructuring, each of the Debtors hereby provides a full release, waiver, and discharge to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, or thereafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, including, without limitation, those that any of the Debtors, the Liquidation Trustee, or the Liquidation Trust would have been legally entitled to assert or that any holder of a Claim or Interest or other entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan.**

- 41 -

**11.3.2    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good-faith settlement and compromise of the Claims released by the Debtors; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to these releases by the Debtors.**

**11.4    Accepting Claim Holders Release.**

**11.4.1    Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all Releasing Parties shall be deemed to have forever released, waived, and discharged all causes of action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases, or the Plan against the Releasees.**

**11.4.2    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Accepting Claim Holders Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Accepting Claim Holders Release is:  (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good-faith settlement and compromise of the claims released by the Accepting Claim Holders Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasees asserting any claim or cause of action released pursuant to the Accepting Claim Holders Release.**

**11.5    Exculpation and Limitation of Liability.**

**Except as otherwise specifically provided in the Plan and to the extent not prohibited by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim; *provided*, *however*, that the foregoing exculpation shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided*, *further*, that in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (and each of their respective affiliates, agents, managers, directors, officers, employees, advisors, and attorneys) have complied with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan and the Plan**

- 42 -

**Distributions and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Plan Distributions.**

**11.6    Injunction Related to Releases and Exculpation.**

**Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, or Confirmation Order, all entities who have held, hold, or may hold Claims against or Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, their Estates, the Liquidation Trust, the Releasees, or the Exculpated Parties on account of any such Claims or Interests including, but not limited to:  (1) commencing or continuing in any manner any action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any encumbrance of any kind; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors' Estates or the Liquidation Trust notwithstanding an indication in a proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (5) commencing or continuing in any manner any action or other proceeding of any kind that does not comply with or is inconsistent with the Plan, including any right of action against an Exculpated Party for any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim; and (6) taking any actions to interfere with the implementation or consummation of the Plan; *provided*, *however*, that nothing in the Plan shall preclude any entity from exercising rights pursuant to and consistent with the terms of the Plan or the Confirmation Order.**

## ARTICLE 12.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over all matters arising out of, and related to the Chapter 11 Cases or the Plan pursuant to, and for purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, jurisdiction to:

      **12.1.1**    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim, the resolution of any and all objections to the allowance or priority of any Claims and the resolution of any and all issues related to the release of Liens upon payment of a secured Claim;

      **12.1.2**    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- 43 -

       **12.1.3**    determine any and all disputes among creditors with respect to the priority, amount, or secured or unsecured status of their Claims;

       **12.1.4**    resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to adjudicate and, if necessary, liquidate any Claims arising therefrom; (ii) any potential contractual obligation under any assumed Executory Contract or Unexpired Lease; and (iii) any dispute regarding whether a contract or lease is or was an Executory Contract or Unexpired Lease, as applicable;

       **12.1.5**    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

       **12.1.6**    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

       **12.1.7**    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, and other agreements or documents adopted in connection with the Plan or Disclosure Statement;

       **12.1.8**    resolve any cases, Claims, controversies, suits, disputes, or causes of action that may arise in connection with the occurrence of the Effective Date, confirmation, interpretation, implementation or enforcement of the Plan or the extent of any entity's obligations incurred in connection with or released under the Plan;

       **12.1.9**    hear and determine any disputes arising from the sale of Liquidation Trust Assets and any related payment or claim disputes arising thereunder;

       **12.1.10**    hear and determine all Causes of Action that are pending as of the date hereof or that may be commenced in the future, including, but not limited to, the Liquidation Trust Causes of Action;

       **12.1.11**    issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or the consummation, implementation or enforcement of the Plan, except as otherwise provided in the Plan;

       **12.1.12**    resolve any ambiguities between the Liquidation Trust Agreement and the Plan;

       **12.1.13**    enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes that may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement, or the transactions contemplated by the Liquidation Trust Agreement;

       **12.1.14**    resolve any matters related to the Liquidation Trust;

- 44 -

**12.1.15**  resolve any Disputed Claims;

**12.1.16**  resolve any cases, controversies, suits, or disputes with respect to the releases, exculpations, and other provisions contained in article 11 of the Plan and enter such orders as may be necessary or appropriate to implement or enforce all such releases, exculpations, and other provisions;

**12.1.17**  recover all assets of the Debtors and property of the Debtors' Estates wherever located;

**12.1.18**  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

**12.1.19**  consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including, without limitation, the Confirmation Order;

**12.1.20**  enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

**12.1.21**  resolve any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

**12.1.22**  adjudicate any and all disputes arising from or relating to Plan Distributions;

**12.1.23**  determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professional Persons for payment of accrued professional compensation;

**12.1.24**  enforce all orders previously entered by the Bankruptcy Court;

**12.1.25**  hear any other matter not inconsistent with the Bankruptcy Code or related statutory provisions setting forth the jurisdiction of the Bankruptcy Court; and

**12.1.26**  enter a final decree closing the Chapter 11 Cases.

## ARTICLE 13.

## MISCELLANEOUS PROVISIONS

### 13.1    Dissolution of Committee.

The Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Committee (including each officer, director, employee, agent, consultant, or

- 45 -

representative thereof) and each Professional Person retained by the Committee shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to the Debtors and the Chapter 11 Cases; *provided, however,* that the foregoing shall not apply to any matters concerning any Professional Fee Claims held or asserted by any Professional Persons retained by the Committee.

### 13.2    Modification of Plan.

The Debtors reserve the right in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan before the entry of the Confirmation Order.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors or the Liquidation Trustee, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Subject to the foregoing, a holder of a Claim that had accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

### 13.3    Revocation or Withdrawal of Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan in accordance with the preceding sentence prior to the Confirmation Date as to any or all of the Debtors, or if confirmation or the Effective Date does not occur with respect to one or more of the Debtors, then, with respect to such Debtors:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor(s) or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

### 13.4    Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 13.5    Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the request of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be

- 46 -

applicable as altered or interpreted. Notwithstanding any such order by the Bankruptcy Court, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**13.6    Governing Law.**

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Kentucky, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

**13.7    Inconsistency.**

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

**13.8    Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**13.9    Exhibits.**

All exhibits to the Plan are incorporated and are a part of the Plan as if set forth in full in the Plan.

**13.10    Notices.**

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> **HARTSHORNE HOLDINGS, LLC**
> Attn: David Gay
> 373 Whobry Road
> Rumsey, Kentucky 42371
> Telephone: 270.499.7405
>
> – and –
>
> Counsel to the Debtors

**SQUIRE PATTON BOGGS (US) LLP**
Stephen D. Lerner
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201

**13.11   Filing of Additional Documents.**

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

- 48 -

Dated:  October 5, 2020

       Rumsey, Kentucky

                             Respectfully submitted,

                             Hartshorne Holdings, LLC
                             on behalf of itself and its affiliated Debtors


                             By: */s/ David Gay*_____
                                 David Gay
                                 President


 Tendered by:

**FROST BROWN TODD LLC**

Edward M. King
Bryan J. Sisto
400 West Market Street, Suite 3200
Louisville, Kentucky 40202
Telephone: 502.589.5400
Facsimile: 502.581.1087
tking@fbtlaw.com
bsisto@fbtlaw.com

– and –

**SQUIRE PATTON BOGGS (US) LLP**

Stephen D. Lerner (admitted *pro hac vice*)
Nava Hazan (admitted *pro hac vice*)
Travis A. McRoberts (admitted *pro hac vice*)
Kyle F. Arendsen (admitted *pro hac vice*)
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
nava.hazan@squirepb.com
travis.mcroberts@squirepb.com

*Co-Counsel to the Debtors and*
*Debtors-in-Possession*

- 49 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will serve notice on all parties registered to receive notice in this case.

/s/ *Edward M. King*
Edward M. King

**<u>EXHIBIT 2</u>**

**Liquidation Analysis**

**IN RE HARTSHORNE HOLDINGS, LLC [CASE NO. 20-40133]**

**LIQUIDATION ANALYSIS**[1]

This Liquidation Analysis was prepared in connection with the filing of the Debtors' Disclosure Statement and Plan. The Debtors have prepared this Liquidation Analysis based on a hypothetical liquidation under chapter 7 of the Bankruptcy Code ("Chapter 7"). The determination of the costs of, and proceeds from, the hypothetical liquidation of the Estates' assets or the Liquidation Trust Assets, as applicable, is an uncertain process involving an extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors. Inevitably, some assumptions in the Liquidation Analysis will not materialize or may result in different outcome than predicated in the Liquidation Analysis. The data included herein represents a preliminary analysis. Items presented are subject to change and revision.

The Liquidation Analysis assumes the conversion of the Debtors' cases under chapter 11 of the Bankruptcy Code ("Chapter 11") to a Chapter 7 cases on November 13, 2020, the anticipated effective date of the Plan. The book values used in the Liquidation Analysis are the Debtors' estimated unaudited book asset values as of August 31, 2020. The Liquidation Analysis was prepared on a consolidated basis, and does not show the recovery to creditors on a Debtor by Debtor basis.

THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE UNDERLYING FINANCIAL INFORMATION IN THE LIQUIDATION ANALYSIS WAS NOT COMPILED OR EXAMINED BY ANY INDEPENDENT ACCOUNTANTS. THE DEBTORS DO NOT MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ALL ITEMS SHOULD BE READ IN CONJUNCTION WITH THE DISCLOSURE STATEMENT. ACTUAL RESULTS COULD VARY MATERIALLY.

The following notes describe the significant assumptions reflected in the Liquidation Analysis:

A. This amount reflects the estimated Cash and Cash equivalents in the Estates as of August 31, 2020. A 100% recovery on Cash and Cash equivalents has been anticipated for the low and high cases under both a Chapter 11 and a Chapter 7.

B. Pursuant to the De Minimis Asset Procedures Order and private asset sale motions, the Debtors and the Liquidation Trustee, as applicable, anticipate selling the remaining assets in the Estates and the Liquidation Trust Asset, as applicable, up until the forecasted closure of these Chapter 11 Cases on January 31, 2021 (the "Forecasted Case Closing Date"). The

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meaning ascribed to them in the Disclosure Statement and the Plan. In the event of any conflict, the definitions contained in the Plan shall control.

1

valuation of the asset sales was supported by an asset appraisal report produced by Equipment Consultants Co.

C.  The operational wind down costs from August 31, 2020 through November 13, 2020 (the "Forecasted Effective Date") include all operating expenses for the Estates, including, among other expenses, employee wages and benefits, trailer lease payments, and payments for utilities, insurance, site security, and office supplies.

D.  The amount of the wind down costs associated with retaining the Professional Persons from August 31, 2020 through the Forecasted Effective Date is an estimate, and includes expenses related to seeking confirmation of the Plan, management of the Estates' cash, drafting of financial forecasts in support of Plan confirmation, Claim resolutions and objections, fees earned by Professional Persons prior to August 31, 2020 but still outstanding, after a further review of the Debtors' books and records, and preparing for the transition to the Liquidation Trustee. The final amount of Professional Fee Claims eligible to receive a Plan Distribution prior to the Effective Date are yet to be determined.

E.  These costs relate to necessary expenses for the Liquidation Trustee to complete the sales of the remaining Liquidation Trust Assets and make Plan Distributions through the Forecasted Case Closing Date. Certain overhead expenses, including employees' wages and benefits and Liquidation Trustee expenses, will be necessary to effectuate the final asset sales and disburse Plan Distributions in accordance with the Plan.

F.  The Debtors estimate that a Chapter 7 trustee's commission would range between $168,000 and $179,000. However, in Chapter 11, the costs for the Liquidation Trustee largely only consist of the Liquidation Trustee's salary, which is captured in the "General Employee & Overhead Costs" row above. We assume the individual designated as the Liquidation Trustee would be needed in both a Chapter 7 and a Chapter 11. The estimates for both the Chapter 7 trustee's commission and the payments to the Liquidation Trustee under Chapter 11 include $30,000 in anticipated fees for Professional Persons, which is shown in the "Trust Professionals" row.

G.  As further explained in the Disclosure Statement and the Plan, the expected recovery for holders of Allowed Administrative Expense Claims is contingent upon a variety of factors. The estimated recovery in the Liquidation Analysis assumes that the Bankruptcy Court rules in favor of the Debtors in their dispute with the Secured Parties concerning the respective amounts of the Carve-Out Escrow and the Postpetition Fee Escrow. If the Bankruptcy Court rules in favor of the Secured Parties, it is highly unlikely that holders of Allowed Administrative Expense Claims will have a full recovery on their Claims.

H.  On and after the Forecasted Effective Date, the Liquidation Trustee shall pay the applicable U.S. Trustee Fees when such fees become due, until such time as a final decree is entered closing the Chapter 11 Cases.

I.  The Debtors' only priority tax claim (proof of claim number 16) will be paid pursuant to Section 2.2.4 of the Plan.

J.  The Liquidation Analysis assumes that the Carve-Out Escrow will be used, as applicable, to pay certain Administrative Expense Claims, including Professional Fee Claims, in accordance with the Final DIP Order. The Professional Fee Claims shall be paid from the Carve-Out Escrow, the Postpetition Fee Escrow (each in accordance with the Final DIP Order), and proceeds from the sales of the Estates' assets and the Liquidation Trust Assets, as applicable, pursuant to Section 2.2.3 of the Plan. The final amount of Professional Fee Claims eligible to receive a Plan Distribution prior to the Effective Date are yet to be determined.

K.  The quantum of the Allowed General Administrative Expense Claims and the related recovery available to satisfy such Allowed General Administrative Expense Claims pursuant to Section 2.2.1 of the Plan are dependent on a number of variables, events and conditions that are unknown at this time and/or outside the control of the Debtors. Those variables include, but are not limited to, recoveries from the sale of the remaining Liquidation Trust Assets and the ultimate timing and manner of the closing of these Chapter 11 Cases. The recovery on such claims is currently unknown. Holders of General Administrative Expense Claims will not be paid in full in Cash as of the Effective Date and the payment by the Liquidation Trustee of the Allowed General Administrative Expense Claims may be delayed and reduced. The estimated amount of General Administrative Expense Claims excludes any amounts that may be requested by Komatsu Financial L.P. before the Administrative Bar Date and subsequently approved by the Bankruptcy Court.

L.  No Claims have been filed or reclassified as Priority Claims and, therefore, the Debtors do not anticipate the Liquidation Trustee making Plan Distributions to holders of Class 1 Claims pursuant to Section 3.3.1 of the Plan.

M.  The Secured Lenders, subject to a Final Order or settlement of the Appeal and Adversary Proceedings, may receive a Plan Distribution pursuant to Section 3.3.2 of the Plan. These Claims also include the Secured Lenders' DIP Loan, which was granted superpriority administrative status pursuant to the Final DIP Order.

N.  Holders of Other Secured Claims, subject to a Final Order or settlement of the Appeal and Adversary Proceedings, may receive a Plan Distribution pursuant to Section 3.3.2 of the Plan. For purposes of this Liquidation Analysis only, and without prejudice to the parties' rights, the Debtors assume that the outcome of the litigation will not result in holders of Other Secured Claims receiving payment before the Secured Lenders.

O.  The estimated recovery for holders of Class 4 Claims is contingent upon the Bankruptcy Court's approval of the Committee Settlement and the amount of the General Unsecured Claims. To the extent approved by the Bankruptcy Court by a Final Order, the Debtors will incorporate the terms of the Committee Settlement to the Plan, specifically Section 3.3.6 of the Plan.

**Summary of Debtors' Liquidation Analysis - Assuming Plan Confirmation on 11/9/20, Forecasted Effective Date on 11/13/20, and Forecasted Case Closing Date of 1/31/21**

| ($ in thousands) | Notes | Estimated Realization Amounts | | | |
|---|---|---|---|---|---|
| | | Chapter 7 | | Chapter 11 | |
| | | Low | High | Low | High |
| ***Gross Liquidation Proceeds:*** | | | | | |
| Cash and Cash Equivalents | A | 1,432 | 1,432 | 1,432 | 1,432 |
| Future Net Realization on Asset Sales | B | 5,165 | 5,565 | 5,565 | 7,205 |
| **Total Assets/Gross Proceeds** | | $ 6,597 | $ 6,997 | $ 6,997 | $ 8,638 |
| | | | | | |
| ***Less Wind-Down Costs (from 8/31/2020 to Forecasted Effective Date):*** | | | | | |
| Wind-Down Costs (Operating Expenses) | C | (537) | (537) | (537) | (537) |
| Professional Fee Payments During Wind-Down | D | (947) | (947) | (947) | (947) |
| | | | | | |
| ***Less Liquidation Costs (from Forecasted Effective Date to Forecasted Case Closing Date):*** | | | | | |
| General Employee & Overhead Costs: | E | (353) | (398) | (387) | (431) |
| Trustee Fees: | F | | | | |
| Liquidation Trustee Fees | | - | - | - | - |
| Chapter 7 Trustee Fees | | (165) | (176) | - | - |
| Trust Professionals | | (30) | (30) | (30) | (30) |
| **Total Wind-Down and Liquidation Expenses** | | $ (2,033) | $ (2,088) | $ (1,901) | $ (1,946) |
| | | | | | |
| **Net Liquidation Proceeds** | | $ 4,564 | $ 4,909 | $ 5,096 | $ 6,692 |

**Summary of Debtors' Liquidation Analysis - Assuming Plan Confirmation on 11/9/20, Forecasted Effective Date on 11/13/20, and Forecasted Case Closing Date of 1/31/21**

| ($ in thousands) | Notes | Estimated Claims | Estimated Recovery Amounts | | | | Estimated Recovery Rates | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Chapter 7 | | Chapter 11 | | Chapter 7 | | Chapter 11 | |
| | | | Low | High | Low | High | Low | High | Low | High |
| *Estimated Claims and Recoveries:* | | | | | | | | | | |
| *Unclassified* | G | | | | | | | | | |
| U.S. Trustee Fees & Statutory Fees | H | 65 | 65 | 65 | 65 | 65 | 100% | 100% | 100% | 100% |
| Priority Tax Claims | I | 1 | 1 | 1 | 1 | 1 | 100% | 100% | 100% | 100% |
| Professional Fee Claims | J | 3,461 | 3,461 | 3,461 | 3,461 | 3,461 | 100% | 100% | 100% | 100% |
| General Administrative Expense Claims | K | 829 | 829 | 829 | 829 | 829 | 100% | 100% | 100% | 100% |
| **Total Unclassified Claims** | | $ 4,355 | $ 4,355 | $ 4,355 | $ 4,355 | $ 4,355 | | | | |
| | | | | | | | | | | |
| *Classified* | | | | | | | | | | |
| Priority Claims | L | - | - | - | - | - | 0% | 0% | 0% | 0% |
| Tribeca's Secured & Superpriority Administrative Claims | M | 50,218 | 209 | 553 | 741 | 2,337 | 0% | 1% | 1% | 5% |
| Other Secured Claims | N | 6,279 | - | - | - | - | 0% | 0% | 0% | 0% |
| General Unsecured Claims | O | 11,112 | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Interests | | - | - | - | - | - | 0% | 0% | 0% | 0% |
| Intercompany Claims | | - | - | - | - | - | 0% | 0% | 0% | 0% |

## **EXHIBIT 3**

### **Committee Letter**

## <u>LETTER OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF THE PLAN</u>

To:      All holders of Class 4 General Unsecured Claims (including Class 4A, Class 4B, Class 4C and Class 4D under the Plan, together, the "<u>Voting Creditors</u>")

**Re:      In re Hartshorne Holdings, LLC, Case No. 20-40133**

Dear Voting Creditor:

On February 20, 2020, Hartshorne Holdings, LLC and three of its affiliated subsidiaries (collectively, the "<u>Debtors</u>") filed for bankruptcy.  The Official Committee of Unsecured Creditors (the "<u>Committee</u>") represents the interests of the Debtors' unsecured creditors in the bankruptcy cases. You are receiving this letter because you are entitled to vote on the Plan.[1]

The Committee was appointed on March 10, 2020 by the Office of the United States Trustee to represent the interests of all unsecured creditors, including you as a holder of Class 4 General Unsecured Claims, in the Debtors' chapter 11 cases.  Since its appointment, the Committee has dedicated substantial time and effort to understanding the circumstances underlying the chapter 11 cases, interfacing with the Debtors and other stakeholders regarding potential opportunities for the Debtors to maximize the returns to the bankruptcy estates for all unsecured creditors, and representing the interests of unsecured creditors before the Bankruptcy Court.

The Committee recommends that all holders of Class 4 General Unsecured Claims vote to **<u>ACCEPT</u>** the Plan on their Ballots.  The Committee believes that the acceptance of the Plan is in the best interests of the General Unsecured Claims that are entitled to vote on the Plan, and all other parties in interest.

---

**THE COMMITTEE'S RECOMMENDATION TO YOU IS TO VOTE TO <u>ACCEPT</u> (<u>VOTE FOR</u>) THE PLAN.**

**THE COMMITTEE NEEDS YOUR SUPPORT TO RECEIVE THE TREATMENT OFFERED TO HOLDERS OF GENERAL UNSECURED CLAIMS**

**Please contact the Committee's counsel at Whiteford, Taylor & Preston LLP and Dentons Bingham Greenebaum LLP with any questions regarding our recommendation of the Plan: Kelly E. McCauley (412-618-5602; kmccauley@wtplaw.com) April Wimberg (502-587-3719; april.wimberg@dentons.com)**

---

[1] The term "Plan" means the *Joint Chapter 11 Plan of Liquidation for Hartshorne Holdings, LLC and Its Affiliated Debtors* as it may be amended, modified, or supplemented from time to time in accordance with its terms, any Plan Supplement, the Bankruptcy Code, or the Bankruptcy Rules.  Capitalized terms used but not defined herein are ascribed the meanings given to them in the Plan.

### Steps Taken by the Committee to
### Generate Value for Holders of General Unsecured Claims

The Committee has generated value for holders of General Unsecured Claims pursuant to the Plan and the Committee Settlement.

Under the Plan, Holders of Class 4 General Unsecured Claims may receive a *pro rata* share of the proceeds of the Liquidation Trust, although, given the Debtors' current financial situation, such distribution is unlikely. The Committee, however, successfully negotiated the waiver by the Debtors of all Causes of Action under Chapter 5 of the Bankruptcy Code against holders of General Unsecured Claims. If the Plan is approved, the Debtors and the Liquidation Trustee will not be allowed to file legal complaints or Causes of Action under Chapter 5 of the Bankruptcy Code against the holders of a General Unsecured Claim for any amounts the holder received from the Debtors before February 20, 2020.

In addition, the Committee negotiated and reached the Committee Settlement with the Secured Lenders in the chapter 11 cases. The Committee Settlement, if approved, allows holders of General Unsecured Claims to receive some monetary consideration.

A motion seeking approval of the Committee Settlement was filed on September 14, 2020 and the deadline for any party to object to the Committee Settlement is October 5, 2020. The Committee Settlement provides as follows: (1) a claims administrator (the "Claims Administrator") will be appointed to administer a trust estate for the benefit of holders of General Unsecured Claims and to distribute certain settlement amounts to the beneficiaries of the trust; (2) on behalf of the Secured Lenders, the Debtors or the Liquidating Trustee (the "Liquidating Entities") will pay the Claims Administrator $50,000 out of the first dollars recovered by the Liquidation Entities payable to the Secured Lenders if the APA is not approved and $65,000 if the APA is approved, (3) on behalf of the Secured Lenders, the Liquidating Entities will pay to the Claims Administrator 3% of the Net Liquidation Proceeds (as defined in the Committee Settlement) if the APA is not approved and 10% of the Net Liquidation Proceeds if the APA is approved, (4) SP2, an affiliate of the Secured Lenders, will assign to the Claims Administrator 7.5% of the Royalty Interest (as defined in the Committee Settlement), in the event that the APA is not approved and 22.5% in the event that the APA is approved; (5) the Secured Lenders will provide affirmative support to a plan of liquidation of the Debtors' estates that provides for a waiver of the Chapter 5 Claims of action against the General Unsecured Creditors, the Secured Lenders, and SP2, and is otherwise acceptable to the Secured Lenders; (6) mutual releases between the Committee and the Secured Lenders; and (7) the Committee would dismiss its adversary proceeding against the Secured Lenders. If the Committee Settlement is approved by a final order of the Bankruptcy Court, the Debtors will incorporate the Committee Settlement in the Disclosure Statement and the Plan, as applicable.

***The foregoing summary should be read in conjunction with the Disclosure Statement. Holders of General Unsecured Claims should read the Disclosure Statement and the Plan in their entirety, and then make their own respective independent decision as to whether the Plan is acceptable.***

The Debtors have provided you with a Ballot to vote to accept or reject the Plan. To have your vote counted, you must complete and return the Ballot by **October 20, 2020 at 11:59 p.m. (prevailing Mountain Time)** in accordance with the procedures set forth therein. PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT TO THE DEBTORS' ADMINISTRATIVE ADVISOR.

*If you need a new Ballot, please call Stretto at (833) 643-0359 or email Stretto at TeamHartshorne@stretto.com.*

DATED: September 28, 2020                **DENTONS BINGHAM GREENEBAUM LLP**

By: */s/ April A. Wimberg*
James R. Irving
April A. Wimberg
Gina M. Young
3500 PNC Tower
101 South Fifth Street
Louisville, Kentucky 40202
Telephone: (502) 587-3606
Facsimile: (502) 587-3695
Email: james.irving@dentons.com
     april.wimberg@dentons.com
     gina.young@dentons.com

– and –

**WHITEFORD, TAYLOR & PRESTON, LLP**

Michael J. Roeschenthaler (PA Id. No. 87647)
Kelly E. McCauley
200 First Avenue, Third Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 618-5601
Facsimile: (412) 587-3695
    Email: mroeschenthaler@wtplaw.com
     kmccauley@wtplaw.com

*Co-Counsel to the Official Committee of Unsecured Creditors*

3

## **EXHIBIT 4**

**Corporate Organization Chart**

# ORGANIZATIONAL CHART

(Debtor Entities in Blue)



## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will serve notice on all parties registered to receive notice in this case.

/s/ *Edward M. King*
Edward M. King